<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Civ. No. 01-124(DRD) |
| Respondent, | : | |
| | : | **O P I N I O N** |
| v. | : | |
| | : | |
| LEONARD A. PELULLO, | : | |
| | : | |
| Petitioner. | : | |

GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey 07102-5497
        By: Lawrence S. Lustberg, Esq.
        Thomas R. Valen, Esq.
        Attorneys for Petitioner

Christopher J. Christie
United States Attorney
By: Mark W. Rufolo
Assistant U.S. Attorney

        and

Leslie L. Schwartz
Assistant U.S. Attorney
970 Broad Street
Newark, New Jersey 07102
        Attorney for Respondent

**Debevoise, Senior United States District Judge**

There is presently before the court defendant's, Leonard A. Pelullo, petition for relief

pursuant to 28 U.S.C. §2255 filed on January 9, 2001 and his motion to amend his §2255 petition

to assert an ineffective assistance of counsel claim. A long and tangled history leads to the present proceedings.

## I. Background

After a six-week trial defendant was convicted on November 8, 1996 on all of 54 counts of an indictment that charged conspiracy and substantive counts to embezzle funds belonging to employee benefit plans and to launder the proceeds of the embezzlement.

On December 8, 1997 the court sentenced defendant to, inter alia, a term of imprisonment of 210 months. The Court of Appeals affirmed defendant's conviction and sentence on June 15, 1999, United States v. Pelullo, 185 F.3d 863 (3d Cir. 1999). The Supreme Court denied his petition for a writ of certiorari on January 10, 2000, Pelullo v. United States 528 U.S. 1081 (2000).

On November 4, 1999, defendant filed a motion for a new trial pursuant to Fed. R. Crim. P. 33 contending that the government had failed to disclose exculpatory evidence at the time of trial in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963). The bulk of the evidence in question consisted of numerous documents derived from a mind-boggling array of documents which defendant had assembled in a Miami warehouse. They were the accumulated records derived from the innumerable, complex transactions, fraudulent and otherwise, in which defendant had engaged over the years. This court previously described this assemblage of documents as follows:

> Pelullo's method of operation was to conduct his multitudinous business and
> personal transactions through a host of corporate and partnership entities and
> through a dizzying succession of wire transfers, both necessary and unnecessary to
> accomplish an objective. As a result Pelullo was able to conceal the nature of his
> undertakings and deceive those with whom he was dealing, not only the

> Employees Benefit Plans which are the subject of this case, but also others who did business with him.  All of this activity generated mountains of documents, as disclosed by the search of the Miami warehouse.  No one but Pelullo could comprehend it all in its entirety.  He alone, an obviously highly intelligent person, was able to keep track of it all and manipulate it to his advantage.
>
>       . . .
>
> One of the problems in this case is the almost inexhaustible body of materials which relates to it.  There is the mountain of records which Pelullo and his companies generated and which is described above . . ..  As a practical matter no one, either prosecutor or defense counsel, can ever expect to get all of this material under control.  There will always be something more which can arguably be relevant to the issues in this case.

U.S. v. Pelullo, 961 F. Supp. 736, 750-53 (D.N.J. 1997).

On January 9, 2001, one day prior to the expiration of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") one-year period of limitations, defendant filed a petition pursuant to 28 U.S.C. §2255 to vacate, set aside, or correct sentence.  He advanced four grounds in support of his petition: i) the court failed to provide the jury with specific jury unanimity instructions in violation of his Sixth Amendment rights; ii) the court misapplied the sentencing guidelines in that it sentenced defendant pursuant to U.S.S.G. §2S1.1, which is applicable to money laundering, whereas it should have sentenced him pursuant to the embezzlement guideline, which would have produced a shorter sentence; iii) the court improperly amended defendant's judgment of conviction to include forfeiture provisions; and iv) the government failed to present sufficient evidence to support the convictions for money laundering.

The court held oral argument on both the motion for a new trial and on the §2255 petition.  On May 17, 2002 the court issued an opinion and order in which it granted defendant's motion for a new trial, holding that the government had in fact suppressed material information in violation of its Brady obligations.  The court denied the first and the fourth §2255 claims but

3

granted a certificate of appealability on the first.  It did not address the second and the third §2255 claims.

The government appealed from the grant of a new trial.  Defendant appealed the denial of the collateral relief.  Reversing, the Court of Appeals held that in the circumstances of this case the documents the government seized from the Florida warehouse were not suppressed so as to violate Brady[1].  The Court of Appeals affirmed the denial of defendant's §2255 claim.  It remanded the case for reinstatement of defendant's judgment of conviction and sentence and resolution of the remaining issues raised in defendant's §2255 petition.

The Court of Appeals opinion was issued on February 25, 2005.  On February 16, 2005, the Court of Appeals issued an order requesting the parties to address the impact of United States v. Booker, 125 S.Ct. 738 (2005) on this matter.  After the parties provided letter responses the Court issued the following communication:

> We . . . direct that all sentencing matters pertaining to Booker . . . be brought before the District Court in the first instance.  We express no opinion as to the applicability or retroactivity of Booker, or any other related issues.  We leave all of these considerations to the District Court in the first instance.

On remand the court, in accordance with the Court of Appeals mandate reinstated defendant's judgment of conviction and sentence.

## II. Discussion

A. Booker:  It is defendant's contention that he should be resentenced in accordance with Booker.  Booker held that because the Federal Sentencing Guidelines allowed judges to find facts

---

[1] Defendant also challenged the government's failure to turn over documents collected by the Pension and Welfare Benefits Administration.  The Court of Appeals held that their disclosure was not required under Brady.

(other than the fact of a prior conviction) that lead to a greater sentence than that authorized by the facts established by a plea of guilty or a jury verdict, the Guidelines were unconstitutional. The defect was remedied by excising the statutory provision that made the Guidelines mandatory.

When the Court of Appeals remanded this case and directed that matters pertaining to Booker be brought before this court, the Court of Appeals had not yet decided whether Booker was retroactive. Since that time the Court has held, along with other courts, that the law announced in Booker does not apply retroactively to defendants who were in the initial §2255 motion stage as of the date Booker issued. As a new rule of criminal procedure Booker is not applicable to those cases which became final before its rule was announced. Lloyd v. United States, 407 F.3d 608 (3d Cir. 2005); In re: Olopade, 403 F.3d 159 (3d Cir. 2005).

Defendant notes that Booker itself made clear that it must be applied to all cases pending on direct appeal on January 12, 2005, the date the decision was issued. He further notes that on that date his case was pending upon an appeal from the grant of his motion for a new trial under Fed. R. Crim. P. 33. He argues that such motions are to be treated as analogous to direct appeals for retroactivity purposes, at least where the motion was filed before the defendant's conviction was final, as defendant's was. This reasoning is not persuasive. For retroactivity purposes defendant's case became final on January 10, 2000 when the Supreme Court denied certiorari.

B. Motion to Amend: Defendant seeks to amend his §2255 petition to assert an ineffective assistance of counsel claim. It is his contention that his counsel Edward J. Plaza, Esq., and Herbert Beigel, Esq., each "[a]s found by the Court of Appeals failed to obtain the documents, including from the warehouse in Florida, or to conduct a reasonably diligent review of those documents in order to determine whether they contained evidence favorable to Mr.

5

Pelullo." (Proposed Amended Motion to Vacate at Para. 20(a)(iv) and (v)  It is defendant's

further contention that "[h]ad [Mr. Plaza] [Mr. Beigel] reviewed the documents, he would have

discovered evidence that was material and favorable to Mr. Pelullo's defense at trial and/or

sentencing." (Id at (vii) and (viii))  The performance of these two attorneys, according to

defendant, was so defective as to require reversal of his conviction in accordance with the criteria

established in Strickland v. Washington, 466 U.S. 668 (1984).

It will be recalled that defendant's §2255 petition filed on January 9, 2001, advanced four

grounds for relief i) a defective jury charge, ii) misapplication of the sentencing guidelines, iii)

improper amendment of the judgment to add forfeiture provisions and iv) insufficient evidence to

support the money laundering convictions.  Defendant relies upon the liberal amendment

provisions of Fed. R. Civ. P. 15(a) which provide for amendment as a matter of course before a

responsive pleading has been filed, or, after a responsive pleading has been filed, by leave of

court, which, the Rule commands, shall be freely given when justice so requires.  A pleading may

be amended such that added claims "relate back," for statute of limitations purposes, to the date

the original pleading was filed.  Rule 15(c) provides:

> (c) Relation back of amendments.  An amendment of a pleading relates back to
> the date of the original pleading when . . .
>
> (2) the claim or defense asserted in the amended pleading arose out of the
> conduct, transaction, or occurrence set forth or attempted to be set forth in the
> original pleading.

A petition for habeas corpus "may be amended or supplemented as provided in the rules

of procedure applicable to civil actions." 28 U.S.C. §2242.  Rule 11 of the Rules Governing

§2254 cases provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not

inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules."

Fed. R. Civ. P. 81(a)(2) states that the Federal Rules of Civil Procedure apply to "proceedings for . . . habeas corpus . . . to the extent that the practice in such proceedings is not set forth in . . . the Rules Governing Section 2255 Proceedings. Rule 12 of the Section 2255 Rules provides that the Federal Rules of Civil Procedure, "to the extent they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."

Defendant is confronted with the one-year limitation period imposed under the AEDPA. He filed his §2255 petition one day prior to the expiration of that period. Now, four years later, he seeks to amend it with an ineffective assistance of counsel claim that is totally unrelated to any of the original four claims. When he filed his motion he could plausibly argue that his new claim arose out of the same transaction or occurrence as his original petition because the transaction or occurrence in issue was his trial and conviction, relying on Mayle v. Felix, 379 F.3d 612 (9th Cir. 2004). However, the Supreme Court's reversal of the Ninth Circuit Court of Appeal's decision rejected that broad approach and limits relation back to "claims that are tied to a common core of operative facts." Mayle v. Felix, 125 S. Ct. 2562 (2005). In the present case defendant's ineffective assistance of counsel claim is not tied to a common core of operative facts. It has nothing to do with the four claims that were advanced in the original §2255 petition.

Confronted with the Supreme Court decision in Mayle v. Felix, defendant urges that his 1999 Rule 33 motion for a new trial based on asserted Brady violations should be deemed a part of his 2001 §2255 petition, and that because his Brady contentions and his ineffective assistance of counsel claims involved the warehouse documents they are tied to a common core of operative

7

facts, permitting relation back of the proposed amendment.  This argument suffers from two flaws.

First, a Rule 33 new trial motion is not a §2255 petition and is governed by different criteria.  It is irrelevant that for purposes of judicial economy this court and the Court of Appeals considered the two applications at the same time.  As the Court emphasized in Mayle v. Felix, "Congress enacted AEDPA to advance the finality of criminal convictions.  To that end, it adopted a tight time line, a one-year limitation period ordinarily running from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review,' 28 U.S.C. §2244 (d)(1)(A)" 125 S. Ct. at 2573.  It would not serve the statutory purpose to evade this time limit by reading a Rule 33 motion for a new trial into a §2255 petition.

Second, even if defendant's contention that the government violated its Brady obligations were read into his §2255 petition, the Brady claim raised in 1999 is not tied to the common core of operative facts of the ineffective assistance of counsel claim first raised in 2005.

It is true that the warehouse documents come into both claims, but the nature of the two claims is entirely different.  The Brady claim is based upon the government's alleged suppression of exculpatory materials.  It involves what the attorneys and investigators in the United States Attorney's Office did and did not do.  The ineffective assistance of counsel claim, which is in contradiction to what defendant has been arguing for the last five years, must be based on the conduct of the attorneys, trial strategy, the dealings between defendant and his attorneys.  This is not the kind of §2255 amendment which can relate back for time limitation purposes.

Finding that defendant's proposed amendment is procedurally barred, it is unnecessary to determine whether the motion to amend should be denied on the ground of futility.  Foman v. Davis, 371 U.S. 178 (1962).  However, one recurring theme that defendant advances in his memorandum in support of his motion to amend his §2255 petition cannot be allowed to stand without comment.  For example, he refers in his Preliminary Statement to "the Court of Appeals' clear indication in its February 25, 2005, opinion that Mr. Pelullo's ineffective assistance of counsel claim is meritorious" (Memorandum at p.1).  The Court of Appeals would surely be surprised to learn that it had so indicated.

Defendant relies upon a few comments in the Court of Appeals's decision, taken out of context: i) ". . . all this merely begs the question why Pelullo and Plaza failed to review the warehouse documents during the twenty-one month span between December 1994, when Pelullo was indicted, and September 1996, when the trial began . . ."  and ii) the government's actions "in no way absolved the defense of its failure to exercise due diligence during the many months between indictment and trial." (339 F.3d at 214).

To begin with, the Court of Appeals's opinion specifically absolved Mr. Biegel of any failure to review documents, stating ". . . there was no realistic opportunity for Mr. Biegel to review the warehouse documents during the two-week window Pelullo had left him to prepare for trial."  Id.

As far as Mr. Plaza is concerned, the Court of Appeals's opinion, read in full, describes the circumstances under which he worked.  At the outset defendant insisted on representing himself with Mr. Plaza serving as stand by counsel.  It was not until December 1995 that defendant informed the district court that he no longer wanted to proceed pro se and asked the

9

court to appoint Mr. Plaza as counsel. Confronted with the vast number of documents that had already been assembled, in March 1996 Mr. Plaza moved to adjourn the May 1996 trial date to September 1996. The motion was granted and Mr. Plaza conducted his review of these documents.

As for the unassembled documents remaining in the Florida warehouse, the Court of Appeals quoted and adopted the description of those documents contained in this court's 1997 opinion. The Court of Appeals emphasized that portion that read: "No one but Pelullo could comprehend it all in its entirety. He alone, an obviously highly intelligent person, was able to keep track of it all and manipulate it to his advantage." 399 F.3d at 210. The Court of Appeals also quoted and adopted the portion of this court's 1997 opinion that read: "As a practical matter no one, either prosecutor or defense counsel, can ever expect to get all of this material under control. There will always be something more which can arguably be relevant to the issues in this case." Id.

In these circumstances in which the Court of Appeals recognized that only defendant himself could keep track of the mountain of documents in the warehouse, as defendant himself recognized, it cannot fairly be said that "the Court of Appeals has made clear that Mr. Pelullo's trial counsel's failure to investigate deprived him of the use of favorable evidence at trial and sentencing, compromised his defense, and gave rise to an unreliable verdict." (Defendant's Memorandum at p. 7).

C. Applicable Guideline: In his §2255 petition defendant argued that he was incorrectly sentenced under the money laundering guideline and that, instead, he should have been sentenced under the fraud or embezzlement guidelines that reflected the true nature of his offense. He

10

contends that his acts of embezzlement fell outside of the heartland of the money laundering

guideline, U.S.S.G. §291.1, and relies upon the case of United States v. Smith, 186 F.3d 290, 300

(3d Cir. 1999), decided after defendant's appeal had been concluded, which requires that

"District Courts should not automatically apply the money laundering guideline to a group of

offenses that includes a money laundering charge, where the overall conduct is not in the

heartland of the money laundering guideline."

     The government contends initially that defendant is procedurally barred by reason of his

failure to raise the issue on appeal.  However, defendant had cause for not raising the issue at that

time.  At the time of defendant's sentencing, U.S.S.G. §§1B1.1 and 1B1.2 directed the

sentencing court to consult the Statutory Index, Appendix A of the Guidelines Manual for a list

of guidelines that correspond to the statute of conviction.  Appendix A listed §2S.1 as the

guideline applicable to convictions under 18 U.S.C. §1956.  Appendix A, at 417, also provided

that if "in an atypical case" the guideline indicated for the statute of conviction was

"inappropriate because of the particular conduct involved," the court was instructed to use the

guideline "most applicable to the nature of the offense conduct charged."  With this option open

to him, the government argues, defendant should have raised his guideline contention on appeal.

     Smith, however, effected a significant change in the law, sufficiently significant to cause

the Sentencing Commission to override it by amendment of the guidelines.  United States v.

Diaz, 245 F.3d 294, 301-05 (3d Cir. 2001).  There was cause, therefore, for defendant's failure to

raise the issue prior to the Smith decision.  There can be little doubt that there was prejudice.

Without going through the precise calculation of the sentence that would have been imposed

upon defendant under the embezzlement guideline, it can be stated that it would have been

considerably shorter than the 210 months imposed on the money laundering counts. This constitutes prejudice.

Notwithstanding subsequent amendments of the guidelines, Smith must be applied in this case to avoid ex post facto problems, Diaz at p. 305. This requires "a two-step inquiry before applying a particular guideline section.

> 1. Does the designated guideline apply or is the conduct 'atypical' in comparison to that usually punished by the statute of conviction; and
>
> 2. If the conduct is 'atypical' which guideline is more appropriate.

United States v. Bockius, 228 F.3d 305, 311 (3d Cir. 1000). Smith and cases subsequent to it provide guidance in the performance of this inquiry.

In Smith itself Smith was convicted of conspiracy to defraud, interstate transportation of stolen property, causing unlawful interstate transportation with intent to distribute stolen property, and money laundering. The underlying conduct was an embezzlement and kickback scheme. The money laundering was based on the fact that defendant Dandrea wrote out checks on the proceeds of the kickbacks and Smith ordered that many of the checks be made payable to his creditors rather than directly to himself. The district court grouped the four offenses and calculated the sentence under §2S1.1, the guideline applicable to the money laundering count. Reversing, the Court of Appeals observed, "[a]s for Smith, even recognizing that the jury must have thought that he was trying to conceal the scheme by having checks made payable to his creditors rather than to himself . . . that conduct is not within the heartland of the money laundering guidelines for sentencing purposes. Smith's disingenuous efforts towards a cover-up fall far short of the large scale drug laundering or serious crime contemplated by the Sentencing

12

Commission when it drafted U.S.S.G. §2S1.1" 186 F.3d at 300.

In Diaz the defendant was charged with mail fraud, federal student assistance fraud, money laundering, and a false statement in connection with a loan application. The district court sentenced pursuant to the money laundering guideline. On appeal the Court observed generally that:

> We also reject, as we did in Mustafa, Bockius and Cefaratti, a reading of Smith that would limit the use of the money laundering guidelines, U.S.S.G. §2S1.1 and 2S1.2 only to cases involving the proceeds of large-scale drug trafficking and organized crime . . . Rather, Mustafa, Bockius, Cefaratti, and Smith all are in accord that the heartland of the money laundering guidelines includes in addition to drugs and organized crime, cases involving typical money laundering, financial transactions that are separate from the underlying crime and that are designed either to make illegally obtained funds appear legitimate, to conceal the source of the funds, or to promote additional criminal conduct by reinvesting the funds in additional criminal conduct.

245 F.3d at 309-10.

Diaz contrasted the money laundering activity not calling for sentencing under the money laundering guideline.

> . . . the money laundering guidelines are not applicable to ordinary cases of routine fraud, to the simple receipt and deposit or use of illegally obtained funds, or to cases in which any money laundering is not separate from the underlying fraud, but merely an "incidental by product" of that underlying fraud . . . Sentencing under the money laundering guidelines is not appropriate in cases in which the money laundering is minimal when evaluated against the overall offense conduct.

245 F.3d at 310

In Diaz the Court held that Diaz's conduct did not fall within the criteria for a sentence under the money laundering guideline. The owner of a legitimate, for-profit vocational school submitted false forms in order to obtain loan funds. She deposited the funds derived from the

fraud in the school's account from which they were expended for school purposes.  The Court found that the deposit of the fraudulently derived funds, although a violation of the money laundering statute, "was minimal when evaluated against the totality of Diaz's unlawful conduct. At its heart, Diaz's offense conduct consisted of the preparation and submission of fraudulent deferment and forbearance documents and submission of fraudulent student loan applications." 245 F.3d at 311.

The Court cited by way of contrast the cases in which the Court of Appeals found that application of the money laundering guidelines was called for.

In United States v. Cefaratti, 221 F.3d 502 (3d Cir. 2000), the evidence showed that Cefaratti received federal student financial assistance funds on behalf of the Franklin School after the date when, but for the fraud, the school would probably have been terminated from the loan program.  He used the fraudulently derived proceeds to promote further fraud by continuing to receive federal funds to operate the school, including building an addition to the school with federal funds and making payments to some lenders so it would appear that students were not in default.

In Bochius the defendant admitted that he engaged in several acts designed to conceal the illegal source of the money and his ownership and possession of it, including multiple wire transfers, conversion to cash and deposits of small amounts of money in multiple bank accounts.

Similarly in United States v. Mustafa, 238 F.3d 485 (3d Cir. 2001) the defendant's deposits of food stamps were intended to disguise the source and nature of the proceeds of his fraudulent activity and to effectuate concealment of their original source.

A Smith analysis must be applied to the present case.  Count One of the indictment

14

charged defendant with conspiracy with others (i) to embezzle, steal and unlawfully and willfully abstract and convert to his own use and to the use of others approximately $4 million belonging to the employees of Compton Press, Inc. (18 U.S.C. §664) and (ii) to conduct financial transactions that involved the proceeds of that unlawful activity with the intent to promote the carrying on of that unlawful activity, and which were designed in whole, or in part, to conceal and disguise the true nature, location, source, and ownership of such proceeds (money laundering, 18 U.S.C. §1956(a)(1)) all in violation of 18 U.S.C. §371.

Counts Two through Twelve charged that defendant embezzled specified amounts of money belonging to the employees of Compton Press, Inc., on specified dates in violation of 18 U.S.C. §664. Counts Thirteen through Fifty-four charged that defendant conducted specific financial transactions on specified dates which were designed to promote the carrying on of that unlawful activity and which were designed in whole, or in part, to conceal and disguise the nature, location, source, ownership, and control of such proceeds, in violation of 18 U.S.C. §1956(a)(1).

The jury returned a guilty verdict on each of the fifty-four counts. On December 8, 1997, applying U.S.S.G. §2S1.1 for money laundering offenses the court sentenced defendant to concurrent terms of 210 months on each of Counts Thirteen through Fifty-four and sixty months on each of Counts One through Twelve. On the basis of Smith defendant contends that the sentence should have been calculated on U.S.S.G. §2B1.1 governing embezzlement. Had a sentence been imposed under that guideline it likely would have been considerably shorter.

The particulars of defendant's offense are described in considerable detail in United States v. Pelullo, 961 F.Supp. 736 (D.N.J. 1997), aff'd, F.3d (3d Cir. 1997) ( the "1997

15

Opinion"). Defendant and his associates acquired control of Compton Press, Inc., which was engaged in the successful business of high quality color printing and which had established a Retirement Plan and a Thrift Plan for its employees. Defendant and his minions acquired control of these Employee Benefit Plans. He also established a new Compton Press bank account referred to as the "174 Account" over which three of defendant's Florida based employees had signing authority. The three employees were totally subservient to defendant and followed his instructions to the letter.

Defendant employed three principal schemes through which he embezzled funds from the Employee Benefit Plan: i) defendant's withdrawal of funds from the Plans to further his acquisition of DWG Corp., as well as to pay for personal expenses, ii) defendant's drawing upon funds of the Plans to finance his acquisition of the travel agency Away To Travel South and for other purposes and iii) defendant's cashing of the UNUM annuity contract and his use of the proceeds for a multitude of his corporate and other purposes.

The dizzying array of money transfers through banks, trust companies, brokerage houses, law firms and other entities by means of which these embezzlements were accomplished and the proceeds of which were disguised, disbursed, and used to further other purposes are described in the text of the 1997 Opinion and shown on the charts that accompanied the opinion. The DWG Corp. acquisition transactions are summarized at page 742-43 of the 1997 Opinion and in charts G1000 and G1100. The Away to Travel South Transactions are summarized at page 743 of the 1997 Opinion and in charts G2000-G2600. The UNUM Annuity liquidation and transfers are summarized at page 743 of the 1997 Opinion and in charts G 3000, G3100 and G3200.

In addition to looting the Plans, defendant diverted money from the Compton Press for

his own purposes, frequently using the 174 Account controlled by himself through his three

Florida employees.  Certain of the disbursements from that account are shown in charts G2600

and G3100 which accompany the 1997 Opinion.

It is defendant's contention that "[b]ecause Mr. Pelullo's conduct . . .primarily consisting

of alleged acts of embezzlement . . . fell outside of the heartland of the money laundering

guideline, the court should have sentenced Mr. Pelullo under the embezzlement guideline, which

would have resulted in a shorter term of imprisonment." (Defendant's Original Brief at 36).  He

argues that "[t]he disbursement of those funds . . . the facts that made up the substance of the

government's money laundering charges . . . were only an incidental aspect of the offense

conduct." (Id. at 44).  He further contends that "the transactions at issue in this matter generated a

paper trail, inconsistent with the notion of making an effort to 'legitimize' the funds." (Id. at 45,

46).

It is true that the government was able to trace the paper trail that defendant created, but it

took years of effort on the part of a Labor Department expert and Assistant United States

Attorneys to trace the money flow and to establish the exact nature of defendant's crimes.

Subterfuge and concealment from the prior principals of Compton Press and others with whom

defendant was dealing was an obvious purpose of the complex flow of assets and money

described in the testimony and portrayed in the various summary charts introduced into evidence.

These transactions were far from the simple expenditure of fraudulently derived funds described

in Smith and Diaz.

David Hellhake, a close associate of the defendant, testified at trial that defendant's

practice of transferring funds between his various entities was purposefully designed to create

confusion and to "provide a defense" for claims against those entities. (T. 2144)[2].  The deposit

and transfers of funds were hardly minimal when viewed as a part of defendant's scheme to

embezzle $4 million from the Plans.  His manipulation and movement of the funds enabled him

to continue to embezzle additional monies to further his business and personal activities.  The

specific transactions charged in money laundering Counts Thirteen through Fifty Four were each

a part of the concealment program and a means to perpetuate the embezzlement program in

which defendant was engaged.

It would be difficult to conceive of a case in which the financial transactions were more

clearly within the reach of the money laundering statute.  There is no basis for defendant's

contention that U.S.S.G. §2S1.1 applicable to money laundering offenses was inappropriately

applied in his case.

D.  Amendment of the Judgment: Defendant contends that the court lacked jurisdiction

on March 6, 1998, three months after defendant was sentenced and after defendant had filed a

notice of appeal, to amend defendant's judgment of conviction to include a forfeiture provision.

On November 11, 1996, the jury returned a verdict that defendant forfeit $3,562,897 to

the government.  On December 8, 1998 the court held a sentencing hearing and announced the

sentence.  During the course of the proceedings it read certain findings into the record as a part of

its formal statement of reasons.  These findings were set forth in a Rider A to the statement of

---

[2]  Documentation submitted in connection with other proceedings in this case and on the
appeals disclose that defendant used in numerous other transactions in which he engaged the
same tactic of transferring funds and assets through multiple banks, corporate shells, brokerage
houses and other entities.  This resulted in the massive array of documents assembled in the
Florida warehouse which only defendant could fully comprehend and which has been the source
of so much difficulty in this case.  Defendant has used them to advance a number of defensive
ploys, but ultimately they have proved his undoing.

reasons and to the formal judgment. Discussing the question whether a requirement of restitution should be imposed on the defendant, Rider A addressed defendant's ability to pay, a factor that had to be considered along with the loss to the victims. In this context Rider A read:

> At the present time defendant does not appear to have the ability to pay any substantial amount of restitution. He is in bankruptcy. In schedules filed in the Bankruptcy Court his substantial liabilities appear to greatly exceed his substantial assets. <u>He is subject to an order of forfeiture</u> in this case. However, defendant's past business and financial dealings are so complex, it would be unwise to assume that no assets will surface in the future. Consequently it is appropriate to award full restitution in the amount of $893,688. When, and if, defendant's financial affairs are sorted out and it appears he has no assets and no prospects of ever receiving any assets he will be able to seek modification of the restitution order. (emphasis added).

Rider A was read into the record at the hearing and then sentence was imposed. There was no mention of forfeiture in the formal oral sentence. The Clerk's Office prepared the written judgment dated December 8, 1997. It set forth all the terms of the sentence imposed orally, including restitution in the amount of $898,688. Attached to the judgment was a copy of Rider A with its recital that defendant "is subject to an order of forfeiture." The judgment form contains a section entitled "FORFEITURE" with a block to check followed by the words: "The defendant is ordered to forfeit the following property to the United States." The block was not checked and no items to be forfeited were entered. The court reviewed the proposed form of judgment and signed it. It is clear that neither the oral nor the written sentence imposed forfeiture reflecting the

19

jury's verdict.  Defendant filed a notice of appeal on December 9, 1998.

By letter dated January 7, 1998 the government notified the court of the oversight.  By order dated March 6, 1998 the court amended the judgment order pursuant to Fed. R. Crim. P. 36 "to reflect that the defendant has been ordered to forfeit $3,562,897 to the United States."

Rule 36 provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders."  The government argues that even though under Rule 35 errors arising from arithmetical, technical, or other error may only be corrected within seven days after sentencing, clerical errors may be corrected "at any time" under Rule 36, even after a notice of appeal has been filed and the district court has lost jurisdiction.

The problem with the government's position is that the omission of a forfeiture provision is not a clerical error.  It is an error of substance.  Although a written judgment may be amended to conform to an oral sentence, United States v. Werber, 51 F.3d 342, 347 (2d Cir. 1995), the oral sentence, like the written sentence did not impose a sentence of forfeiture; it simply referred to a non-existent order of forfeiture.  There was no clerical error which could be corrected at any time subsequent to filing appeal.  United States v. Katsougrakis, 715 F.2 769, 776 (2d Cir. 1983), cert denied, 464 U.S. 1040 (1984).  Rather there was a sentencing error by the court which could not be corrected under Rule 36.  "However, Rule 36 does not permit amendment of the oral sentence itself, except for a 'mere slip of the tongue' that appears clearly and ambiguously on the record . . ."  Moore's Federal Practice, Third Ed. §636.03[1][c].

Thus it would appear that the court was without jurisdiction to enter the March 6, 1998 order imposing forfeiture in the amount of $3,562,897 upon defendant.

20

## III. Conclusion

For the reasons set forth above i) defendant's motion to file an amended §2255 petition pursuant to Fed. R. Civ. P. 15(a) is denied; ii) defendant's motion for relief pursuant to §2255 on the ground that he was sentenced under the incorrect sentencing guideline will be denied; iii) defendant's motion for relief pursuant to §2255 on the ground that the court improperly amended the judgment of conviction to provide for forfeiture in the amount of $3,562,897 is granted, and the court's order dated March 6, 1998 effecting such amendment and awarding forfeiture will be vacated; iv) in all other respects defendant's petition is dismissed without issuance of a certificate of appealability.

October 20, 2005                                   /s/ Dickinson R. Debevoise
                                                   DICKINSON R. DEBEVOISE
                                                   U.S.S.D.J.