NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | Crim. No. 94-276(DRD) |
| | : | Civ. No. 01-124(DRD) |
| v. | : | |
| | : | |
| LEONARD A. PELULLO | : | **O P I N I O N** |
| | : | |
| Defendant. | : | |
| _____ | : | |

Christopher J. Christie
United States Attorney
By:    Leslie F. Schwartz
        Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
        Attorneys for United States of America

Lawrence S. Lustberg, Esq.
Thomas R. Valen, Esq.
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, New Jersey 07102-5497
        Attorneys for Leonard A. Pelullo

**Debevoise, Senior District Judge**

Defendant, Leonard Pelullo, ("Pelullo) was convicted on charges arising from an

embezzlement scheme involving Compton Press, Inc. ("Compton Press") and its employee

benefit plans.  On December 8, 1997 he was sentenced to a term of imprisonment of 210 months.

On May 17, 2002 this court issued an opinion and order granting Pelullo a new trial on <u>Brady</u>

1

grounds. The Court of Appeals reversed the grant of a new trial on February 25, 2005 and

remanded the case to this court. On May 12, 2005 the court reinstated Pelullo's judgment of

conviction and sentence imposed on December 8, 1997.

Pelullo now moves the court pursuant to Fed. R. Civ. P. 60(b) to vacate the May 12, 2005

judgment of conviction and dismiss the case with prejudice or direct a new trial. He asserts that,

in reliance upon the government's misrepresentations, the Court of Appeals held that the

Department of Labor ("DOL") and its Pension Welfare and Benefits Administration ("PWBA")

were not part of the prosecution team and that, therefore, the government was not required under

Brady to turn over to Pelullo documents held by the DOL and PWBA.

For the reasons set forth below, the court concludes that Pelullo's Rule 62(b) motion must

be treated as a successive § 2255 petition and that this court lacks jurisdiction until the Court of

Appeals issues a certificate of appealability. The court further concludes that Pelullo's motion to

be released on bail should be denied and that there is no basis to take action pursuant to the Rules

of Professional Conduct on account of alleged misrepresentations by the government attorneys to

the Court of Appeals. The court will transfer the Rule 60(b) motion to the Court of Appeals for a

determination whether a certificate of appealability should issue.

## I. Background

On November 4, 1999 Pelullo filed, among other applications, a motion for a new trial

under Fed. R. Crim. P. 33(b)(1) based upon the allegation that the government had failed to make

available to him favorable evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The

evidence consisted of hundreds of thousands of business records that Pelullo had stored in a

Miami warehouse (the "warehouse documents") and documents generated in a civil lawsuit

against Pelullo and others regarding Pelullo's defalcations from the Compton Press benefit plans. Argument on the motion was deferred until after Pelullo pursued document requests under the Freedom of Information Act ("FOIA").

On January 9, 2001 Pelullo filed a petition pursuant to 28 U.S.C. § 2255 alleging that: 1) the court failed to provide the jury with specific unanimity instructions; 2) the court misapplied the sentencing guidelines in that it sentenced Pelullo pursuant to U.S.S.G. § 2S1.1, which is applicable to money laundering, rather than the embezzlement guidelines; 3) the court improperly amended Pelullo's judgment of conviction to include forfeiture provisions; and 4) the government failed to present sufficient evidence to support a conviction for money laundering. On or about October 19, 2001, Pelullo filed a supplemental brief supporting his motion for a new trial based on documents he received pursuant to his FOIA requests, and he filed a brief in support of his § 2255 petition. At the same time, he filed a motion for bail pending determination of his motion for a new trial and his § 2255 petition.

Argument on the motion and petition was held on January 22, 2002, and Pelullo was released on bail pending a decision on the motion and petition. On May 17, 2002 the court issued an opinion granting Pelullo's motion for a new trial based upon alleged Brady violations. The court denied the § 2255 petition for relief on ground one (flawed jury charge) and ground four (insufficient evidence), granting a certificate of appealability on ground one and denying a certificate of appealability on ground four. It did not address ground two (misapplication of the sentencing guidelines) and ground three (amending the judgment to include forfeiture).

The Government appealed the grant of a new trial, and Pelullo appealed the denial of § 2255 relief. The Court of Appeals reversed the grant of a new trial. United States v. Pelullo, 399

F.3d 197 (3d Cir. 2005).

The Court of Appeals decision was directed principally to the question of whether failure of the government to turn over allegedly material documents in the Florida warehouse constituted a Brady violation. For a number of reasons, the Court held that there was no such violation: "(1) the massive amount of documents which belonged to Pelullo; (2) the government's lack of knowledge as to the exculpatory nature of the material contained in the warehouse documents; (3) the defense knowledge of, and access to, the subject documents." 399 F.3d at 216.

The Court of Appeals devoted much less attention to the documents that were generated in the civil lawsuit against Pelullo and others and that were in the possession of the PWBA which had been monitoring the civil suit. The Court referred to its holding in an unpublished opinion in an earlier Pelullo case that "because the 'government is not under an obligation to obtain and disclose all information in the possession of other arms of the government that are not involved in the particular prosecution,' the prosecution was under no obligation to 'ferret out evidence from another pending proceeding with a tenuous connection to the prosecution.'" Id. at 217.

The Court stated that "[t]he question presented, then, is whether PWBA officials who possessed the documents at issue were members of the 'prosecution team' in this case." Id. at 216. Related footnote 20 read:

> Stated somewhat differently, the question is whether the prosecution should be charged with "constructive knowledge" of the evidence held by the PWBA. See United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (holding that "the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it").

Answering that question, the Court of Appeals concluded:

> Applying the general principle set forth in these cases - that the prosecution is

only obligated to disclose information known to others acting on the government's behalf in a particular case - we conclude that the PWBA was not a member of the prosecution team.  There is no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources.  Cf. United States v. Antone, 603 F.2d 566, 569-70 (5th Cir. 1979) (holding that information possessed by state investigator should be imputed to federal prosecutor because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]").  Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents.  And Pelullo's arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team.  Indeed, in Locascio, information was not attributable to the prosecution team, even though it was known to investigators drawn from the same agency as members of the prosecution team.  Likewise here, the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.

Id. at 218 (footnotes omitted).

Footnote 23 is significant in the context of Pelullo's present motion:

> 23.  Because the PWBA was not a part of the prosecution team, the prosecution never had "constructive possession" of the Brady materials.  In United States v. Joseph, we construed "constructive possession" to mean "that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence."  996 F.2d at 39.  We there held that "where a prosecutor has no actual knowledge or cause to know of the existence of Brady material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information."  Id. at 41.  Here, there is no dispute that Pelullo never made a specific request for the PWBA documents, making this case somewhat similar to Joseph.  But whereas Joseph concerned "unrelated" files, this case arguably involves related files.  While that distinction certainly distances this case from Joseph, it does not compel the conclusion (advanced by Pelullo) that Joseph has no bearing on this case.  Joseph concerned a prosecutor's duty to search his own unrelated files for exculpatory material.  This case concerns a prosecutor's duty to search related files maintained by different offices or branches of the government.  Given that the PWBA was not a member of the prosecution team, it would be accurate to say that the prosecution never had "constructive possession" of the PWBA documents.

Id.

The Court of Appeals also noted that it did not reach the issue of whether Pelullo's <u>Brady</u> claim would be defeated even if the prosecution were charged with knowledge of the PWBA documents:

> We note that, even if the prosecution is charged with knowledge, either actual or constructive, of the PWBA documents, Pelullo's <u>Brady</u> claim would still fail if he could have obtained the information through the exercise of reasonable diligence. While the public nature of these documents, generated as they were during the course of two civil actions, suggests that Pelullo had sufficient access to the documents to defeat his <u>Brady</u> claim, we need not reach that issue in light of our holding here.

<u>Id</u>. at 219 n. 24.

Thus with respect to Pelullo's Rule 33 new trial <u>Brady</u> motion, the bulk of the opinion was devoted to the warehouse documents, which the Court held were not suppressed. As to the PWBA documents, which Pelullo never specifically requested and which were generated in cases in which he, or one of his companies, was a party, the Court ruled that because the PWBA was not a part of the prosecution team, the prosecution never had "constructive possession" of the <u>Brady</u> materials. It did not rule on the question of whether Pelullo had sufficient access to those documents to defeat his <u>Brady</u> claim.

The Court of Appeals reversed this court's grant of a new trial and directed this court to reinstate Pelullo's judgment of conviction and sentence. Further, it directed that this court "as a priority matter, give serious consideration to vacating its Order of January 29, 2002, which had released Pelullo on bail." <u>Id</u>. at 201-02.

The Court of Appeals then turned to the separate appeal, namely, Pelullo's appeal from the denial of his § 2255 petition for collateral relief. It addressed Pelullo's challenge to the jury instruction relating to Count 1, which did not require that there be a unanimous jury decision

either as to the object of the conspiracy or as to the particular schemes alleged. The Court held that Pelullo was procedurally barred from raising the issue and that the Court properly dismissed this ground of his § 2255 petition pursuant to <u>United States v. Frady</u>, 456 U.S. 152 (1982). It affirmed the denial of collateral relief and remanded the matter for resolution of the remaining issues raised in Pelullo's § 2255 motion.

In accordance with the Court of Appeals's mandate, on May 12, 2005 this court entered an order reinstating the judgment of conviction and sentence imposed upon Pelullo on December 8, 1997 and also revoked Pelullo's bail. The court rejected Pelullo's argument that the intervening Supreme Court decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005) rendered it inappropriate to impose a sentence (albeit a reinstated sentence) that relied on facts (apart from the fact of conviction) not found by a jury. Pelullo appealed the May 12, 2005 order, raising the <u>Booker</u> issues.

On October 21, 2005 the court issued an opinion that disposed of the unresolved grounds of Pelullo's § 2255 petition and certain new issues that Pelullo had raised. The court denied the § 2255 claim that he was incorrectly sentenced pursuant to the money laundering guidelines rather than the embezzlement guidelines, ruling that "it would be difficult to conceive of a case in which the financial transactions were more clearly within the reach of the money laundering statute." (Oct. 21, 2005 Opinion at 18). The Court granted Pelullo's § 2255 claim that his judgment of conviction had been improperly amended to include a forfeiture provision. Further, the court rejected Pelullo's contention that he should be sentenced under <u>Booker</u>, holding that, for retroactivity purposes, his judgment became final on January 10, 2000, when the Supreme Court denied certiorari from his direct appeal. The court denied Pelullo's motion to amend his §

2255 petition to add a claim of ineffective assistance of counsel, finding that this new claim was unrelated to any of his four original § 2255 claims.

The court denied a certificate of appealability as to all claims. Pellulo appealed the October 21, 2005 ruling and moved in the Court of Appeals for issuance of a certificate of appealability.

There are now pending in the Court of Appeals Pelullo's appeal of the May 12, 2005 reinstatement of conviction and sentence, Pelullo's appeal of the denial of his § 2255 petition and denial of his motion to amend the petition, and Pelullo's motion for issuance of a certificate of appealability regarding the denial of the § 2255 claims.

## II.  Rule 60(b)(3) Motion

On or about May 12, 2006 Pelullo filed his motion for relief, pursuant to Fed. R. Civ. P. 60(b), in which he moves the court to vacate the May 12, 2005 judgment of conviction with prejudice or direct a new trial. Pelullo notes that in opposition to his prior motion for a new trial, as well as on appeal of the court's grant of a new trial, the government asserted that the DOL and the PWBA were not part of the prosecution team. Based on the government's assertions regarding the limited role of the PWBA investigators, the Court of Appeals accepted the government's arguments and found that the PWBA was not part of the prosecution team and, therefore, that the PWBA documents withheld from Pelullo did not constitute Brady material.

Since May 12, 2005 Pelullo has obtained, through FOIA requests, documents that he claims demonstrate that the government misrepresented the role of the PWBA and that the PWBA was, in fact, an integral part of the prosecution team. Pelullo pointed out that the government represented in its Third Step Brief to the Court of Appeals that "the PWBA officials

who possessed the documents at issue were not members of the prosecution team in this case." In reliance upon this representation, the Court concluded:

> There [is] no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources. . . Nor [is] there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents . . . [t]hat other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team.

399 F.3d at 218. According to Pelullo, the Court of Appeals was led to believe that the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.

It is Pelullo's contention that the multitude of documents recently acquired through FOIA since May 12, 2005 (the "recent FOIA documents"), in conjunction with those already submitted to the court, establish that DOL and PWBA employees who led the civil investigation were intimately involved in the criminal investigation and prosecution and must be deemed part of the prosecution team.

Pelullo contends that the government misrepresented the roles of PWBA Agents Robert Goldberg ("Goldberg") and Carmine P. Pascale ("Pascale"). In an August 6, 2004 letter from Assistant U. S. Attorney Mark Rufolo ("AUSA Rufolo") to Pelullo's attorney, Lawrence S. Lustberg, Esq., ("Lustberg") AUSA Rufolo wrote:

> As the Government explained in its Third Step Brief, a PWBA employee named Robert Goldberg <u>was assigned to provide accounting expertise to the prosecution team in this case.</u> As the Government also explained, although Mr. Goldberg worked in the same large federal agency, the PWBA, that employed the persons who were monitoring the civil lawsuits against Pelullo that arose from the charged criminal conduct in this case, <u>Mr. Goldberg had no involvement in the monitoring of the civil lawsuits.</u> Nor did Mr. Goldberg ever have custody or control of any of the documents

pertaining to those lawsuits that were collected by other PWBA officials on the "civil side" of the agency.

Mr. Pascale's involvement in this case terminated before either of the prosecutors who handled the trial, Assistant United States Attorneys Mark Rufolo and Leslie Schwartz, were assigned to this case. Mr. Pascale was Mr. Goldberg's predecessor in the criminal investigation, and provided similar services to the prosecution team that Mr. Goldberg later provided. We have further determined that, like Mr. Goldberg, Mr. Pascale was not privy to the activities of the PWBA officials who were monitoring the civil lawsuits. Accordingly, Mr. Pascale's involvement in the investigation of Mr. Pelullo does not alter the Government's position that any information in the PWBA documents collected by civil investigators is not attributable to the prosecution team for purposes of assessing the Government's disclosure obligations under Brady v. Maryland and its progeny.

Pelullo relies on a number of documents that, he asserts, demonstrate that Goldberg and Pascale played more active and integral roles on the prosecution team than just providing accounting services:

i) A June 13, 1997 affidavit of AUSA Rufolo described an interview with government witness Fred Schwartz that Special FBI Agent Richard D. Mohr, ("SA Mohr") Goldberg, and DOL Agent Rosario Ruffino ("Ruffino") attended;

ii) A December 23, 1996 verification of government witness Jan Larson stated that she was interviewed by the government at a session attended by AUSA Rufolo, SA Mohr, Ruffino and Goldberg;

iii) Documents establish that these interviews were held in Florida to prepare witnesses for trial, not for accounting related purposes;

iv) An April 3, 1992 letter from the attorney for the intervening trustees in the Pelullo civil case, addressed to the PWBA at the address to which the government corresponded with

Pascale, included material referring to the report of handwriting expert Gus R. Lesnevich, a material document having nothing to do with accounting;

v) A PWBA memorandum of July 3, 1990 authored by Pascale summarized conversations he had with attorneys for Gerardi and McQueen and the attorney for the Compton Press participants in the Pelullo civil case, and other documents, demonstrated that Pascale had communications with their attorneys and with the attorneys for the trustees concerning various phases of that action.

It is Pelullo's contention that these documents demonstrate that Goldberg and Pascale provided more than accounting services and in fact possessed material documents from the Pelullo civil cases and interacted with witnesses in preparation for the criminal trial.

Pelullo further contends that the recent FOIA documents establish that PWBA agents who received material documents were part of the prosecution team and that there was overlap between the civil and criminal investigating teams. Certain documents acknowledge that Pascale and Ruffino of the PWBA were part of this prosecution team. Pelullo contends that other documents show that PWBA agent Michael Briglia ("Briglia") was also a member of the prosecution team and maintained contact with the attorneys working on the civil case to garner information. There is an FBI document that refers to the "joint FBI-Department of Labor investigation" of Pelullo. In support of a request for Certificates of Appreciation, the SAC, Newark, wrote:

> During this investigation Investigator [redacted] United States
> Department of Labor (USDL) and retired USDL Investigator
> [redacted] along with Special Agent (SA) [redacted] FBI, Newark
> worked together as a team to convict Pelullo.

Investigator [redacted] and [redacted] who was expressly brought
back to Government service following his retirement because of
his expertise, effectively wove their way through a myriad of
pension laws and regulations to establish criminality.  Along with
SA [redacted] their tiredless [sic] efforts proved successful.  The
United States Attorney, District of New Jersey, wrote to the SAC,
Newark and noted

> "The success of this prosecution
> depended in large measure on the
> varied expertise of the agents from
> both the FBI and the United States
> Department of Labor.  These talents
> were successfully molded as a result
> of the spirit of cooperation exhibited
> by both agencies."

Based on the prosecutive [sic] results of this investigation, it is
respectfully submitted that Investigator [redacted] and [redacted]
be each provided a Certificate of Appreciation.

Other documents reflected that members of the prosecution team other than Pascale,

Briglia and SA Mohr were involved in monitoring and investigating the civil cases.  Frank

Agostino, Esq., attorney for the class plaintiffs in the civil action, executed on January 21, 1997

an affidavit in which he described the continuing and extensive exchange of information that

took place between himself, an attorney in the civil action, and the AUSAs and DOL personnel

working on the Pelullo prosecution.

Apart from the contention that the government misrepresented the relationship between

the prosecution and the PWBA, Pelullo asserts that recent FOIA documents reveal that the

government falsely represented throughout all pretrial proceedings that Ruffino constructed the

charts which diagrammed the flow of money from Compton Press and its employee funds to

Pelullo.  See United States v. Pelullo, 961 F. Supp. 736, 742 (D.N.J. 1997). Describing these

funds in his testimony, Rosario stated that he prepared the charts and that he had no other charts.

Pelullo refers to documents that the FBI prepared that refer to flow charts furnished to AUSA Jose Sierra ("AUSA Sierra") representing the embezzlement of $6 million worth of pension funds, to computer charts that were made by the FBI and DOL concerning the embezzlements, and to a February 2, 1993 memorandum authorized by SA Mohr which reported AUSA Sierra's pleasure with FBI and DOL charts indicating the flow of money into Pelullo's personal possession. These documents, Pelullo argues, demonstrate either that Ruffino lied when he testified that he prepared the critical chart in this case, or he lied when he asserted that there were no other financial flow charts.

Pelullo's final contention is that despite AUSA Rufolo's statement to the court at a September 24, 1996 hearing that he had turned over whatever 302s he had for witnesses that would be called, and that despite SA Mohr's affidavit that he did not take any notes or prepare any 302 interview reports, the recent FOIA documents establish that during the course of the joint FBI-DOL investigation, or other Pelullo investigations, numerous memoranda concerning witness interviews had been authored.

### III. Jurisdiction

When addressing the serious jurisdictional questions in this case, it is necessary to consider the challenged May 12, 2005 reinstated judgment of conviction separately from the other multi-faceted proceedings that were considered along with the Fed. R. Civ. P. Rule 33 motion.

In its May 12, 2005 decision, in accordance with the Court of Appeals mandate, the court reinstated the judgment of conviction and sentence imposed upon Pelullo on December 8, 1997.

13

The Court of Appeals had reversed this court's granting of Pelullo's Rule 33 new trial motion which was based on alleged <u>Brady</u> violations. The alleged <u>Brady</u> violations were failure to turn over material Florida warehouse documents and failure to turn over material PWBA documents. With respect to each category of documents, the Court of Appeals held that neither the warehouse nor the PWBA documents were suppressed by the government.

To establish a due process violation under <u>Brady</u>, "a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." <u>United States v. Dixon</u>, 132 F.3d 192, 199 (5th Cir. 1997) (citations omitted); <u>see</u> <u>also</u> <u>United States v. Higgs</u>, 713 F.2d 39, 42 (3d Cir. 1983). Because the Court of Appeals limited its discussion to a determination of whether <u>Brady</u> material was suppressed by the government - holding that it was not - it did not reach the question of the materiality issue either with respect to the warehouse documents or with respect to the PWBA documents. Further, as to the PWBA documents, the Court of Appeals observed that "even if the prosecution is charged with knowledge, either actual or constructive, of the PWBA documents, Pelullo's <u>Brady</u> claim would still fail if he could have obtained the information through the exercise of reasonable diligence. While the public nature of these documents, generated as they were during the course of two civil actions, suggests that Pelullo had sufficient access to the documents to defeat his <u>Brady</u> claim, we need not reach that issue in light of our holding here." 399 F.3d at 219 n. 24.

Thus, the May 12, 2005 reinstatement of sentence, which Pelullo challenges, concerns only a resolution of Pelullo's Rule 33 motion for a new trial on <u>Brady</u> grounds. Pelullo does not challenge the Court of Appeals' ruling on the warehouse documents. He challenges only its

ruling on the PWBA documents. If the challenge based on that aspect of the Court of Appeals' opinion is to be heard, there will have to be an evidentiary hearing to determine, among other things:

i) the identity of the PWBA documents that Pelullo contends were withheld;

ii) the date or dates when Pelullo received information that the documents had been withheld in order to determine if his Rule 60(b) motion was filed within the one year period mandated by Rule 60(b)(3) or within the reasonable time mandated by Rule 60(b)(6).

iii) the materiality of the documents that Pelullo contends were withheld.[1]

iv) whether Pelullo had sufficient access to the PWBA documents to defeat his Brady claims.

Thus, the May 12, 2005 reinstatement of the judgment of conviction was predicated upon the Court of Appeals' reversal of this court's granting of Pelullo's Rule 33 motion for a new trial. Pelullo's Rule 60(b) motion challenges the disposition of the Rule 33 motion and for relief "seeks to be relieved of the judgment of conviction, i.e., the May 12 Order, that was garnered

---

[1] The Court of Appeals did not address the question of the materiality of the allegedly withheld Florida warehouse and PWBA documents. This court, in its May 17, 2002 opinion granting Pelullo's motion for a new trial on Brady grounds, made findings as to the materiality of certain documents. Those findings can no longer by relied upon in light of the intervening Court of Appeals opinion and in light of the evidence that has been introduced during the course of this motion and the § 2255 proceedings. Part of the new evidence was the documents that were the subject of Pelullo's motion in the Court of Appeals to expand the record. When this court, on remand of the motion, considered the documents, it observed that a recent opinion of the Court of Appeals may have raised the question of whether the court had imposed an unreasonable burden on the government and stated that the documents might provide grounds for excusing any Brady violations because "[i]t would be a strange outcome if a defendant whose many fraudulent schemes created a number of mountainous piles of documents in several jurisdictions, could escape conviction because, as a practical matter, no United States Attorney's Office prosecuting one of the frauds could put its hands on every single possibly relevant document."

through the government's misconduct."  (Page 5 of Pelullo's Rule 60(b) Brief.)

As a separate matter, the Court of Appeals also ruled on Pelullo's appeal from the court's partial denial of his petition for § 2255 collateral relief.  The issues raised in that petition, described above, had nothing to do with allegedly withheld PWBA documents.  On October 11, 2005, after reinstatement of the judgment of conviction, this court, in accordance with instructions of the Court of Appeals, issued an opinion that disposed of the unresolved grounds of Pelullo's § 2255 petition and certain new issues that Pelullo had raised.  The court denied the § 2255 petition, as described above, and denied a certificate of appealability.  The denial of the petition is now on appeal and Pelullo has moved in the Court of Appeals for a certificate of appealability of that denial.

The questions that must now be resolved is whether Rule 60(b) provides this court with jurisdiction to grant the relief Pelullo seeks.

Pelullo relies principally, but not exclusively, upon Rule 60(b)(3), which permits a court to relieve a party from a final judgment for fraud, misrepresentation, or other misconduct of an adverse party.  A motion asserting this ground for relief must be brought not more than one year after the judgment was entered.  Pelullo asserts that the fraud and misrepresentation in this case was the government's assertions to the Court of Appeals in connection with the appeal of the Rule 33 order that the PWBA was not a part of the prosecution team and that the misrepresentation prevented him from fully and fairly presenting his case.

Pelullo addresses the government's contention that Rule 60(b) is applicable in civil cases and generally is an inappropriate vehicle to obtain relief from a judgment in a criminal case. United States v. Mosavi, 138 F.3d 1365 (11th Cir. 1998).  To a limited extent, Pelullo points out,

the Fed. R. Civ. P. apply to proceedings involving criminal cases, specifically, to habeas corpus proceedings: "These rules are applicable to proceedings for . . . habeas corpus . . . the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Proceedings . . ." <u>Fed. R. Civ. P.</u> 81(a)(2).

It is at this point that the prior post-trial proceedings in this case must be distinguished. There was the Rule 33 motion for a new trial based on alleged <u>Brady</u> violations that was filed on November 4, 1999; argued on January 22, 2002; and decided in a May 17, 2002 district court opinion and order that was reversed by the Court of Appeals on February 25, 2005.  In accordance with the Court of Appeals' mandate, on May 12, 2005, the district court reinstated the judgment of conviction and sentence that were the subject of the Rule 33 motion.

Parallel, but substantively totally separate from the Rule 33 motion, was Pelullo's § 2255 petition.  It was often argued in conjunction with the Rule 33 motion, and, on occasion, it was the subject of an opinion that also dealt with the Rule 33 motion.  That in no way converted the Rule 33 motion into a § 2255 petition.

In <u>Pridgen v. Shannon</u>, 380 F.3d 721 (3d Cir. 2004), the Court of Appeals set forth the circumstances when a Rule 60(b) motion should be deemed a § 2255 petition for the purpose of determining the applicability of the statutory provisions governing § 2255 proceedings set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  In <u>Pridgen</u>, the Court held that to the extent that a Rule 60(b) motion:

> "attacks the manner in which the earlier habeas judgment was procured and not the underlying conviction, the Rule 60(b) motion may be adjudicated on the merits.  However, when the Rule 60(b) motion seeks to collaterally attack the petitioner's underlying conviction, the motion should be treated as a successive habeas

> petition.  We believe that this rule is consonant with Congress's
> goal of restricting the availability of relief to habeas petitioners."

380 F.3d at 727.

During the course of these proceedings, Pelullo's characterization of the nature of his Rule 60(b) motion has metamorphosed.  In his Amended Memorandum in Support of Defendant's Motion, Pelullo "moves this Court to vacate the May 12, 2005 judgment of conviction in the matter and dismiss the case with prejudice or direct a new trial." (at p. 1).  He states he "now presents the motion pursuant to Federal Rule of Civil Procedure 60(b), in which he seeks relief from the May 12 Order, based upon recently garnered FOIA documents not personally reviewed by the Court of Appeals."  <u>Id</u>. at 5.  Further, "Mr. Pelullo seeks to be relieved of the judgment of conviction, i.e., the May 12 Order, that was garnered through the government's misconduct."  <u>Id</u>. at 5.  Similar language appears throughout Pelullo's Amended Memorandum.

Further in his quest to obtain relief from the May 12, 2005 reinstatement of the judgment of conviction, Pelullo relied upon three grounds that had nothing to do with the alleged representations to the Court of Appeals.  Pelullo asserts that recently received documents demonstrate that the government's representations and DOL Agent Ruffino's testimony that he and AUSA Rufolo prepared the all-important flow charts were false.  Pelullo alleges that recently discovered documents disclose that the government withheld FBI memoranda and falsely represented that no other memoranda existed other than DOL memoranda relating to three interviews, plus another two memoranda about persons who did not testify.  Finally, Pelullo argues that his conviction should be set aside upon the basis of documents and depositions

secured in two civil lawsuits filed against Kenneth Falk, Esq. and his law firm, Wilentz, Goldman & Spitzer - documents that were not created until after Pelullo's conviction.

Pelullo's characterization of his Rule 60(b) motion changed significantly in his reply to the government's opposition brief and in his counsel's argument at the hearing on the motion. He no longer phrases the relief sought as vacation of the judgment of conviction. Rather, he "requests the Court to reopen this matter . . . so as to permit a new trial . . ." (Reply Br. at 2). As to his grounds for relief that are unrelated to the alleged misrepresentations to the Court of Appeals and clearly should be the subject of a § 2255 petition, Pelullo writes in a footnote:

> If any aspect of Mr. Pelullo's claims, including those concerning the creation of flow charts and disclosure of FBI 302s, *see* Amended Rule 60(b) Brief, pp. 20-25, were to be deemed to be beyond the Court's power to redress through this application, Mr. Pelullo respectfully requests that he be permitted either to "amend [] his petition to delete those [second or successive] claims so he can proceed with the claims that require no authorization," *Winestock*, 340 F.3d at 206 (citation omitted), or transfer the matter to the Court of Appeals, as suggested by the government, *see* Gov't Opp. Brief, p. 25, pursuant to Local Appellate Rule 22.5(h) and 28 U.S.C. § 1631, where his claims should be allowed to proceed under 28 U.S.C. § 2255, *see Workman v. Bell,* 245 F.3d 849, 852 (6th Cir. 2001) ("the court can reconsider the petition if there was a fraud upon the court").

(Reply Br. at 7-8, par. 2).

Addressing the government's contention that, under <u>Pridgen</u>, his Rule 60(b) motion is in reality a second or successive § 2255 petition requiring issuance of a Court of Appeals certificate of appealability, Pelullo, in his reply papers, contends that his Rule 60(b) motion does not focus at all upon his underlying conviction, or the actions of the trial court, but rather upon the government's conduct during the course of the combined post-conviction motion practice under

Federal Rule of Criminal Procedure 33(b)(1) and § 2255 and subsequent appeal. He invites the court to view the Rule 33 motion and the § 2255 petition as one and the same proceeding. In the same vein, he argues that the Rule 33 motion should be deemed a § 2255 petition, and, because it was filed before the actual § 2255 petition, it should not be deemed a second or successive petition.

Pelullo advances a number of reasons why the court should hear his motion in order to accomplish the ends of justice and avoid insulating the government's conduct from judicial review. He notes that courts have held that a motion for a new trial under Fed. R. Civ. P. 33 is functionally the equivalent of a § 2255 motion, e.g., United States v. Evans, 224 F.3d 670, 673-74 (7th Cir. 2000), and that the instant motion seeks a remedy for a defect in the collateral review process. United States v. Winestock, 340 F.3d 200, 207 (4th Cir. 2003) (a proper Rule 60(b) motion seeks "a remedy for some defect in the collateral review process"). Pelullo argues that the court could proceed under Rule 60(b)(6) which "permits a district court to vacate a judgment whenever such action is appropriate to accomplish justice." Wilson v. Fenton, 684 F.2d 249, 251 (3d. Cir. 1982) (citing Klapprott v. United States, 335 U.S. 601, 615 (1949)). Further, Pelullo urges the court, if necessary, to treat his motion as an independent action to challenge a criminal conviction obtained through fraud upon the court, a proceeding that would be justified where necessary "to prevent a grave miscarriage of justice," citing Burke v. United States, 1999 WL 1065217 at *2 (E.D. Pa. Nov. 23, 1999).

The court will reject Pelullo's creative jurisdictional arguments and decline to reshape the proceedings that have been pursued in this case since November 4, 1999, when the Rule 33 motion was filed, in order to acquire jurisdiction over Pelullo's Rule 62(b) motion at this time.

As has been described in detail above, even though Pelullo's Rule 33 motion and his § 2255 petition have often been considered at the same time, they were, and are, two separate and distinct applications, and each should be considered in accordance with the rules of law applicable to it.

The § 2255 petition was filed on January 9, 2001 and proceeded in this court, after which it was the subject of appeal and further proceedings in this court. It is now once again pending in the Court of Appeals.

The Rule 33 motion, filed on November 4, 1999, was a part of the criminal proceeding. Granting that motion would result in vacating the original judgment of conviction and holding a new trial. Proceedings on that motion remained a criminal proceeding through the appellate process until, on May 12, 2005, this court, in accordance with the Court of Appeals mandate, reinstated the original December 8, 1999 conviction and sentence. It, too, is now on appeal.

Pelullo's Rule 62(b) motion is a collateral attack on the underlying conviction that was the subject of the Rule 33 motion. Consequently, in accordance with <u>Pridgen</u>, the motion must be treated as a successive § 2255 petition. Treated as such, before seeking relief in this court, Pelullo must move in the Court of Appeals for an order authorizing this court to consider the motion. <u>In re Olabode</u>, 325 F.3d 166, 169 (3d Cir. 2003 (citing 28 U.S.C. §§ 2244(b)(3)(A) and 2255). Thus, Pelullo is not without a means of raising his claims of misrepresentation in the Court of Appeals. To facilitate that review, the court will transfer his Rule 62 (b) motion to the Court of Appeals pursuant to Rule 22.5(b) of the Local Appellate Rules of the Third Circuit and 28 U.S.C. § 1631.

Pelullo also moves for release on bail pending disposition of his appeals from the court's

orders of May 12, 2005 and November 1, 2005 and transfer of his Rule 60(b) motion. His

application for bail is premised upon the seriousness of the issues presented in applications

pending before both the Court of Appeals and this court. Among the issues before the Court of

Appeals is whether the rules announced in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), and

<u>Booker</u>, apply retroactively to cases that were pending on collateral review when the Supreme

Court decided those cases. In June 2006, the Supreme Court granted certiorari in a case raising

those issues. <u>Burton v. Waddington</u>, U.S. Supreme Court Docket No. 06-9222, 2006 WL

393368, 74 U.S.L.W. 3673, 3676 (June 5, 2006).

In light of the court's disposition of Pelullo's Rule 60(b) motion, his application is solely

one for bail pending appeal.

His application for bail pending appeal is governed by 18 U.S.C. § 3143, which states that

a defendant shall be granted bail pending appeal if the Court finds:

  (A)    by clear and convincing evidence that the person is not
likely to flee or pose a danger to the safety of any other
person or the community if released . . . and

  (B)    that the appeal is not for purpose of delay and raises a
substantial question of law or fact likely to result in:

        (i)     reversal,

        (ii)    an order for a new trial,

        (iii)   a sentence that does not include a term of
imprisonment, or

        (iv)   a reduced sentence to a term of
imprisonment less than the total of the time
already served plus the expected duration of
the appeal process.

18 U.S.C. § 3143(b)(1).  See also United States v. Messerlian, 793 F.2d 94, 95-96 (3d Cir. 1986);

United States v. Miller, 753 F.2d 19, 24 (3d Cir. 1985).

On the occasion of the reinstatement of Pelullo's judgment of conviction and sentence

imposed on December 8, 1997, the court ordered that bail be revoked, finding that Pelullo did not

meet the requirements of 18 U.S.C. § 3143.  Although Pelullo was found not likely to flee, and in

view of his exemplary family, community, occupational and religious life during his period of

release on bail extending from February 2002 to June 2005, he was found unlikely to pose a

danger to the community, he did not meet the criteria set forth in paragraph b(1)(B) of § 3143.

Pelullo asserts that two factors point to a different conclusion as to the paragraph b(1)(B)

factors - i) the Supreme Court's granting of certiorari in Burton v. Waddington, 142 Fed. Appx.

297 (9th Cir. 2005), cert. granted, 126 S. Ct. 2352 (2006), and ii) the filing of his Rule 62(b)

motion.

Neither event calls for departure from the court's earlier determination that the pending

appeals do not raise a substantial question of law or fact likely to result in one of the paragraph

b(1)(B) events.  It is unlikely that the Supreme Court, when deciding Burton v. Waddington, will

rule differently on the Booker retroactivity question from the Courts of Appeals which have

addressed that question, all of which have held that the rule does not apply retroactively to cases

on collateral review because the rule constitutes a new rule of criminal procedure.

The court does not yet have jurisdiction of the Rule 60(b) motion.  Even if the motion

were before the court, consideration of Pelullo's papers submitted to date does not suggest that

he has raised substantial claims on which he has a high probability of success or that

extraordinary or exceptional circumstances exist which make the grant of bail necessary to make

the habeas remedy effective.  <u>Landano v. Rafferty</u>, 970 F.2d 1230, 1239 (3d Cir. 1992), <u>cert</u>.

<u>denied</u>, 506 U.S. 955 (1992).

Accordingly, Pelullo's motion for release on bail pending appeal and disposition of his

motion for relief pursuant to Rule 60(b) will be denied.

## IV.  **Rules of Professional Conduct**

The court's duties in this case do not end with a finding of lack of jurisdiction.  Pelullo

has accused the Assistant United States attorneys handling the criminal case against him and the

appeal of the order granting him a new trial of sustained and deliberately false representations to

this court and to the Court of Appeals.  Such conduct would constitute a serious violation of the

New Jersey Rules of Professional Conduct, ("NJRPC") which govern the members of the bar

admitted to practice in this court.  L. Civ. R. 103.1(a).

Under NJRPC 8.3(a), a lawyer who knows that another lawyer has committed a violation

of the Rules of Professional Conduct shall inform the appropriate professional authority.  Canon

3.B(3)(b) of New Jersey's Code of Judicial Conduct provides that "[a] judge having knowledge

that a lawyer has committed a violation of the Rules of Professional Conduct should take

appropriate action."[2]

The court must, therefore, examine the evidence Pelullo has advanced in support of his

false representation charges to determine if action by the court is required.

In its responding papers, the government vigorously denies that it made

---

[2]  L. Civ. R. 103.1 provides that "[t]he Code of Judicial Conduct of the American Bar
Association shall govern the conduct of the Judges of this Court, subject to such modifications as
may be required or permitted by Federal statute, regulation, court rule or decision of law."  The
New Jersey Supreme Court adopted the Code of Judicial Conduct of the American Bar
Association, as amended by the Court.

misrepresentations to the Court of Appeals.  Because it relies, appropriately as it turns out, upon

its contention that the court lacks jurisdiction of this motion, it did not mount a full scale rebuttal

of Pelullo's assertion that the Court of Appeals, when it decided the appeal, relied on the

government's fraudulent misrepresentation that the DOL or PWBA was not "a part of the

prosecution team."  Because the documents that support Pelullo's motion contain language that,

when viewed in isolation, would seem to contradict this representation, and because such a

willful representation by the government would be a serious matter requiring action by the court

independent of Pelullo's motion, the court has examined with care the proofs that Pelullo

produced to determine if it should take action at this time.

At the outset, it is necessary to recognize that during the course of the appeal the attorneys

handling the case for the government were misinformed about the role of at least one PWBA

employee, Pascale.  In an August 6, 2004 letter (E1)[3] to Pelullo's attorney, Lustberg, they

informed Lustberg that Pascale had provided accounting expertise to the government in the

criminal case but that "Mr. Pascale was not privy to the activities of the PWBA officials who

were monitoring the civil lawsuits."  This was erroneous.  The civil lawsuits were active in the

early years after the Compton Press embezzlements - in 1989, 1990, 1991.  As will be detailed

below, Pascale participated in the monitoring of the civil cases in those early years.  At that time,

the criminal investigations were being handled by the Newark Strike Force, and the AUSAs

assigned to conduct the further investigation and trial of Pelullo, AUSAs Rufolo and Leslie Faye

Schwartz ("AUSA Schwartz"), were not given this responsibility until February 1995, by which

---

[3]  The "E" references are to the Exhibits that accompanied Pelullo's motion for Rule
60(b) relief.

time any involvement of Pascale in the case had terminated.  AUSAs Rufolo and Schwartz were

unaware of his early participation in the monitoring of the civil cases and thus misinformed

Lustberg in that regard.  What that monitoring consisted of will be described below.

First, it is necessary to ascertain what the Court of Appeals found, on the basis of the

government's representations, was the nature of the relationship between the prosecution and the

DOL or PWBA.  It clearly recognized that some DOL agents were assisting the criminal

prosecution.  "Here, there is no question that certain DOL agents were integral members of the

prosecution team," 399 F.3d at 216, and the issue was "whether the PWBA officials who

possessed the documents at issue were members of the 'prosecution team' in this case."  Id.

The Court of Appeals was fully aware that DOL agents accompanied AUSAs and FBI

agents to Florida to interview witnesses and examine documents:

> During a three-day period in 1991, DOL Special Agent Rosario Ruffino (the
> principal investigator in the District of New Jersey case) and two other agents
> working on the Compton Press matter traveled to Jacksonville and conferred with
> the FBI agent in charge of the Florida investigation.  Florida FBI agents assisted
> Agent Ruffino in identifying six boxes of documents from the retained warehouse
> documents that were relevant to the New Jersey investigation.

399 F.3d at 205.

The court distinguished these DOL - PWBA agents from the entire DOL, a massive

federal agency.  It found that there was "no indication that the prosecution and PWBA engaged in

a joint investigation or otherwise shared labor and resources . . .   Nor is there any indication that

the prosecution had any sort of control over the PWBA officials who were collecting documents."

Id. at 218.  The Court of Appeals observed that "Pelullo's arguments to the contrary

notwithstanding, that other agents in the DOL participated in this investigation does not mean that

26

the entire DOL is properly considered part of the prosecution team. . . [h]ere, the PWBA civil investigators who possessed the documents at issue played no role in the criminal case." Id.

Having set forth what it was that the government's representations led the Court of Appeals to believe, it is necessary to examine the documents that Pelullo has produced in support of his motion and to determine if they establish that the government made misrepresentations to the Court of Appeals.

The documents (E1 - E46) in their entirety provide a rather detailed picture of the multiple investigations of Pelullo, criminal and civil, that were being conducted simultaneously. The quotations and actions upon which Pelullo relies to establish misrepresentations must be placed in the context of this larger scene.

### A. The Investigations

1. Compton Press Civil Actions: As disclosed in E6, in May 1989 Pelullo and his associates acquired control of Compton Press. Prior to that time the trustees of Compton Press's two employee benefit plans were Harry J. Gerardi ("Gerardi") and Coolidge J. Marqueen ("Marqueen"), former owners of Compton Press. On May 22, 1989 Pelullo's associates David G. Hellhake and Paul Corona also became trustees of the benefit plans, and they along with Pelullo became members of the benefit plans' Administrative Committee.

In September 1989, Gerardi and Marqueen were terminated as officers and employees of Compton Press and as co-trustees of the plans. Pelullo commenced looting the company and the plans as described in United States v. Pelullo, 961 F. Supp. 736 (D.N.J. 1997). Shortly after their termination, Gerardi and Marqueen instituted a civil action in this court against Pelullo and certain of his associates in connection with their administration of the benefit plans. Civ. 89-4069

(D.N.J.). Gerardi and Marqueen were represented by Kenneth M. Van Deventer, Esq. ("Van Deventer") of Riker, Danzig, Scherer & Hyland (later Riker, Danzig, Scherer, Hyland and Perretti).

The civil litigation expanded as new parties intervened or actions were consolidated with it. The attorneys who participated in the litigation were Frank Agostino, Esq., ("Agostino") of the law firm of Cohn Lifland Pearlman Herrman & Knopf, who represented plan participants; Dillon, Bitar & Luther, who represented the trustees and administrators of the plans appointed to replace Pelullo and his associates, and who commenced an independent action against various entities and persons to whom or by whom assets of the plans were transferred, (Civ. 91-1256).

The attorneys in the civil cases kept the DOL fully informed of the progress of those cases. There were a number of letters from one or another of them to agents of the DOL or PWBA. On November 19, 1990 Agostino informed Carmine Pascale of the PWBA that the defendants in the civil actions had transmitted funds to the Summit Trust Company (E10). On June 18, 1991 the Dillon firm reported to the DOL that it had moved to intervene in the original civil action (E13).

On October 21, 1991 Agostino reported to the DOL that the deposition of Andrew Heine ("Heine") was about to be taken and that Pelullo interests were about to receive substantial funds in a settlement of an Ohio lawsuit. He wrote, "My clients do not have the resources to finance another litigation against Pelullo and Heine much less an expensive 'constructive trust' action in Cleveland, Ohio. Consequently, the beneficiaries of the Plans respectfully request that the Department of Labor bring an action to impose a constructive trust on those monies." (E12).

On November 26, 1991 the Dillon firm sent PWBA a copy of the transcript of Heine's deposition taken on October 31, 1991 (E14). On January 7, 1992 the Dillon firm sent PWBA

copies of its reply brief and supplemental certification in the second filed civil action. The letter stated that, "we remain hopeful that the Pension and Welfare Benefits Administration will be able to assist in efforts to track down the potential defendants and recover assets of these Plans so as to minimize the future depletion of the Plans by virtue of litigation costs." (E15).

On April 3, 1992 the Dillon firm once again communicated with PWBA, informing it that the firm had filed a motion for partial summary judgment against Granada Investments, Inc. and Heine and enclosing a copy of the notice of motion and brief. Once again, the Dillon firm pleaded with PWBA to involve itself in the matter and inquired if PWBA had reached a decision "whether it is able to assist in this matter." (E5).

On December 17, 1992 the Dillon firm sent PWBA copies of: i) February 27, 1992 consent order in the civil action imposing temporary restraints as to $1,500,000 of any proceeds to be paid by DWG Corporation to Granada Investments, Inc., in connection with the Ohio litigation; and ii) order and opinion of Magistrate Judge Chesler granting partial summary judgment against Heine in the amount of $400,000 and against Granada in the amount of $750,000. It is apparent that PWBA was still taking no active part in the matter, because the letter concluded, "Please advise if you anticipate any enforcement action by the Department of Labor in the near future with respect to these and other matters relating to the loss of Plan assets." (E16).

Pelullo's documents evidence a minimal number of telephone calls between one or more of the civil case attorneys and PWBA. A July 3, 1990 DOL memo authored by Pascale provided a recap of telephone conversations with three individuals regarding the plans: i) Van Deventer reported that he would appear before Judge Ackerman on July 9, 1990 for a show cause order as to Pelullo's failure to make May 16, 1990 and June 16, 1990 payments of $500,000 each; ii)

Agostino reported that he received $30,000 from Pelullo which will allow him to proceed to represent the participants; iii) Mark Currier, a Compton employee, said they plan to have an actuary administer the Funds for the participants and that the latest statements showed a balance of approximately $5 million being held by Summit Trust Company (E8).

Agostino submitted an affidavit of services in support of his attorneys' fee application in connection with the civil litigation. The listing of services consisted of 20 pages of single space typed entires. There are a few entries reflecting telephone calls with PWBA personnel: an "incomplete phone call" with Pascale which was either not billed or billed for $13.33, and four either non-billable or $13.33 phone calls or messages with or from Michael Briglia ("Briglia") of the DOL (E24). The period covered by the affidavit extended from October 23, 1990 to February 18, 1991. It is apparent that the DOL received from the attorneys only documents that were available to Pelullo as a participant in the civil lawsuits or from court records.

In a November 22, 1991 letter, Agostino wrote to the Dillon firm and Van Deventer of the Riker firm stating that Briglia of the DOL would like to meet with the three civil action attorneys "as soon as practicable in order to coordinate what office will pursue which defendant and how." (E20). There is no evidence that anything came of the suggested meeting or that the DOL even took an active part in the civil actions other than monitoring them through receipt copies of court filings and occasionally conferring by telephone. The DOL's monitoring of the civil actions appears to have been only totally the passive receipt of information and documents. There is no indication that the prosecution had any sort of control over the PWBA officials who were collecting documents. See 399 F.3d at 218.

As will be discussed in connection with the New Jersey Pelullo criminal action, DOL's

and PWBA's participation in the Pelullo matter was to assign several of its agents to assist the U.S. Attorney's Office in the criminal case.

2. <u>Crash and Burn Cases</u>: The Compton Press civil cases and the New Jersey criminal case against Pelullo, which is the subject of the instant motion, involve a single, discrete looting of one company, its assets, and its employee benefit plans. This scheme produced a mountain of documents that have been the subject of many motions in this case. The Compton Press case has been dealt with in isolation during the course of its investigations and criminal trial. During the course of the appeal from the order granting a new trial, it developed that, in fact, the Compton Press scheme was but one of many similar schemes in which Pelullo was or had been engaged.

This disclosure was introduced into the record when Pelullo moved in the Court of Appeals to expand the record to include 25 exhibits derived from FOIA litigation. The Court of Appeals remanded the case to this court to determine whether the record should be expanded. During the course of the remand, Pelullo introduced an additional twenty multi-page exhibits. The court could never fathom why Pelullo sought to introduce these documents into the record. Until that point, every effort was made during discovery and trial to confine the evidence, vast as it was, to the single Compton Press scheme. The new documents introduced into the case illuminate significant portions of Pelullo's life history of fraudulent and deceptive conduct.

The fraudulent conduct was generally styled "crash and burn," which consisted of arranging a complex series of corporate and financial transactions designed to enable him to take over a company, divert its assets to his purposes, and then abandon the wreckage he had created. A variant of the crash and burn technique was the "hipper-dipper" plan.

In the court's January 7, 2004 opinion addressing Pelullo's motion to expand the record

31

there are described in some detail a number of the crash and burn and hipper dipper plans in which Pelullo had engaged: e.g., i) the looting of an Atlantic City limousine service; ii) an insurance fraud involving two Pelullo trucking companies, OHA and PIE; iii) fraud perpetrated upon an English insurance company, Bain Clarkson; iv) fraud upon multiple trucking companies that collapsed after Pelullo purchased them; v) the Pinnacle scheme involving "ITOFCA . . . another trucking company which had 'crashed and burned' or that was 'busted out' under Pelullo's ownership;" and, vi) check kiting schemes.

This continuing fraudulent activity produced vast quantities of documents that buried the Compton Press documents. Most of the documents from all the fraudulent activities were kept in the Florida warehouse, and it was necessary for the government agents to extract the Compton Press documents from the mass of unrelated material.

Further, the various fraudulent schemes resulted in criminal investigations and prosecutions throughout the country, separate and distinct from the Compton Press investigation and prosecution. All this is reflected in the exhibits Pelullo submitted in support of his Rule 60(b) motion. It would appear that, initially, the Compton Press investigation was part of the Newark Strike Force's investigation of Pelullo's nationwide criminal activities and not simply a prosecution of Pelullo for the Compton Press offense.

In 1990, AUSA Robert C. Stewart (AUSA "Stewart") was chief of the Strike Force Division of the United States Attorney's Office ("Strike Force") in the District of New Jersey, a unit concerned with the investigation and prosecution of organized crime as distinguished from the usual crimes which are prosecuted by the United States Attorney's Office. In the fall of 1990, the Compton Press debacle had come to the attention of the Strike Force, and AUSA Stewart

commenced an investigation as part of the larger investigation of Pelullo.

E17 is a November 1, 1990 memo from AUSA Stewart to Michael A. DeFeo, ("Chief DeFeo") Chief, Organized Crime and Racketeering Section. The subject of the memo was "Leonard Pelullo - Equity Finance Group and P.I.E." and stated "We have opened an investigation on the matter specified herein: 2. David Hellhake, 3. Raul Corona, 4. Compton Press, victim, 5. Granada Investment, Inc." The persons identified as working on the case were "AUSA A. Zucker (apparently then a member of the Strike Force (E27)); Agents D. Mohr-FBI., S. Ruffino - OLR; C. Pascale - PWBA."

The Strike Force's efforts were part of the nationwide investigation of Pelullo:

> Organized Crime Connection; Leonetti has identified Pelullo as a Scarfo Family associate who was engaged in frauds. He was recently acquitted in a false statements case in Ohio (SD).

> Source of Information Establishing Connection: FBI-NJ-SCI

> Objective: Determine if the benefit plans are being looted to finance the acquisition of companies which are then busted out seriatim for the benefit of the O/C family.

A June 11, 1991 memo from SAC Newark to SAC Miami (E30) concerning the Compton Press pension plan fraud indicated that copies went to the Divisions in Miami, Chicago, Jacksonville, Los Angeles, and Newark with a notation that each of those Divisions will apprise the Newark Division of the investigation in that Division pertaining to Leonard Pelullo. The memo also noted "that the Newark Division appreciates Miami's effort to assist obtaining a search warrant at Miami, Florida . . . the photographs forwarded by Miami will definitely assist Newark's anticipated search of 222 S.W. 15th Road, Miami, Florida." This appears to be a prelude to the search of the Miami warehouse. On September 23, 1991 SA (Deleted) GMRA sent a memo to

SAC Newark concerning Compton Press requesting approval to travel to the Miami Division to conduct interviews of persons with knowledge of the scheme. The memo stated that, "This case is a joint investigation between FBI and the Newark and New York Labor Department." (E23).

A November 6, 1991 memo from SA (deleted) to SAC Newark (E40) recited that "SA [deleted] accompanied by U.S. Department of Labor agents traveled to Miami, Florida Division and served subpoenas on eight individuals in addition to interviewing a number of these individuals . . . In addition, the [deleted] were subpoenaed for records pertaining to the captioned case." The memo further stated, "1. Will continue to review records with members of the U.S. Department of Labor; 2. Will continue to conduct Grand Jury investigation regarding the aforementioned individuals; 3. Will maintain contact with AUSA Arthur Zucker." AUSA Zucker was the first of a series of assistant U.S. Attorneys to handle the Pelullo prosecution.

An April 24, 1992 memo from SAC Newark to SAC Miami (E27) stated that AUSA Zucker had resigned from the Strike Force and had been replaced by AUSA Sierra. It also announced that the Newark Strike Force had interviewed witnesses in Miami Beach and had contacted the Jackson Division regarding anticipated review of records relating to Compton Press. It stated that AUSA Sierra had been furnished with a series of flow charts representing embezzlement of $6 million of pension funds from Compton Press. The memo expressed concern about Pelullo's continued crash and burn escapades: "Newark's information indicates that [deleted] is traveling with Pelullo's cohorts. This group of individuals is reportedly moving into companies, completely usurping all funds, and leaving the companies defunct."

A May 2, 1992 memo (E39) recited that Janet Larson had appeared at the Newark Organized Crime Strike Force for questioning about Pelullo's companies, the liquidation of the

UNUM insurance policy, and other details of the Compton Press and other Pelullo matters. Present at the interview were "(AUSA) Arthur Zucker, Special Agent (SA) (deleted), Newark Department of Labor, and (deleted) New York City Department of Labor."

An August 18, 1992 memo from SA (deleted) to SAC Newark (E28) recited that a meeting took place in the office of Chief AUSA Robert Stewart of the Newark Organized Strike Force on August 12, 1992. Present were Deputy Chief AUSA Kevin McCarthy, AUSA Joe Sierra, SA (deleted) Department of Labor, and the writer (deleted) of this memo. The FBI and the Department of Labor displayed computer charts made by the FBI and the DOL concerning the $6 million embezzlement. The memo stated "AUSA Stewart is aware that there were numerous additional records to be reviewed and additional witnesses to be interviewed, but he claimed that the FBI and Department of Labor will have the full support of the Strike Force in this pursuit of this matter."

A February 2, 1993 memo (D29) reflects that on January 8, 1993 "AUSA Sierra met with SA (deleted) and agents of the Department of Labor (deleted) and (deleted) in order to discuss the captioned matter. AUSA Sierra advised that he anticipated calling ten additional witnesses before the Federal Grand Jury." AUSA Sierra also stated that Pelullo's records have been seized by the FBI in Jacksonville and would be valuable for the captioned case." He suggested that it would be two to three months before the indictments would be drafted and "indicated that his office is pleased regarding the charts prepared by the FBI and Department of Labor indicating the flow of money from the Compton Press pension plan into Pelullo's personal possession."

A February 12, 1993 memo from FBI Newark to FBI Jacksonville (E41) recited that the on-going Strike Force investigation "is a joint investigation between FBI and Department of

Labor" and that it disclosed that, in effect, Pelullo's acquisition of the Compton Press was another of his crash and burn operations. The memo reflects that the investigation was still at a preliminary stage, because "the Jacksonville records must be reviewed and obtained in order to thoroughly document the Compton Press case. AUSA Sierra also agrees with the investigators because of the mere volume of the records seized, and the complexity of the investigation, it would necessitate that this task should be handled by the Newark FBI, as it would be unduly burdensome to FBI Jacksonville in assisting Newark in the development of its case."

Thus, it appears that in February 1993 the joint efforts of the Strike Force and the DOL led the two agencies to conclude that the "investigation has determined in mid 1989 Pelullo acquired control of a sizeable printing company called Compton Press. Pelullo bankrupted the company in approximately one year by embezzling all operational and pension funds." The Newark U.S. Attorney's Office was in the process of calling witnesses before a federal grand jury and subpoenaing documents for review. The Newark investigation also reflected that from an office in Miami, Pelullo had also orchestrated the take over of other companies throughout the country.

At that time, the Pelullo records had been seized by the Jacksonville U.S. Attorney's Office looking into a bankrupted company. These records had yet to be reviewed and obtained. Up to this point, the DOL and the Strike Force had worked together. The only documents that there is evidence of the DOL obtaining separately are the documents concerning the civil cases that the DOL received from the attorneys in the civil cases during the 1990-1992 period. All the DOL interviews of witnesses and examination of documents during that period and in 1993 were in the company of FBI agents or assistant U.S. Attorneys. As the Court of Appeals recited "[d]uring a three-day period in 1991, DOL Special Agent Rosario Ruffino (the principal

36

investigator in the District of New Jersey case) and two other agents working on the Compton Press matter traveled to Jacksonville and conferred with the FBI agent in charge of the Florida investigation. Florida FBI agents assisted SA Ruffino in identifying six boxes of documents from the retained warehouse documents that were relevant to the New Jersey investigation." 399 F.3d at 205.

The DOL agents who participated with the AUSAs and the FBI in the Strike Force investigation and subsequent prosecution had been assigned by the DOL to do so. The exhibits that Pelullo submitted suggest that there were two phases of the government's criminal investigation of the Compton Press embezzlement. In the early years, about 1989 to about 1993, it appeared to be a part of the Strike Force's participation in a nationwide investigation of Pelullo's wide-ranging crash and burn and other fraudulent schemes. Thereafter it appeared to narrow down solely to an investigation and prosecution of the Compton Press embezzlement.

C. New Jersey Pelullo Prosecution: Two Strike Force attorneys, AUSA Zucker and AUSA Sierra, working under Chief Stewart, handled the Pelullo investigation during its early stages when it was being conducted as part of the nationwide investigation of Pelullo. By 1995, the decision must have been made to concentrate on prosecuting Pelullo for the Compton Press diversion of funds[4]. As disclosed in E-3, in February 1995 AUSA Rufolo became primarily responsible for the prosecution of Pelullo. He was assisted by AUSA Schwartz. They, like the Strike Force Attorneys, were assisted by DOL agents, who, because of their expertise in accounting and pension fund management, were assigned to them.

---

[4] There was also an on-going prosecution of Pelullo in the Eastern District of Pennsylvania.

Two of these agents were DOL Agent Goldberg and DOL Agent Ruffino. They had also assisted the Strike Force attorneys. They were physically present during the preparation for, and during the conduct of, Pelullo's trial.

Rosario was particularly important, as he was the person who prepared the definitive charts that traced the flow of funds. See United States v. Pelullo, 961 F. Supp. 736, 742 (D.N.J. 1997). One of the charges that Pelullo makes in his motion papers is that "[t]he recent FOIA documents reveal that, contrary to Ruffino's testimony, the FBI either created the charts, assisted in their creation, or created other charts that were never produced to the defense." (Pelullo Memo at 21). Undoubtedly, everyone who worked on the case made charts as he or she sought to comprehend the transactions in which Pelullo engaged. For example, the 1992 brief in support of plaintiff's motion for summary judgment contained a money flow chart (E6), and several of the FBI memoranda referred to preliminary charts tracing funds. Ruffino never testified that there were no charts other than his; he simply stated that he had no other charts and prepared the ones admitted into evidence with the help of AUSA Rufolo (E25).

Between May 10 and May 17 this court heard Ruffino's testimony authenticating the charts. His affidavit (E11) describes the source of the documents that reflected the transactions traced on the charts. Subpoenas were served on various banks, brokerage houses, and other persons, including Merrill Lynch, Kidder Peabody, A.G. Edwards and Sons, Inc., Dean Witter Reynolds, Shearson Lehman, Chemical Bank, First Bank of Philadelphia, Marine Midland Bank, Imperial Bank, First American Bank and Trust, Barnett Bank, the Adorno, Zeder, et. al. law firm, UNUM Life Insurance Co., Summit Trust Co., and the Wilentz, Goldman and Spitzer Law firm. Ruffino assembled, organized and charted the thousands of documents that these subpoenas

produced.  In light of Ruffino's testimony, which was totally convincing, and in light of the

incredibly complex task that he undertook and completed, it borders on the absurd to suggest that

someone else prepared the charts or that there exist somewhere else comparable charts showing

the totality of Pelullo's transactions as he expropriated the assets of Compton Press and its

employee benefit funds.

The role of the DOL and PWBA agents was exactly what the Court of Appeals understood

it to be: "there is no question that certain DOL agents were integral members of the prosecution

team," 399 F.3d at 215.  Pelullo's exhibits submitted in support of his motion establish the limited

role the DOL and PWBA played in the Pelullo investigation other than assigning agents to

accompany FBI agents and AUSAs as they interviewed witnesses and examined documents in

Florida and Newark and assigning Ruffino to perform his important task.  The labor agencies

monitored the civil actions that were active in 1989 and early 1990s, receiving copies of court

papers and having occasional conferences with the plaintiffs' attorneys.  They resisted all attempts

of these attorneys to persuade them to take an active role in the civil cases, knowing that the

investigative and prosecutorial role was being performed by the Strike Force or the United States

Attorney's Office.

Pelullo extracts several documents to support his contention that the AUSAs made grave

misrepresentations to this court and to the Court of Appeals.  He points to E-1, the August 6, 2004

letter referred to above, from AUSAs Norman Gross and Rufolo, in which the AUSAs' responded

to Pelullo's attorney, Lustberg's inquiry about the role of Pascale.  The AUSAs stated that

Pascale's involvement in the case terminated before AUSAs Rufolo and Schwartz were assigned

to the case.  They further stated that "Mr. Pascale was not privy to the activities of the PWBA

officials who were monitoring the civil lawsuits." That was a mistake, as described above. Their mistake in the letter to Lustberg (not to the Court of Appeals) is just that, a mistake.

Pascale was doing what several DOL and PWBA personnel were doing - monitoring the civil actions. There is no evidence that they were doing that under the guidance or supervision of the Strike Force or the United States Attorney's Office.

There are two documents authored by SAC Newark, (E21 and E22), each dated January 3, 1997, addressed to the Director of the FBI. Each recommends that a letter of appreciation be issued to an agent of the DOL for assistance in a Bureau case - the Pelullo case. Each of these communications states in part:

> During this investigation Investigator [redacted] United States Department of Labor (USDL) and retired USDL Investigator [redacted] along with Special Agent (SA) [redacted] FBI, Newark worked together as a team to convict Pelullo.
>
> Investigator [redacted] and [redacted] who was expressly brought back to Government service following his retirement because of his expertise, effectively wove their way through a myriad of pension laws and regulations to establish criminality. Along with SA [redacted] their tiredless [sic] efforts proved successful. The United States Attorney, District of New Jersey, wrote to the SAC, Newark and noted
>
>> "The success of this prosecution depended in large measure on the varied expertise of the agents from both the FBI and the United States Department of Labor. These talents were successfully molded as a result of the spirit of cooperation exhibited by both agencies."
>
> Based on the prosecutive [sic] results of this investigation, it is respectfully submitted that Investigator [redacted] and [redacted] be each provided a Certificate of Appreciation.

Pelullo offers these documents as evidence that the DOL as an institution was a part of the Pelullo prosecution. In fact, they are further evidence that, not the DOL, but certain of its agents worked with the AUSAs in this case and were, as the Court of Appeals found, "integral members

of the prosecution team." The local FBI office simply wished to give recognition to these DOL agents who, like Ruffino, contributed so significantly to the success of the Pelullo prosecution.

The record does not establish that the government attorneys made misrepresentations to the Court of Appeals. Consequently, no action is required of this court under the Rules of Professional Conduct.

## V.  **Conclusion**

Finding that it does not have jurisdiction over Pelullo's Rule 60(b) motion because it is a second or successive § 2255 petition and the Court of Appeals has not issued a certificate of appealability, the court will transfer the Rule 60(b) motion to the Court of Appeals pursuant to Rule 22.5(b) of the Local Appellate Rules of the Third Circuit and 28 U.S.C. § 1631. Pelullo's motion for bail will be denied. The Court will file an order implementing this opinion.


 **/s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE
United States Senior District Judge

DATED:   December 13, 2006