**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | Crim. No. 94-276(DRD) |
| | : | Civ. No. 01-124(DRD) |
| v. | : | |
| | : | |
| LEONARD A. PELULLO | : | **O P I N I O N** |
| | : | |
| Defendant. | : | |
| _____ | : | |

Christopher J. Christie
United States Attorney
By:    Leslie F. Schwartz
        Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
        Attorneys for United States of America

Leonard A. Pelullo
Fed. #44140-066
Low Security Correctional Institute Allenwood
P.O. Box 1000 - Union A-7
White Deer, PA 17887
        Defendant, *Pro Se*

### Contents

|  | Page |
|---|---|
| I. Background .............................................................. | 3 |
|   A. Trial, Sentencing and Appeal ................................. | 3 |
|   B. Initial Rule 33(b) and § 2255 Motions ................................... | 8 |

    1.  Filing the Motions .......................................................    8

    2.  May 17, 2002, Disposition of Rule 33(b) Motion .................    10

    3.  May 17, 2002, Disposition of § 2255 Motion ......................    13

    4.  Appeal and September 11, 2003, Remand ...........................    16

    5.  Court of Appeals Decision-February 25, 2005 ....................    20

C.  Post February 25, 2005, Proceedings ................................    23

    1.  October 20, 2005, Disposition of Booker and

    Unresolved § 2255 Claims ...........................................    23

    2.  Pelullo's May, 2006 Rule 60(b) Motion ............................    25

II.  Pending Motions ...........................................................    26

    A.  General ...................................................................    26

    B.  March 29, 2007, Rule 33 Motion .......................................    26

    C.  2008 Motion and Supplemental Motion Pursuant to

    Rule 60(b) to Expunge January 7, 2004, Opinion ...................    29

    1.  Pelullo's Contention ...............................................    29

    2.  Giacomaro's Cooperation with the Government ...................    33

    3.  Relationship of Giacomaro to Pelullo ...................    38

III.  Discussion .................................................................    45

    A.  Jurisdiction ............................................................    45

    1.  Effect of Pending Appeals .......................................    45

    2.  Rule 33 Motions ...................................................    46

    3.  Pelullo's 2008 Rule 60(b) Motions .............................    48

    B.  Evidence from Related Cases ............................................    54

    C.  Motions for Release on Bail ...........................................    58

IV.  Conclusion ................................................................    58

**Debevoise, Senior District Judge**

Defendant, Leonard A. Pelullo, has peppered the court with § 2255 petitions, Criminal Rule 33 and Civil Rule 60(b) motions, discovery motions, and motions for release on bail. In order to understand the interrelationship of the various motions, past and pending, it is necessary to start with a detailed account of the proceedings in this case.

## I. Background

A. Trial, Sentencing and Appeal: On December 9, 1994, a grand jury sitting in Newark, New Jersey, returned a 54-count indictment against Pelullo. Count One charged a two-part conspiracy: (a) to embezzle approximately $4.176 million belonging to the Compton Press Inc. ("Compton Press") Employees' Profit Sharing Retirement Plan and Employees' Thrift Plan (the "Employee Benefit Plans"), in violation of 18 U.S.C. § 664; and (b) to launder the proceeds of the embezzlement, in violation of 18 U.S.C. § 1956(a)(1). Counts Two through Twelve each charged Pelullo with specific instances of embezzlement from the Employee Benefit Plans. Counts Thirteen through Fifty-Four each charged him with specific money laundering transactions. A six-week trial in the fall of 1996 followed extensive motions and hearings.

A summary of the evidence produced at trial is set forth in United States v. Pelullo, 961 F. Supp. 736, 744-50 (D.N.J. 1997). Through a series of transactions Pelullo took over ownership and control of Compton Press, which was in the business of producing high quality color printing. It had established the Employee Benefit Plans for the benefit of its employees. When Pelullo achieved control of Compton Press, he placed himself and a long-time associate, David Hellhake, in the principal positions in Compton Press and in the corporation through which Pelullo controlled Compton Press. Pelullo also created a directors' resolution designating

himself and Hellhake as the new committee of each of the Employee Benefit Plans and appointing Hellhake as sole trustee.

The evidence established that Pelullo diverted funds from the Employee Benefit Plans through three complex schemes. The first entailed withdrawing funds from the plans to further his acquisition of DWG Corp., as well as to pay personal expenses. The second scheme was diversion of funds from the Plans through a fraudulent $1.35 million loan, purportedly to purchase a Miami travel agency, but actually used for Pelullo's own business and personal expenses (the "Away to Travel South" or "ATTS" transfers). The third scheme was the use of the proceeds of the Employee Benefit Plans' UNUM annuity contract for a multitude of Pelullo's corporate and personal purposes. In addition Pelullo caused the diversion of Compton Press corporate funds.

Apart from the testimony of many witnesses, the diversion of the funds of the Employee Benefit Plans and the uses to which they were put were evidenced by a vast array of financial documents of banks, brokerage houses, law firms and other persons and entities, and also from the enormous quantity of documents seized from Pelullo's Florida warehouse. The flow charts prepared from these documents are an appendix to the previously referenced opinion.

The records and the charts prepared from the evidence were authenticated at an extensive pre-trial hearing at which the various custodians of subpoenaed documents identified them and testified about the manner in which they were prepared and maintained. In addition, Rosario Ruffino testified. He was the Special Agent of the United States Department of Labor ("DOL") who had primary responsibility for investigating and preparing this case. In his testimony and in a supplemental affidavit, he described how the documents had been obtained and how the

4

summary charts were prepared. Apart from testimony, these records, many of which came from Pelullo's Florida warehouse, established the basis of the three principal embezzlements from the Employee Benefit Plans.

The first of these embezzlements, the DWG Corp. scheme, is reflected in one series of documents. They portray a transfer of $1.150 million from Compton Press's Kidder Peabody, Merrill Lynch and A.G. Edwards Retirement Plan accounts. A chart (G1000) traces the flow of funds out of the three Employee Benefit Plans brokerage accounts, either directly or indirectly, into a bank account of a Pelullo corporation, Granada Investments, Inc. ($750,000), or to another Pelullo corporation, Paribas ($400,000). G1000 shows the numerous payments of these funds made to the Granada Investments account.

G1100 shows the delivery of 19,900 shares of DWG Corp. stock held in the Shearson Lehman Thrift Plan account to a Shearson Lehman Compton Press corporate account and then to an A.G. Edwards Compton Press corporate account. There they were liquidated and the proceeds remitted to the Summit Trust Company Compton Press operating account. G1100 shows the many entities to which these funds were disbursed from that account. These transfers were not charged as criminal offenses in the indictment but were part of Pelullo's overall plan to use fund assets to acquire DWG Corp.

The second series of embezzlements charged in the superseding indictment consisted of the transfer of $1.35 million from Employee Benefit Plans accounts at A.G. Edwards, Shearson Lehman and Dean Witter to Employee Benefit Plans accounts established at Imperial Bank in Florida. From there the funds were transferred to an Adorno, Zeder, Allen Trust-Escrow Account at the Barrett Bank in Florida. A dizzying array of payments and transfers of funds

5

followed the deposit in the Adorno, Zeder, Allen Trust-Escrow Account, a significant portion of which was designed to facilitate an investment in a bankrupt travel agency, ATTS. The flow of these funds is shown in Exhibits G2100, G2200, G2300, G2400, G2500, and G2600. Exhibit G2000 shows the source of $960,000 paid to the bankruptcy examiner for Away to Travel South.

The third embezzlement charged in the superseding indictment consisted of the loss occasioned by the unnecessary incurring of a $330,000 liquidation charge and the transfer of $1.4 million proceeds of a UNUM Life Insurance Company Group Annuity Contract owned by the Employee Benefit Plans. Exhibits G3000, G3100 and G3200 show how the proceeds of these assets of the Employee Benefit Plans were expended.

These summary charts, the accuracy of which is beyond challenge, and the records which support them, the authenticity of which is unquestioned, alone constitute overwhelming evidence that the Employee Benefit Plans were systematically looted.

Following the six-week trial, on or about November 8, 1996, a jury convicted Pelullo of all fifty-four counts in the Indictment, and ordered forfeiture in the amount of $3,562,987. Thereafter, the court denied a series of post-verdict motions. See 961 F. Supp. 736 (D.N.J. 1997); 971 F. Supp. 159 (D.N.J. 1997); 5 F. Supp. 2d 285 (D.N.J. 1998).

Significant in connection with some of Pelullo's pending motions is the government's effort to obtain an upward departure at the time of Pelullo's sentencing. Prior to sentencing, the government filed a sentencing memorandum in which it sought an upward departure in Pelullo's Criminal History level based upon uncharged crimes in which he had allegedly been involved. The criminal conduct included, but was not limited to, a fraudulent scheme relating to a trucking company called Pinnacle Enterprises, Inc. of Taylor, Michigan ("Pinnacle"), which Pelullo

acquired and controlled for an eight month time period during the first half of 1991. The government contended in its sentencing memorandum that during this short time period, Pelullo orchestrated a scheme to defraud an insurance company of nearly $3 million, and embezzled funds from the company itself. The scheme came to light when insurance agents realized that monies loaned to Pinnacle were being used for purposes other than to pay insurance premiums, which was the purpose of the loans. Much of the information pertaining to this scheme had been provided to the Federal Bureau of Investigation ("FBI") by Thomas Giacomaro, Pelullo's alleged coconspirator in the Pinnacle scheme. In support of the allegations that Pelullo was involved in the Pinnacle fraudulent scheme, the government provided to the court and to Pelullo two transcripts of Giacomaro's testimony to the Grand Jury concerning Pinnacle, as well as five relevant FBI 302 (witness interview) reports ("302 Reports").

In response to the government's departure motion, Pelullo sought an adjournment of his sentencing and further discovery regarding these allegations of criminal conduct. At Pelullo's sentencing on December 8, 1997, however, the court denied the upward departure motion and further unequivocally stated that it would not consider the allegations set forth in the government's departure motion as "(t)hey are such a serious nature, if - - I'd have to give the defendant an opportunity to rebut them, if I were to consider them in any way, shape, or manner." (See Sentencing Hrg, Tr. at 36, Dec. 8, 2007). After denying the government's Criminal History departure motion, the court then proceeded to impose a Guideline sentence of 210 months for each of the 41 money laundering counts, and sixty months for the conspiracy and each of the embezzlement counts, all to be served concurrently with each other and with the sentence imposed on Pelullo for his racketeering and wire fraud convictions in the Eastern District of

Pennsylvania.

The Court of Appeals affirmed Pelullo's conviction on June 15, 1999, <u>United States v. Pelullo</u>, 185 F.3d 863 (3d Cir. 1999) (Table), and rehearing en banc was denied on August 23, 1999.  The United States Supreme Court denied Pelullo's petition for a writ of certiorari on January 10, 2000, <u>Pelullo v. United States</u>, 528 U.S. 1096 (2000).

B.  <u>Initial Rule 33 and § 2255 Motions</u>: On or about November 4, 1999, Pelullo filed a three-part motion for a new trial pursuant to Fed. R. Crim. P. 33(b)(1).  On January 9, 2001, Pelullo filed a petition for relief pursuant to 28 U.S.C. § 2255.

1.  <u>Filing the motions</u>: Pelullo raised three grounds in his Rule 33 motion.  First, Pelullo contended that he had obtained newly discovered evidence that the government had access to privileged conversations between himself and counsel, as well as to documents protected by the attorney-client privilege.  Second, Pelullo asserted that newly discovered evidence obtained from files of two related civil cases demonstrated that certain government witnesses testified falsely at his criminal trial.  Third, Pelullo argued that the prosecutors failed to make available to him "favorable evidence" in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Bagley</u>, 473 U.S. 667 (1985).  That evidence consisted of certain documents seized by the United States Attorney's Office in the Middle District of Florida in October, 1991, during the execution of a search warrant at a Miami, Florida warehouse, where Pelullo had stored the records of 25 of his companies, including Compton Press.  The documents were seized during the course of a grand jury investigation concerning allegations of bankruptcy fraud and related offenses by Pelullo and others affecting the Ryder and PIE trucking firms.

After filing his motion for a new trial, Pelullo also sought to obtain disclosure of

documents maintained by the civil side of the Pension and Welfare Benefits Administration ("PWBA"), of the DOL, alleging that there was <u>Brady</u> material contained within those files. On the date scheduled for argument of the motion for a new trial, the court suggested that inasmuch as Pelullo would ultimately get the DOL documents under the Freedom of Information Act ("FOIA"), the government should provide him with all the documents in the DOL file with the exception of documents that the government believed were protected by the work product doctrine.

On July 20, 2000, the government obtained and then turned over all the documents contained in the DOL files to Pelullo, with the exception of a narrow group of documents that it provided to the court and argued were protected by the work product doctrine.

On January 9, 2001, before argument of the Rule 33 motion, Pelullo filed a petition for relief pursuant to 28 U.S.C. § 2255 alleging i) the district court erred in failing to give specific unanimity instructions to the jury, ii) the district court misapplied the Sentencing Guidelines when imposing his sentence, iii) there was insufficient evidence to support the money laundering convictions, and iv) there had been an improper amendment of his judgment of conviction to include the forfeiture provisions.

On October 19, 2001, fifteen months after having received the DOL documents from the government and almost five years after the jury had returned its guilty verdict, defendant filed a supplemental brief alleging that he was entitled to a new trial based upon "newly discovered evidence" found in the DOL files. On or about the same date, defendant filed a brief in support of his Section 2255 petition which had been filed ten months earlier.

On January 22, 2002, this court ruled that defendant should be released from custody

pending the disposition of his motion for a new trial based upon <u>Brady v. Maryland</u>.  An order releasing defendant on bail was entered on January 29, 2002.

2.  <u>May 17, 2002, Disposition of the Rule 33(b) Motion</u>: On May 17, 2002, the court issued an opinion disposing of both the Rule 33(b) motion and the § 2255 motion.  The Rule 33(b) issues will be dealt with first.

In November, 1999, Pelullo filed his three-part motion for a new trial pursuant to Fed. R. Crim. P. 33.  The principal contention was that newly discovered evidence revealed that the government had suppressed and failed to disclose favorable evidence in violation of its obligations under <u>Brady</u>, and had elicited perjured testimony and argued to the jury from false evidence at his trial.

Initially, the 1999 motion for a new trial relied primarily upon evidence obtained from the Florida warehouse that the federal prosecutor produced for Pelullo in connection with the then recently abandoned prosecution against Pelullo in the Middle District of Florida.  These documents, according to Pelullo, cast doubt upon the four charges of fraud upon Compton Press and the Compton Press Employee Benefit Plans: i) the ATTS transaction, ii) the Granada - DWG transfers, iii) the UNUM insurance liquidation, and iv) looting Compton Press itself.

Subsequently, as recited above, Pelullo added to this <u>Brady</u> claim i) depositions and documents that Pelullo obtained from the DOL pursuant to an order of the court and ii) documents obtained from the DOL pursuant to a FOIA request.  The depositions were of David Hellhake, taken in a Florida bankruptcy matter, <u>In re Ocean Properties of Delaware Inc.</u>, S.D. Fla. Case No. 90-11919 BRC-SM, and of David Hellhake's father, George P. Hellhake, taken in the same matter.  In addition, defendant relied upon a newly discovered letter dated August 30, 1989,

to Douglas Miller of Shearson Lehman, authorizing the transfer of the pension plan's account to A.G. Edwards. The letter was signed by Coolidge Marqueen, one of Compton Press's former owners, as well as by Raul Corona (originally a defendant in the instant case) and David Hellhake. Further, Pelullo relied upon the then newly produced report of Gus R. Lesnevich, an expert forensic document examiner who had examined seven of the original Granada Investment Inc., loan documents and concluded that the signatures of Andrew N. Heine on each of these documents were genuine.

These documents, according to Pelullo, contradicted the government's contentions and the testimony of its witnesses i) concerning the relationship of David and George Hellhake to GH Enterprises, the role of GH Enterprises in the DWG transaction and George Hellhake's role in the ATTS transaction, ii) that Gerardi and Marqueen had not been aware of the transfer of funds from the Employee Benefit Plans to acquire the DWG stock, and iii) that Heine had not signed loan instruments in connection with the DWG stock acquisition.

A second part of the 1999 motion for a new trial relied primarily upon allegedly newly discovered documents derived from two civil cases involving prior associates of Pelullo, many of whom were witnesses against him in the trial of the instant case. One of these cases was instituted in 1993 in the United States District Court for the Southern District of Florida by Fred and Murray Schwartz against attorney Kenneth Falk, his law firm (Wilentz, Goldman & Spitzer) and against Moshe Milstein, David Hellhake and Media Partners, Inc., all of whom figured prominently in Pelullo's trial. In the second civil suit Congregation Chevra Shas, Moshe Milstein and Alan Weisberger sued Falk and the Wilentz, Goldman & Spitzer firm in the New York State Supreme Court. The suit was commenced on December 11, 1995; Pelullo was aware

of it, but depositions were not taken until 1998, two years after Pelullo's trial.

Pelullo contended that evidence derived from these two suits demonstrated that government witnesses lied when they testified that Pelullo was the mastermind controlling a myriad of transactions and directing others who acted only at his behest. This new evidence, according to Pelullo, showed i) that the government witnesses acted without Pelullo's involvement in contradiction to their trial testimony, ii) witnesses testified falsely that Pelullo directed Falk with regard to the disbursement of the National Media litigation settlement proceeds, iii) the testimony that Pelullo, with the Hellhake investment group fronting for him, sought to obtain a 70% equity interest in ATTS was false, and iv) witnesses testified falsely that Pelullo had directed attorney Falk to write a letter that falsely stated that a $400,000 debt owed to the pension funds had been repaid.

It is unnecessary to detail Pelullo's contentions concerning an alleged breach of his attorney-client privilege, as that is no longer a contested matter in the case. In its May 17, 2002, opinion the court found that its disposition of the Brady claims made it unnecessary to decide the claim based on the evidence relating to the civil actions.

The court found no evidence that the government knowingly used false evidence. However, the court concluded that the disclosures, subsequent to trial, of documents from the Florida warehouse and from the DOL's own files evidenced a sufficiently serious violation of the government's Brady obligations that Pelullo's motion for a new trial should be granted. On the basis of undisclosed Florida warehouse and DOL documents the court found:

> It can be observed that even if defendant's version of all the transactions were accepted by the jury, the jury could still have found that he had the criminal intent requisite to establish the charges of

conspiracy, embezzlement and money laundering. The loans and investments of pension plan funds that defendant admittedly directed were shocking and outrageous. However defendant characterized them [they] would not have precluded the jury from finding that he had the requisite criminal intent. Nevertheless the government relied on particular characterizations of the relevant transactions upon which the new evidence casts doubt and the government relied upon witnesses whose credibility is challenged by evidence that was not produced. In these circumstances, and viewing the new evidence in its entirety, confidence in the trustworthiness of the jury verdict is seriously diminished. Defendant is entitled to a new trial at which the jury will be able to arrive at a verdict based on the totality of the evidence.

(May 17, 2002 Slip Op. at 23.)

Therefore, the court rejected Pelullo's contention that he was entitled to a new trial by reason of the government's invasion of his attorney-client privilege.

3. <u>May 17, 2002, Disposition of § 2255 Motion</u>: Pelullo moved pursuant to 28 U.S.C. § 2255, advancing four grounds to vacate, set aside or correct his sentence, namely: i) the failure to provide the jury with specific jury unanimity instructions violated his Sixth Amendment rights; ii) the court misapplied the sentencing guidelines in that it sentenced Pelullo pursuant to U.S.S.G. § 2S1.1, which is applicable to money laundering, whereas it should have sentenced him pursuant to the embezzlement guideline, which would have produced a shorter sentence; iii) the court improperly amended Pelullo's judgment of conviction to include forfeiture provisions; and iv) the government failed to present sufficient evidence to support the convictions for money laundering.

The court concluded that only the first of these grounds warranted extended discussion. It held that the second and third grounds could be dealt with if Pelullo were convicted after a new trial. It noted that the fourth ground, the asserted lack of evidence to support the convictions on

the money laundering counts, had been addressed and rejected on Pelullo's motion for a judgment of acquittal, <u>United States v. Pelullo</u>, 961 F. Supp. at 751 and had been raised on direct appeal to the Court of Appeals and held to be without merit. For the reasons set forth in 961 F. Supp. at 751-752 that ground remained without merit.

The court found that the first ground for § 2255 relief presented serious questions, i.e., whether it had legal merit and whether Pelullo could raise it on a § 2255 motion.

As described above, the indictment charged Pelullo with involvement during a three year period in a series of complex schemes to embezzle the assets of Compton Press and its Employee Benefit Plans for his own personal use. Count 1 charged a two-part conspiracy to embezzle and to engage in money laundering. It was alleged that these objects were accomplished through four schemes: i) the looting of Compton Press, leading to its bankruptcy, ii) the loan of funds from the Compton Press Employee Benefit Plans to Granada, as part of the acquisition of DWG Corp., iii) the loan of funds from the Compton Press Employee Benefit Plans in connection with the acquisition of ATTS, and iv) the conversion of an Employee Benefit Plans' asset, the UNUM policy.

The jury charge relating to Count 1 did not require that there be unanimity either as to the object of the conspiracy or as to the particular schemes alleged. It was Pelullo's contention that this failure to require unanimity both as to the offenses Pelullo conspired to commit and as to the four alleged schemes deprived him of his Sixth Amendment rights.

Pelullo contended that a similar defect appeared in the charges of Counts 2-12 relating to embezzlement and in the charges of Counts 13-54 relating to money laundering. Each of those Counts incorporated Count 1 by reference, and, according to Pelullo, the applicable charge

suffered from the same defect as the charge relating to Count 1. Further, the charge applicable to the embezzlement offenses did not require unanimity as to whether defendant engaged in i) embezzling, ii) stealing, iii) abstracting, or iv) converting pension funds. The charge applicable to money laundering did not require unanimity as to whether defendant engaged in the financial transaction i) with the intent to promote the carrying on of the specified unlawful activity or ii) with knowledge that the financial transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity. Pelullo did not object to the charges given at the time of trial, and he did not raise this asserted error on his appeal until it was so late that the Court of Appeals declined to hear it.

In its opinion, the court agreed with Pelullo that a specific (as distinguished from a general) unanimity instruction should have been given in this case as to the specific offense that Pelullo conspired to commit as charged in Count 1, i.e., embezzlement and/or money laundering or both, as there was a genuine possibility that different jurors might have determined Pelullo's guilt without a unanimous agreement as to the specific offense Pelullo conspired to commit. The court also found that the error was not harmless and that Pelullo suffered actual prejudice as defined in <u>United States v. Frady</u>, 456 U.S. 152 (1982). The court held specific unanimity instructions were not required with respect to Counts 2 through 12 (embezzlement) and Counts 13 through 14 (money laundering).

Despite the finding with respect to Count 1 that a specific unanimity charge should have been given, Pelullo's § 2255 petition was denied because he failed to establish cause for his procedural default.

In sum, Pelullo's § 2255 claims that the court had misapplied the Sentencing Guidelines and that the court had improperly amended the judgment to include forfeiture provisions were not addressed on the merits. The contention that the government failed to present sufficient evidence to support the convictions for money laundering was found to be without merit. To the extent that Pelullo correctly contended that a specific unanimity jury charge should have been given on Count 1, the court held that Pelullo was barred by <u>Frady</u> from raising the issue in his § 2255 motion. On May 17, 2002, the court dismissed Pelullo's § 2255 motion with the issuance of a certificate of appealability as to the specific unanimity jury charge issue.

4. <u>Appeal and September 11, 2003, Remand</u>: The government appealed from the grant of a new trial and Pelullo appealed from the denial of collateral relief. During the pendency of the appeals, Pelullo moved in the Court of Appeals seeking an order expanding the record with a large quantity of documents that he alleged were <u>Brady</u> materials which he had obtained pursuant to FOIA requests to the FBI. The government opposed the motion, and on September 11, 2003, the Court of Appeals remanded the matter to this court to consider whether the motion to expand the record should be granted.

On remand the court received additional evidence and held a hearing. It appeared that in December, 2002, eight months after the court had decided Pelullo's Rule 33(b) and § 2255 motions, Pelullo received approximately 3,000 pages of documents pursuant to his FOIA litigation. From the 3,000 pages Pelullo extracted and presented to the Court of Appeals 25 Exhibits (most of which contained many separate documents) in support of his contention that these documents provided further support for the district court's conclusion that a new trial was required and that "they may as well give rise to additional substantive relief, such as dismissal of

the underlying indictments or suppression of the government's evidence, based upon the government's misconduct in failing to provide these materials, the gravity of which might alter or even moot the appeal."  (Pelullo's Mot. to Expand the R. at 5.)

In support of his motion, at the December 29, 2003, hearing Pelullo presented twenty additional multi-page exhibits culled from 4,411 pages of documents the FBI had recently released.  The court reviewed the documents that Pelullo had submitted and found it difficult to comprehend why Pelullo would seek to introduce them into the record.  The court summarized its observations as follows:

> The instant criminal case involves one, discrete fraudulent enterprise, the looting of the employee benefit funds of Compton Press.  It is true that the looting was accomplished through a myriad of intercorporate transactions and money transfers, but the entire maze of financial dealings was confined to only one of defendant's objectives and to that one objective only.  Every effort was made during discovery and trial, successfully it is submitted, to confine the evidence to that single scheme.

> The effect of what defendant now proposes to do is to introduce into this case his life history of fraudulent and deceptive conduct in order to derive therefrom a few nuggets of information that might have some relevance to the instant case.  The documents in question are evidence that: (i) defendant's career has consisted of engineering one fraudulent transaction after another, looting one company after another, deceiving one individual or corporation after another, of which Compton Press was only the most recent; (ii) during the course of these activities defendant has generated tens of thousands of documents designed to facilitate his fraudulent conduct and has involved countless individuals in his schemes, some innocent victims and some knowing participants; (iii) leaving in his wake his many victims, defendant's activities have generated many criminal and civil investigations, each of which generated its own mountain of documents; (iv) no prosecutor could possibly keep track of the array of documents generated during the course of the many investigations of defendant; (v) most of the documents that defendant advances in support of his motion to expand the record are perhaps material to the

other crimes he has committed, but they have no relevance to the crime charged in the instant case - the looting of Compton Press - except as they might constitute Rule 404(b) evidence to show motive, intent, preparation, plan, etc.; (vi) with possibly one or two exceptions the documents defendant now seeks to introduce into the record did not come from the Miami warehouse of Pelullo records or from records in possession of the government attorneys prosecuting this case; (vii) the very few documents that relate to witnesses in the instant case either are not inconsistent with their testimony in this case or are merely cumulative and unnecessary either in connection with the original motion for a new trial or the pending appeal in the Court of Appeals.

Jan. 7, 2004 Slip Op. at 4

In its January 7, 2004, opinion supporting its order denying Pelullo's motion to expand the record, the court described the documents that, in their entirety, provided evidence that for a very long time Pelullo engaged in fraudulent conduct, generally styled "crash and burn." This generally consisted of arranging a complex series of corporate and financial transactions designed to enable him to take over a company, divert its assets to his purposes and then abandon the wreckage he had created. The documents disclosed frauds committed upon a limousine service, insurance companies, and trucking companies. One of the more egregious crash and burn schemes involved a trucking company known as Pinnacle Enterprises, a scheme in which Pelullo and his aide de camp David Hellhake (a witness in the Compton Press case) appeared to have been deeply involved.

These many criminal activities produced investigations in a number of districts throughout the United States. The DOL also conducted its investigations. In light of the circumstances disclosed in the documents that Pelullo proffered, the court in its opinion observed: "A recent decision of the Court of Appeals, United States v. Merlino, supra, defined

what may reasonably be expected of a prosecutor in a search for <u>Brady</u> material.  The Court observed that '[w]e found it unreasonable to expect the prosecutor to search all of the unrelated files in his or her office to look for exculpatory material'.  <u>Merlino</u>, 349 F.3d at 154.  It would follow that it would be even more unreasonable to expect the prosecutor to search all of the unrelated files in the offices of other prosecutors and other agencies.  This raises the question whether in its opinion granting defendant a new trial on <u>Brady</u> grounds this court imposed an unreasonable burden on the government."  (Jan. 7, 2004 Slip Op. at 16.)

The court's opinion stated that "[m]ost of the documents that defendant seeks to introduce into the record are derived from unrelated investigations and indictments and except for possible Rule 404(b) purposes have no relevance whatsoever to the instant case."  (<u>Id.</u>)  The court analyzed the few documents that might have related to the Compton Press charges or witnesses, finding that generally they were not discoverable under <u>Brady</u> or <u>Jencks</u> requirements, they were not exculpatory, they did not come from the Miami warehouse or the Newark United States Attorney's Office, they concerned investigations taking place before the Compton Press case arose, or they were not contradictory of trial testimony.

The court reviewed the twenty multi-page exhibits that Pelullo sought to add to the record after remand of his motion.  The results were essentially the same as the results of the court's review of the original batch of documents.  A final comment (which proved prophetic) was "[w]ere defendant's insatiable quest for documents to be accommodated, the quest could go on for years (or decades), and no doubt the court would be confronted with motion after motion to supplement the record.  The utter lack of relevance of the documents proffered to date demonstrates that any further pursuit of documents would be a totally wasteful exercise."  (<u>Id.</u> at

22.)

Based on the foregoing, the court denied Pelullo's motion to supplement the record.

5. <u>Court of Appeals Decision - February 25, 2005</u>: The Court of Appeals had jurisdiction of the government's appeal from this court's order granting Pelullo's Rule 33(b) motion for a new trial, and it granted Pelullo's motion for leave to appeal the § 2255 contention as to which this court had issued its certification (the unanimous jury instruction), leaving the unresolved § 2255 issues to be resolved by this court in the first instance.

Addressing the <u>Brady</u> contentions, the Court of Appeals set forth the long-standing rule that "[t]o establish a due process violation under <u>Brady</u>, then, 'a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.'" <u>United States v. Pelullo</u>, 399 F.3d 197, 209 (3d Cir. 2005). Holding that it need reach the issue of materiality only upon concluding that the warehouse documents or the PWBA documents were suppressed by the government within the meaning of <u>Brady</u>, the Court initially limited its discussion to a determination of whether <u>Brady</u> material was suppressed by the government. The Court noted pragmatic considerations, specifically the massive amount of documents involved in the case and the concomitant practical difficulty faced by the government in discovering and revealing all <u>Brady</u>-type material dispersed, as it was, through many jurisdictions and agencies. Three specific factors influenced the Court of Appeals's ultimate decision with respect to the warehouse documents to reverse the grant of the new trial on <u>Brady</u> grounds. First, Pelullo had personal knowledge of the warehouse documents, and had received a substantial portion of them well before trial. The government had no knowledge of the exculpatory nature of any of them.

Second, the government repeatedly made the warehouse documents available to Pelullo and his attorneys for inspection and copying. Third, Brady does not compel the government to furnish a defendant with information he already has, or, with any reasonable diligence, can obtain for himself. The Court found no evidence that Pelullo relied on representations of the government to deter him from taking advantage of the opportunity to review the warehouse documents himself. In light of these factors the Court held "that the District Court clearly erred in its finding of fact and that there was no suppression of the warehouse documents." Id. at 216.

Turning to the Department of Labor documents[1] the Court of Appeals held that, because the PWBA civil investigators who possessed the documents at issue played no role in the criminal case, the government did not suppress the PWBA documents, and that to the extent that the findings of this court were at issue, such findings were clearly erroneous. Id. at 218-19. The Court expanded on this conclusion:

> Applying the general principle set forth in these cases - that the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case - we conclude that the PWBA was not a member of the prosecution team. There is no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources. Cf. United States v. Antone, 603 F.2d 566, 569-70 (5th Cir. 1979) (holding that information possessed by state investigator should be imputed to federal prosecutor because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]").

---

[1] The Court of Appeals classified the PWBA category of documents as follows: "While the United States Attorney's Office in New Jersey and agents from the Labor Racketeering Office of the DOL (which is responsible for enforcing violations of federal criminal law) were investigating Pelullo's actions with respect to the benefit plans, officials of the PWBA, a civil arm of the DOL, were monitoring a separate lawsuit, Gerardi, et al. v. Pelullo, et al., United States District Court for the District of New Jersey, Civ. No. 89-4069. That case, like this one, involved the conversion of the benefit plans' assets. The PWBA collected documents which had been exchanged in discovery between Pelullo and other litigants in that civil case." Id. at 209.

Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents. And Pelullo's arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team. Indeed, in <u>Locascio</u>, information was not attributable to the prosecution team, even though it was known to investigators drawn from the same agency as members of the prosecution team. Likewise here, the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.

<u>Id.</u> at 218. (footnotes omitted).

The Court commented upon the fact that the district court did not reach the question whether the government suppressed evidence in the files of two civil actions against Kenneth Falk and his law firm, stating, "[a]s we observed in note 5, <u>supra</u>, matters and documents having to do with the Kenneth Falk litigations are not before us on this appeal. We believe, however, that our holding, and the principles upon which it is based, have equal validity with respect to the documents from the Kenneth Falk litigations. Accordingly, we see no reason for the District Court to revisit this suppression issue." <u>Id.</u> 210 n.10.

It is unnecessary for the purpose of the present proceedings to set forth in detail the reasons the Court of Appeals gave for its disposition of the one issue raised in Pelullo's § 2255 motion which was before it. Suffice it to say that the Court held that the "cause and actual prejudice" test articulated by the Supreme Court in <u>Frady</u> procedurally barred Pelullo's collateral challenge to the jury instructions. <u>Id.</u> at 223.

In its February 25, 2005, opinion and judgment, the Court of Appeals reversed this court's grant of a new trial and directed this court to reinstate Pelullo's judgment of conviction and sentence. The Court affirmed this court's denial of collateral relief. In addition it remanded

the matter to this court for resolution of the remaining issues raised in Pelullo's § 2255 motion and directed "that the District Court, as a priority matter, give serious consideration to vacating its order of January 29, 2002, which had released Pelullo on bail." Id. at 224. The Court of Appeals also instructed this court to consider the Booker issues that Pelullo had raised in the Court of Appeals.

C. Post February, 2005, Proceedings: After the Court of Appeals reversed this court's grant of a new trial, this court proceeded to act in accordance with the mandate. Pelullo raised substantial new issues during these proceedings and filed new applications for relief.

1. October 20, 2005, Disposition of Booker and Unresolved § 2255 Claims: In accordance with the Court of Appeals's mandate, on May 12, 2005, this court entered an order reinstating the judgment of conviction and sentence imposed upon Pelullo on December 8, 1997, and also revoked Pelullo's bail. The court rejected Pelullo's argument that the intervening Supreme Court decision in United States v. Booker, 543 U.S. 220 (2005), rendered it inappropriate to impose a sentence (albeit a reinstated sentence) that relied on facts (apart from the fact of conviction) not found by a jury. The court held that as a new rule of criminal procedure, Booker is not applicable to those cases which became final before its rule was announced. In this case that date was January 12, 2000, when the Supreme Court denied certiorari. Pelullo appealed the May 12, 2005, order, raising the Booker issues.

While the court was in the process of hearing and deciding the remaining issues in the original § 2255 motion, Pelullo filed a motion to amend his § 2255 petition to assert a claim of ineffective assistance of counsel. It was his new contention that his counsel, Edward J. Plaza, Esq., and Herbert Biegel, Esq., each failed to obtain the exculpatory documents, including those

from the warehouse in Florida, or to conduct a reasonably diligent review of those documents in order to determine whether they contained evidence favorable to him.

In the October 20, 2005, opinion[2] the court denied as time barred Pelullo's motion to file an amended § 2255 petition pursuant to Fed. R. Civ. P. 15(a), holding that its claims were not tied to a common core of operative facts supporting the four claims advanced in the original § 2255 petition, which itself was filed on January 9, 2001, one day prior to the expiration of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") one-year period of limitations.

In the same opinion the court disposed of the two issues that Pelullo raised in his 2001 § 2255 petition that had not been resolved previously. It denied Pelullo's motion for relief based on his contention that he should have been sentenced under the fraud or embezzlement Guidelines rather than the money laundering Guideline, and granted Pelullo's motion for relief on the ground that the court improperly amended the judgment of conviction to provide for forfeiture in the amount of $3,562,897. The court vacated the order effecting such amendment and awarding forfeiture, and in all other respects dismissed Pelullo's § 2255 petition without issuance of a certificate of appealability.

The government filed a notice of appeal from the court's decision to grant Pelullo's § 2255 petition claim that the judgment of conviction was improperly amended to include a forfeiture award. Pelullo sought from the Court of Appeals a certificate of appealability

---

[2] In their submissions the government and Pelullo refer to this opinion as the "November 1, 2005 opinion." It was signed on October 20, 2005, filed on October 21, 2005 and entered on the docket on November 1, 2005. It will be referred to in this opinion as the October 20, 2005 opinion.

regarding rejection of his § 2255 claim that this court misapplied the sentencing Guidelines and regarding the denial of his motion to amend the § 2255 petition.

On April 25, 2007, the Court of Appeals denied Pelullo's request for a certificate of appealability regarding his § 2255 claims, finding that the Pelullo had not made a substantial showing of the denial of a constitutional right with regard to his <u>Booker</u> claim, his claim that the District Court misapplied the sentencing guidelines, or his claim that the District Court erred in denying his motion to amend the § 2255 motion. On or about July 6, 2007, the Court of Appeals denied Pelullo's petition for rehearing en banc. On or about November 5, 2007, the United States Supreme Court denied Pelullo's petition for certiorari.

2. <u>Pelullo's May, 2006, Rule 60(b) Motion</u>: On May 12, 2006, Pelullo filed a motion under Fed. R. Civ. P. 60(b) in which he sought relief from the May 12, 2005, order reinstating the judgment of conviction and sentencing. The motion was predicated upon his allegation that documents recently obtained through a FOIA request established that the PWBA agents were, in fact, part of the prosecution team, and thus the government's statements to the contrary were knowingly false. Pelullo sought relief from the Court of Appeals's February 25, 2005, reversal of this court's grant of a new trial as well as this court's May 12, 2005, order reinstating the judgment of conviction and sentence.

In an opinion and order dated December 13, 2006, the court held that the Rule 60(b) motion should be treated as a second or successive petition under § 2255, and, as a result, the court lacked jurisdiction because Pelullo had not requested or received approval from the Court of Appeals to file such a petition. The court transferred the Rule 60(b) motion to the Court of Appeals to be treated as an application for leave to submit a second or successive petition. The

court also denied Pelullo's motion for bail.  Pelullo appealed the December 13, 2006, order.

By letter dated August 2, 2007, Pelullo elected not to proceed with the transferred proceeding in the Court of Appeals.  Accordingly, the Court of Appeals dismissed the transferred application for leave to submit a second or successive petition on June 1, 2007.  On October 15, 2007, the Court of Appeals dismissed Pelullo's appeal of the district court's December 13, 2006 order transferring his Rule 60(b) motion to the Court of Appeals, holding that orders transferring motions found to be second or successive § 2255 motions to a Court of Appeals are not appealable.  The Court of Appeals, however, dismissed Pelullo's appeal without prejudice to the defendant filing a new § 2244 application with the appellate court.  Finally, the Court of Appeals affirmed the district court's denial of bail.

## II.  **Pending Motions**

A.  <u>General</u>: Since March of 2007, Pelullo has been deluging the court with a blizzard of motions and a rising mountain of supporting documents.  Included among the motions are periodic motions for release on bail.

B.  <u>March 29, 2007, Rule 33 Motion</u>: Pelullo's March 29, 2007, Rule 33 motion asks the court to rule upon the claims asserted in the initial Rule 33 motion upon which the court did not rule in 2002.  Those claims were that the government violated its <u>Brady</u> obligations by failing to produce documents from two civil cases.  The claims are described in the court's May 17, 2002 opinion:

> The second part of the 1999 motion for a new trial relies primarily upon documents derived from the two civil cases involving prior associates of defendant many of whom were witnesses against him in the trial of the instant case.  One of these cases was instituted in 1993 in the United States District Court for the Southern District of Florida

by Fred and Murray Schwartz against attorney Kenneth Falk, his law firm (Wilentz, Goldman & Spitzer) as well as against Moshe Milstein, David Hellhake and Media Partners, Inc., all of whom figured prominently in defendant's trial. In the second civil suit Congregation Chevra Shas, Moshe Milstein and Alan Weisberger sued Falk and Wilentz, Goldman & Spitzer in the New York State Supreme Court. The suit was commenced on December 11, 1995; defendant was aware of it; but depositions were not taken until 1998, two years after defendant's trial.

Defendant contends that evidence derived from these two suits demonstrates that government witnesses lied when they testified that defendant was the mastermind controlling a myriad of transactions and directing others who acted only at his behest. This new evidence, according to defendant, shows the government witnesses acted without defendant's involvement in contradiction to their trial testimony, i) that defendant directed Falk with regard to the disbursement of the National Media litigation settlement proceeds; ii) that defendant, with the Hellhake investment group fronting for him, sought to obtain a 70% equity interest in ATTS, and iii) that defendant had directed attorney Falk to write a letter that falsely stated that a $400,000 debt owed to the pension funds had been repaid.

(May 17, 2002, Slip Op. at 3, 4.)

Pelullo further argues that because the government admits that it mistakenly assured his counsel that PWBA Agent Carmen Pascale was not a part of the prosecution team, when in fact he was, the underpinning of the Court of Appeals ruling was destroyed. Consequently, according to Pelullo, "[a]ll of the DOL/PWBA suppressed documents not ruled on by this court are in play, along with the civil lawsuit documents in Defendant's Rule 33 motions to reverse the conviction and sentence forthwith. Based on this serious suppression by the Government, Defendant's conviction should be reversed and the indictment dismissed based on the Government's knowing use of false testimony. Defendant will establish below that either the Gus Lesnevich report alone or in combination with all of the previously submitted suppressed DOL/PWBA documents, along

with the civil lawsuit documents in the pending Rule 33 motions, which now include the newly discovered documents attached to Defendant's Rule 60(b) motion establishes beyond question that he did not receive a fair trial." (Pelullo's March, 2007, Br. at 5.) The documents upon which Pelullo relies to establish that PWBA Agents Robert Goldberg and Carmine P. Pascale were part of the prosecution team are described in the court's December 13, 2006 opinion transferring Pelullo's earlier Rule 60(b) motion to the Court of Appeals.

Finally, Pelullo moved to supplement his open Rule 33 motion with his ineffective assistance claim against his prior attorneys, Edward Plaza, Esq. and Herbert Biegel, Esq.

Apart from the Brady claims based upon the failure to produce documents from the two civil cases, the claims raised in this new Rule 33 motion are essentially the same as those raised in Pelullo's May, 2006, Rule 60(b) motion. The court previously held it did not have jurisdiction to hear that claim. It is true that Pelullo has supported these claims with additional documents which, he asserts, establish that PWBA Agents Pascale, Briglia and Goldberg, who, as monitors of the civil litigation against Pelullo, had possession of favorable evidence and at the same time were full members of the prosecution team.

It is Pelullo's contention that the Assistant United States Attorneys ("AUSAs") working on the Pelullo case were fully aware of the role of the PWBA agents and that the representations that they were not part of the prosecution team were false. Further, in his most recent Rule 33 motion Pelullo accuses the prosecution of using false testimony at the trial. In support of this charge Pelullo relies, in part, on i) a newly discovered June 10, 1991, letter from Michael Rich, the Employees Pension Fund lawyer, to Fred Schwartz and ii) a newly discovered July 25, 1991, letter from Fred Schwartz to Michael Rich.

C. <u>2008 Motion and Supplemental Motion Pursuant to Rule 60(b) to Expunge January 7, 2004 Opinion</u>:  It will be recalled that on January 7, 2004, the court issued an opinion which, on a remand from the Court of Appeals, denied Pelullo's motion to expand the record to include documents evidencing all manner of criminal activities by Pelullo and others having nothing to do with the Compton Press offense.  On January 4, 2008, Pelullo filed a motion seeking bail, renewing his pending Rule 33 and Rule 60(b) motions, but the motion was primarily to "To Vacate and Expunge From the Record the January 7, 2004 Remand Opinion and To Vacate The Judgment and Conviction in This Case, Dismiss The Indictment with Prejudice, or In the Alternative Order A New Trial Pursuant To the Federal Rules of Civil Procedure 60(b)."  On March 12, 2008, Pelullo filed a Supplemental Motion seeking the same relief but adding additional grounds.

1. <u>Pelullo's Contentions</u>:  It is Pelullo's contention that all subsequent decisions after January 7, 2004, by this court and by the Court of Appeals, were supported by the January 7, 2004, opinion and that that opinion was the product of the lies of government informant Thomas Giacomaro and renegade Special FBI Agent Harry Mount.  Accordingly, Pelullo contends that not only should the January 7, 2004, opinion be vacated, but also all that followed should be set aside and the indictment dismissed.

> The 1/07/04 remand Opinion painted Petitioner in such a disfavorable light that the Appeals Court used the opinion offensively against Petitioner to find an outcome - determinative decision that was intellectually deficient, based on the underlying record in this case. The Opinion (1/07/04) sent a clear message to the Third Circuit to reverse the granting of a new trial by this Court in the face of overwhelming evidence that the Petitioner did not receive a fair trial because:
> "The documents were exonerating and impeaching . . ."

> Petitioner contends that the 1/07/04 Opinion has to be vacated and
> expunged (totally repudiated by this Court) in order for Petitioner to
> receive a fair, impartial review of his issues before the Third Circuit
> or any other reviewing court.

(Pelullo's Mot. to Vacate at 3.)

What Pelullo contends is: The description of him in the January 7, 2004, opinion as living a life of crime and having organized crime associations was based on FBI 302 Reports prepared by corrupt Special Agent Mount and congenital liar Thomas Giacomaro and that these Reports were false and were designed to curry favor with the government by portraying Pelullo in a bad light. "Agent Mount developed all these lies on Giacomaro's behalf by embellishing the alleged statements by Hellhake and Giacomaro in order to frame Petitioner." (Id. at 33.)

In his January, 2008, Motion to Vacate and Expunge the January 7, 2004, Remand Opinion (the "Remand Opinion") and in his March, 2008, Supplemental Motion to Vacate and Expunge the Remand Opinion, Pelullo relies upon the government's mishandled supervision of cooperating witness Thomas Giacomaro to challenge his own conviction in the instant case. The government has not responded to the substance of Pelullo's contentions, relying on its argument that the court does not have jurisdiction over these two motions. However, Pelullo's charges are so grave, the court cannot simply ignore them. Instead the court has reviewed each of Pelullo's extensive submissions as well as the Cooperation Binder and the government's U.S.S.G. § 5K1.1 letter submitted on behalf of Giacomaro on January 11, 2002. The court has evaluated this evidence to determine if there is any merit to Pelullo's charges and, if so, whether in the circumstance of this case, there is jurisdiction to take any action.

It will be recalled that the Court of Appeals remanded the case to this court to determine whether the record should be expanded to include a substantial number of documents listed by

Pelullo. Upon reviewing the documents, the court in its January 7, 2004, Remand Opinion concluded that they disclosed that Pelullo's life consisted of a series of fraudulent transactions, including looting one individual or corporation after another. The opinion summarized the contents of many of the documents. The documents included FBI 302 forms that detailed some of the transactions, such as those involving a fraudulent insurance purchase, and the acquisition and looting of Pinnacle Enterprises, a trucking company. The documents which Pelullo sought to introduce referred to his associations with members of organized crime. The court denied Pelullo's motion to supplement the record, concluding that most of the documents he sought to introduce into the record were derived from unrelated investigations and indictments, and except for possible Rule 404(b) purposes had no relevance to the instant case.

Pelullo's January, 2008, Motion and his March, 2008, Supplemental Motion advance two distinct, but related grounds to vacate the Remand Opinion and invalidate each action that the Court of Appeals and this court took in this case after issuance of the Remand Opinion. In both motions Pelullo contends that during a ten year period FBI Special Agent Mount supervised cooperating witness Giacomaro, and that Giacomaro was a known liar. While cooperating with the government, Giacomaro conducted his own criminal enterprise that defrauded investors of upwards of $69 million and in which Special Agent Mount, after resigning from the FBI, joined. According to Pelullo, the criminal activities and mob associations attributed to him in the documents quoted in the Remand Opinion were based on lies of Giacomaro and Mount:

> Petitioner will establish below, based on evidence at the time of the opinion in conjunction with the newly discovered evidence that <u>the informant's statements lack any indicia of credibility and that the recordings of fraudulent statements by Agent Mount were those of an FBI agent who was on the payroll of government informant Thomas</u>

> Giacomaro.  It was in Mount's and Giacomaro's best interests to frame Petitioner as a mafioso and criminal so that Giacomaro could gain favor with the government and thereby remain <u>free</u> <u>with</u> <u>Mount</u> to continue to perpetuate (sic) their crimes on the public at a gain of ten's of millions of dollars to Mount and Giacomaro.

(Mot. to Vacate, Jan. 2008, at 3). (emphasis in original.)

According to Pelullo, this court's Remand Opinion and all the opinions, orders and actions of this court and of the Court of Appeals subsequent to the Remand Opinion were so infected by the false allegations contained in the documents referred to in the Remand Opinion that they must be vacated and the indictment dismissed.

The Supplemental Motion relies upon the same alleged misconduct of Giacomaro and Special Agent Mount, but adds a much more serious charge - namely, that in the course of their handling of Giacomaro and Special Agent Mount, the AUSAs in charge were aware of, and, in fact, for a ten year period, enabled Giacomaro's criminal activities and kept him out of prison. More relevant to the instant case, Pelullo charges that the investigation of Compton Press and Pinnacle were coordinated, and that documents the government obtained in the Pinnacle case and the FBI 302 Reports developed in that case should have been turned over to Pelullo's attorneys in this case, but were not.  The government attorneys in this case repeatedly informed defense counsel that they had no 302s and assured them and the court that they had turned over whatever 302 Reports they had for witnesses who would be called.  Pelullo asserts that this absence of 302 Reports is explained, at least in part, by the fact that "Mount stole the investigative files that contained the FBI witness interviews in this case in their entirety including the Roller/Hellhake documents."  In sum, Pelullo contends that the government acted fraudulently by failing to advise defense counsel of the Giacomaro-Mount investigation and the evidence it produced.

2. <u>Giacomaro's Cooperation with the Government:</u> In the 1980s and early 1990s, there was a rash of "bust-outs" in the trucking industry in which organized crime figures were deeply involved. In simple terms, the perpetrators of these schemes acquired a trucking company and then looted its assets until the company went into bankruptcy. This was the subject of federal investigations, by the Newark Organized Strike-Force in particular. Giacomaro was deeply involved one way or another in many of these schemes, one of which was the looting of Pinnacle Enterprises, Inc. In January, 1992, after Pinnacle went into bankruptcy, Giacomaro, fearing that mob figures would kill him because of his knowledge of the fraud, fled the country. He returned in October of that year and offered to become an informant for the FBI. Special Agent Mount became his manager, and there thus began a close association during which Giacomaro provided a vast amount of information concerning the trucking industry, numerous frauds that had been perpetuated on trucking firms, insurance companies and others, and concerning associations of persons with organized crime families.

On February 10, 1996, Giacomaro entered a guilty plea to conspiring to embezzle monies and assets belonging to Imperial Air Freight Profit Sharing Trust and to committing mail fraud. His cooperation proceeded both before and after his plea, and sentencing was deferred so that the cooperation could continue.

By strange coincidence, on January 8, 2008, Giacomaro was transferred from his place of confinement at Fort Dix to Low Security Correctional Institute Allenwood ("Allenwood") and was placed in Pelullo's unit. The two talked extensively, and Pelullo describes in an affidavit what Giacomaro told him about his cooperation with the government. Giacomaro also informed him about the new frauds that he perpetrated during the ten year period of cooperation.

The first new scheme during the period of cooperation was the formation of Mayfair Investment Corp. in 1993. Persons were persuaded to invest, and Giacomaro used the funds for personal expenditures and to purchase an Audi car dealership. As to the car dealership, he sold the cars but kept the proceeds instead of paying Volkswagen credit. He informed Pelullo that Special Agent Mount and the AUSAs were aware of these transactions.

Giacomaro's major project was the 1995 formation of Wellesley Services, LLC, and related companies, ("Wellesley"), purportedly to purchase small waste companies, merge them, and sell interests in the unified companies. To conceal his ownership, he hired Keith Moody and Anthony Bianco as principal officers. Most remarkable of all, Special Agent Mount agreed to become an officer, and did so in 1995, after he had accrued maximum pension benefits at the FBI.

Special Agent Mount not only joined Wellesley, but also he apparently brought with him FBI 302 Reports that he had prepared while supervising Giacomaro. Pelullo states in his affidavit:

> Affiant specifically asked Giacomaro if Mount had the FBI 302 interviews of witnesses in those files. Giacomaro's answers was: "He had all of them" - "including Lisa Freiburg, the accountant". Affiant then asked Giacomaro if Mount had the 302s on David Hellhake, Corona, Donna Holman. Giacomaro said: "Len, he had them all, there were several boxes." Giacomaro went on to admit to Affiant: "Len, Mount had all the files on you."

Accompanying Pelullo's affidavit is a January 22, 2008, attestation of Giacomaro that "the foregoing accounting of my time spent working on the Government's behalf and the Criminal and Civil violations unearthed, and as well as my own behavior within the same time period is the truth and I attest to these truths under the penalties of perjury . . . from page 1 to

45." It is believed that Giacomaro meant "the following accounting" rather than "the foregoing accounting," because there follows this attestation 54 handwritten pages constituting his letters to AUSA Ralph J. Marra, Jr. These letters are dated January 22, 2008 and set forth in excruciating detail his dealings with Special Agent Mount and AUSAs, his corrupt activities while serving as an informant, and the occasions when Special Agent Mount and an AUSA enabled him to escape prosecution for criminal offences.

Special Agent Mount was a part of Wellesley in January or February 1999. His office was down the hall from Giacomaro's office. At that time Giacomaro was preparing a memorandum reciting all he had done for the government to give to the AUSA preparing a § 5K1.1 letter for use at his sentencing on the Air Freight offense. In his handwritten report, which accompanies Pelullo's affidavit, Giacomaro wrote:

> I explained to Harry Mount I kept a Diary of all the meetings Dates and Times, <u>however</u> I would like anything that he would have to add to my Diary, Dates and Times and what took place at those meetings -
>
> De Briefing
>
> Harry Mount gave me from a Box of Files in his office at Wellesley the Black 3 Ring Binder which on the side Painted perhaps with <u>Nail</u> (Finger) (Finger Nail Paint) was - -
>
> F
> B
> I
> 3
> 0
> 2's

I used this Book to develop my own version of a 3 Ring 5 Inch White
Binder called

Cooperation of Thomas Giacomaro

Sometime in the summer of 1999 I called Jose Sciarra and delivered
the Book to him at U.S. Attorney's Office in Newark, N.J.

Giacomaro's account of his own transgressions while serving as a government informant
and his account of the extensive information with which he provided the government are
generally in accord with accounts contained in other documents. It is information with which the
government is totally familiar. However, there is some question whether he is now functioning
totally rationally. He apparently hopes that by spewing forth all this information to AUSA Marra
he can obtain a reduction in his sentence. In his letter he tells AUSA Marra what he seeks:

Mr. Marra, I am requesting the following please.

1. That I am appointed an Attorney to represent me to open
discussions/negotiations with you the Government for the following

A. Witness Protection Program
B. Rule 35 Sentence Reduction
C. Whistle Blowers Compensation
D. Financial Assistance/An Apartment/Automobile/Monthly
Allowance while I am waiting to testify/on/for Individuals/Companies
to be Indicted/Trials/Convictions/Plea
Agreements/Arrangements/Restitution Payments/Collection of Back
Taxes, Fines, interest.

Somewhere Far Away from New Jersey, (Please) NOW.

It is also somewhat mysterious why Giacomaro cooperated so fully with Pelullo during
their brief stay together at Allenwood. For some reason, after he was transferred to FCI Loretto,
Pennsylvania Giacomaro sent the court a copy of his August 12, 2008, letter to the State of New
Jersey Parole Board seeking consideration for parole. In addition to describing personal

tragedies he recited in summary form the assistance that he had provided the United States

government.  He also stated:

> I have been Assaulted, Sexually Assaulted, Extorted and Terrorized
> for a 6 month Period by an Inmate Julio Perez that <u>threatened</u> to
> "Stab" me if I did not do the things he told me to do in Forth Dix
> (West).
>
> Then I was transferred to Allenwood/Law in January 2008.  I was
> assaulted and threatened by an inmate Leonard Pelullo an Inmate who
> had his sentence Enhanced because of Testimony I gave to the F.B.I.
> and U.S. Attorney.

This would appear to be indicative of Giacomaro's present unstable condition, not

evidence of any violent tendencies on Pelullo's part.  Nevertheless, because Giacomaro's

54-page account of his cooperation and simultaneous transgressions is corroborated to a great

extent by other evidence, the court has accepted it as substantially correct.

To return to Giacomaro's saga, after sending the Cooperation Binder to AUSA Sciarra he

continued to pursue his fraudulent activities through Wellesley and its affiliates, conduct that

ultimately cost his victims upwards of $69 million.  It enabled Giacomaro to live a life of luxury

in New Jersey and Florida.  All the while he was free under his cooperation agreement with the

government.

Eventually, the egregiousness of Giacomaro's conduct came to public attention.  In 1999

law suits against Wellesley were filed in New Jersey, New Haven and Hartford, Connecticut.

The ultimate wake up call was an August 19, 2001, article in The Star Ledger.  It's headline was

"FBI Informant Still Free And, Some Say, Still Swindling."  A subheadline recited "Bergen con

man cut a deal eight years ago but has yet to be sentenced."  The article spelled out in great detail

the relationship of former FBI agent Mount and Giacomaro, the formation and operations of

37

Wellesley, and the claims of persons who had invested in Wellesley. The article stated: "An examination of Giacomaro's case raises ethical questions for the FBI and suggests the U.S. Attorney's Office in Newark failed to act when allegations surfaced of new wrong doing by Giacomaro. Federal prosecutors also moved slowly in arranging Giacomaro's sentencing after his cooperation ended."

It didn't take long for the government to move after the article appeared. On January 11, 2002, Giacomaro appeared before Judge Wolin for sentencing on the Imperial Air Freight offense. The government delivered a strong § 5K1.1 letter and vouched for the usefulness and truthfulness and reliability of Giacomaro. In addition Giacomaro had paid $1.2 million in restitution, money taken from Windham Associates, a Wellesley affiliate, robbing Peter to pay Paul. Honoring the government's motion for a downward departure, Judge Wolin sentenced Giacomaro to 18 months in prison.

Thereafter, the government assigned new AUSAs to the case. Giacomaro made full disclosure to them of his criminal activities during his period of cooperation, except that at the outset he could not remember who had provided him with the FBI 302s. His memory was later refreshed.

Giacomaro pleaded guilty to the Wellesley fraud, and on February 13, 2004, Judge Wolin sentenced him to 168 months in prison. This ultimately led to his encounter with Pelullo at Allenwood in January, 2008.

3. <u>Relationship of Giacomaro to Pelullo</u>: The fact that the government appears to have handled Giacomaro ineptly, of itself, has nothing to do with the instant case. The grounds that are the basis of Pelullo's January, 2008, Motion to Vacate the Remand Opinion do not state a

reason to take action in this case. Assuming that Giacomaro was lying and that Special Agent Mount fabricated the FBI 302 reports that accused Pelullo of having engaged in the Pinnacle and other "bust outs" and of having been associated with organized crime, the instant case would not be affected at all. When the government tried to introduce evidence to that effect at the time of Pelullo's sentencing, the court excluded it; when Pelullo sought to introduce on appeal documents that seemed to support those contentions, albeit for a limited purpose, the court denied his motion to admit the documents as totally irrelevant to the issues in this case.

Pelullo's March, 2008, Supplementary Motion to Vacate the Remand Opinion does raise an issue that is relevant. He asserts that the government used the investigations in which Giacomaro cooperated, in effect, to bury documents that would be Brady material in the Compton Press case.

To start with, it must be recognized that there were two kinds of offenses that, for a time, were under investigation simultaneously. One was the nationwide "bust out" phenomenon particularly in the trucking industry. The other was much more limited, the looting of Compton Press and its Employee Benefit Plans.

There was an initial relationship between the two kinds of offenses. Pelullo, along with persons associated with him, was thought to be active in both offenses. Thus witnesses in the Compton Press case might well be witnesses in the "bust out" cases, particularly Pinnacle, in which Pelullo and his associates were involved. For a time law enforcement authorities were considering prosecuting the Pinnacle and Compton Press cases together. On March 30, 1994 an FBI Air Tel stated: "The Newark Strike Force Attorney is currently preparing a prosecutive memo on the other Newark case (Compton). He intends to indict that matter and thereafter

supersede this indictment, incorporating captioned matter (Pinnacle-redacted) into a RICO prosecution." As late as December 13, 1994, the Strike Force was still treating the Pelullo cases in a unitary fashion. A December 15, 1994 Memorandum stated:

> On 12/13/94, Strike Force Attorney Joe Sierra advised Leonard Pelullo was indicted by the FGJ, Newark on 12/9/94, in the Compton Press matter. Pelullo is scheduled to be arraigned 12/14/94. Pelullo is scheduled to be retried in Philadelphia in January, 1995, after two reversals and a hung jury in that district. Pelullo's attorney has initiated plea negotiations in an effort to resolve matters in several districts. If a plea agreement is reached, it include captioned matter (Pinnacle?). If there is no plea agreement, the Compton Press indictment will be superseded to include captioned matter, or it will be indicted separately.

The decision was made to investigate and prosecute the Pinnacle trucking "bust out" investigations and prosecutions separately from the Compton Press investigation and prosecution. Special Agent Mount worked on the trucking industry phase. Special Agent Richard Mohr worked on the Compton Press phase. Their witnesses overlapped to a limited extent, and undoubtedly on occasion the Special Agents coordinated their interviewing of witnesses. However, the subject matter of the two investigations was totally different.

Pelullo seems to assume that if a witness in the Compton Press case is mentioned in the trucking industry investigation, it involved Brady material in the Compton Press case. For example, there are contained in reports in the trucking industry case statements of Giacomaro that he was willing to testify against Pelullo. However, the testimony was unquestionably about Pelullo's actions in the Pinnacle transactions, in which both he and Giacomaro were involved.

Pelullo places great emphasis upon Hellhake's attorney's delivery of documents to Special Agent Mount, citing Mount's December 5, 1994 Memorandum:

Subject [ Deleted]
ET, AL;
OC/DI, Bruno/Scarfo LCN Family
OO's NK
On 12/5/94, I received two cardboard boxes from Douglas Roller, an attorney representing David Hellhake. Mr. Roller supplied the documents contained in those boxes pursuant to an agreement worked out between AUSA Jose Sierra, Roller, and Hellhake.
I completed an FD-192 and forwarded it to Bulky Exhibits Room.
The actual documents will be stored in the Garret Mountain Resident Agency's Bulky Room since the documents have to be carefully examined for investigative purposes and leads.

There is nothing to suggest that these documents related to the Compton Press case or, if they did, that documents related to that case were not turned over appropriately to Pelullo's attorneys. The caption of the Memorandum, "OC/DI, Bruno/Scarfo LCN Family," suggests that the documents were sought in connection with the trucking industry investigation. Through his associations with Pelullo, Hellhake was heavily involved in the Pinnacle transactions as well as the Compton Press take-over.

Pelullo emphasizes Special Agent Mount's purloining of boxes of FBI 302 forms, arguing that this is where 302s relating to Compton Press case witnesses were concealed. There is no evidence to support that argument. In fact, the evidence suggests that these 302s concerned witnesses interviewed in connection with the trucking industry investigation.

Special Agent Mount was assigned to the trucking industry investigation, and there is no reason to believe that he would have had custody of the 302 Reports developed in the Compton Press prosecution. Giacomaro, assigned to Special Agent Mount, was providing information concerning trucking company "bust outs" and organized crime figures. From time to time in the reports concerning him there is a passing reference to the fact that Pelullo was engaged in, or

charged with, the Compton Press offense, but there is nothing to suggest that Giacomaro had knowledge of the Compton Press matters or was providing information about Pelullo's involvement in it. The records reflect that any information he provided about Pelullo related to his activities at Pinnacle or organized crime associations

As described above, when he prepared a Cooperation Binder describing his assistance to the government during his many years as an informant, Giacomaro obtained copies of 302 Reports from then former Special Agent Mount. The court has examined in camera this volume. It includes copies of a large number of FBI 302 Reports. All the Reports contained information Giacomaro provided the Special Agents. This information related to the looting or defrauding of trucking or other entities or to organized crime figures. Pelullo was mentioned only as to his involvement in these activities, particularly his role in the stripping of Pinnacle's assets. There was nothing that could be considered <u>Brady</u> material in the Compton Press case. This further confirms that Special Agent Mount's 302s involved the trucking industry investigation and not the Compton Press case.

In addition, the January 11, 2002, § 5K1.1 letter of the government seeking a downward departure for Giacomaro in connection with the Imperial Air Freight indictment recited the matters in which Giacomaro provided assistance to the government. Giacomaro provided information concerning Pelullo only with respect to Pinnacle, part of the trucking company "bust out" investigation and with respect to asserted organized crime connections. There was no suggestion in the § 5K1.1 letter that Giacomaro provided any information to the government concerning the Compton Press case.

Pelullo cites a number of 302s which record interview of persons who were witnesses in

42

the Compton Press case. For example, he refers to a December 30, 1994[3], Mount Memorandum

describing an interview of Hellhake, an important Compton Press case witness:

> On 12/8/94, I interviewed the captioned source [Hellhake] at GMRA and drafted an FD-302. The source also noted that he had been contacted by Leonard Pelullo, a subject in the case in which the CW will testify. [The Compton Press case]. Pelullo called him on or about 12/5/94. The CW had been specifically briefed not to talk about defense strategies that might be employed by defendants. He avoided talking about the subject and told Pelullo that he had been interviewed by the FBI about Pinnacle Enterprises. Pelullo voiced no concerns about that investigation. The CW also said that the FBI had told him not to call Pelullo.

This Memorandum confirms that Special Agent Mount was interviewing Hellhake about

trucking company "bust outs" (Pinnacle) and not Compton Press matters. The facts developed in

those interviews were not relevant to the Compton Press case, and there was every reason why

the government should not turn over to Pelullo 302 Reports developed in an unrelated

investigation, particularly as Pelullo was a subject of that investigation.[4]

Pelullo builds his case that the government withheld <u>Brady</u> material, and in particular 302

_____

[3] The dates given for reports and memoranda are often the dates the documents were transcribed, not the dates of the interview.

[4] An exception to this general practice seems to be a May 2, 1992 302 Reports that reflected a Newark Organized Crime Strike Force interview of Pelullo employee Janice L. Larson, who was asked about the liquidation of the UNUM insurance policy held by one of the Compton Press Employee Benefit Plans. This took place two years before the trucking industry investigation involving Pinnacle and the Compton Press prosecution were separated.

One can only speculate that prior to 1994 the Newark Organized Crime Strike Force was handling both aspects of the Pelullo investigation, and that when in 1994 the Compton Press aspect of the investigation was separated from the investigation the Newark United States Attorney's Office took responsibility for the Compton Press case. Some documents relating to Compton Press may have remained with Special Agent Mount and his trucking industry "bust out" project, perhaps departing with him when he joined Giacomaro's Wellesley companies.

Reports, by conflating two separate investigations. One was the much larger investigation of the "bust outs" in the trucking industry taking place throughout the United States. The Pinnacle venture, in which Pelullo had a role, was a part of this investigation. The other investigation concerned the much more modest looting of Compton Press and its Employee Benefit Plans, in which Pelullo played the dominant role.

There was a brief period when the government's Strike Force was handling both investigations, but after Pelullo was indicted on the Compton Press charges in 1994, that case was separated from the trucking industry investigations. The trucking industry investigations continued, however, during the on-going investigation, prosecution and trial of the Compton Press case. Because Pelullo and some of his associates were suspects in the trucking industry offenses, there were numerous interviews of persons who were not only potential witnesses in the Compton Press case but who also had knowledge relevant to the trucking industry "bust outs." In his extensive presentation and argument, Pelullo proceeds on the assumption that because a person was a potential or actual witness in the Compton Press case, any interview of him or her, even if taken in the trucking industry case, was Brady material in the Compton Press case. This is obviously not correct. A few Compton Press 302 interview reports taken early on in the combined investigation may have become lodged in the trucking industry files and not disclosed to Pelullo's attorneys, but the vast amount of material upon which Pelullo relies in his March, 2008, Supplemental Motion to sustain his charge that Brady material was not turned over to him is material relevant only to the trucking industry investigation. It had no relevance to the Compton Press case, and because Pelullo was one of the subjects of the trucking industry investigation it would have been improper to have provided him with that material.

44

### III.  Discussion

There are now pending before the court i) Pelullo's November 4, 1999, Rule 33 motion for a new trial to the extent that it is based on newly discovered evidence from two civil trials; ii) Pelullo's March 29, 2007, motion for (a) a ruling on the November 4, 1999 Rule 33 motion to the extent that the court had not previously ruled upon it, (b) leave to supplement his motions with a claim of ineffective assistance of counsel, (c) leave to supplement his Rule 33 motions with two newly discovered documents that were attached to his Rule 60(b) motion, and (d) an order dismissing the indictment or granting a new trial; iii) Pelullo's 2008, motions (a) to vacate and expunge from the record the court's January 7, 2004, opinion and order denying Mr. Pelullo's motion filed in the Court of Appeals to supplement the record, (b) to vacate the May 12, 2005, judgment and conviction and dismiss the indictment or direct a new trial, and (c) for bail pending disposition of the motions; and iv) miscellaneous motions relating to bail, discovery and failure of the government to respond in a timely manner.

A.  Jurisdiction: It is first necessary to extract from the plethora of motions described above those over which the court has jurisdiction and to dismiss those over which it does not have jurisdiction.  It must be kept in mind that there are pending before the Court of Appeals Pelullo's appeal from the court's May 12, 2005 order reinstating the judgment of conviction and sentence imposed upon Pelullo on December 8, 1997, and the government's appeal of the court's October 20, 2005, order granting Pelullo's original § 2255 application to vacate that portion of the judgment of conviction that, by amendment, provided for forfeiture in the amount of $3,562,897.

1.  Effect of Pending Appeals: A district court has the authority to entertain and deny a

motion filed pursuant to Fed. R. Crim. P. 33 despite the fact that a notice of appeal has been filed from the defendant's conviction and sentence, See Gov't of V.I. v. Joseph, 685 F.2d 857, 863 n.3 (3d Cir. 1982); Gov't of V.I. v. Josiah, 641 F.2d 1103, 1105 (3d Cir. 1981). However, if an appeal is pending the district court may not grant a motion for a new trial until the appellate court remands the case. Fed. R. Crim. P. 33(b)(a); see United States v. Cronic, 466 U.S. 648, 667 n.42 (1984).

Similarly, "[o]nce the notice of appeal has been filed, while the district court may consider or deny a Rule 60(b) motion . . . it no longer has jurisdiction to grant such a motion while the appeal is pending." Shepard v. Int'l Paper Co., 327 F.3d, 326, 329 (5th Cir. 2004), citing Winchester v. U.S. Atty. for S.D. of Tex., 68 F.3d 947, 950 (5th Cir. 1995.) Under the approved procedure for handling Rule 60(b) motions during a pending appeal, "the district court may either deny the motion on the merits . . . or, if disposed to grant the motion, certify its determination so that a motion for remand of the pending appeal may be favorably entertained in the court of appeals." United States v. Ellison, 557 F.2d 128, 132 (7th Cir. 1977).

Thus, the existence of the pending appeals does not preclude the court from considering the pending Rule 33, Rule 60(b) and § 2255 motions, determining if it has jurisdiction to address the merits, and, if it has jurisdiction, to either deny the motions or, if it is inclined to grant them, to so certify so that an application can be made to the Court of Appeals for a remand.

2. Rule 33 Motions: It will be recalled that on November 4, 1999, Pelullo filed a motion for a new trial pursuant to Fed. R. Crim. P. 33(b)(1), alleging that newly discovered evidence obtained from the files of two related civil cases disclosed that certain government witnesses at his civil trial testified falsely and further alleging that the government committed a Brady

46

violation by failing to turn over to him exculpatory documents obtained from the Florida warehouse.  After filing the motion, Pelullo obtained documents from the DOL and amended his Rule 33 motion to assert that the government had withheld certain of them in violation of <u>Brady</u>.[5]

The court granted a new trial solely on the basis of the withheld Florida warehouse and DOL documents.  The Court of Appeals reversed the order granting a new trial, but there remain indisposed of Pelullo's Rule 33 contentions based on the documents derived from the civil cases.

In his March, 2007, motion pursuant to Rule 33, Pelullo sought i) to have the court adjudicate the claims raised, but left open, in his earlier Rule 33 motion, ii) to amend his Rule 33 motion to add claims of ineffective assistance of trial counsel, and iii) to supplement his initial Rule 33 motion with "newly discovered" letters of Michael Rich, Esq., allegedly obtained through FOIA requests.

Rule 33(b) sets forth time limitations as follows:

(b) Time to File

(1) Newly discovered evidence.  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

(2) Other grounds.  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

Pelullo's claim regarding evidence from the two civil lawsuits was set forth in his motion for a new trial filed on November 4, 1999.  The jury returned its verdict of guilty on November 8,

---

[5]  The original Rule 33 motion also sought relief on the ground that newly discovered evidence established that the government had access to privileged conversations between Pelullo and his counsel.  The court rejected this contention, and it is no longer an issue in this case.

1996, and accordingly Pelullo's motion based on the newly discovered evidence was timely. The court has jurisdiction to hear this claim.

Jurisdiction over this claim does not give the court jurisdiction over the new Rule 33 claims that Pelullo seeks to add by means of his March, 2007, motion. He cannot now, long after the expiration of the three-year limitation period, add the entirely disparate claim that his counsel, Edward Plaza, Esq., and Herbert Biegel, Esq., were both ineffective for failing to travel to Florida to examine the documents stored in the warehouse. The claim was made nine years and four months after the jury returned its verdict, six years and four months after Rule 33's three year time period had elapsed.

Pelullo cannot bootstrap his new belatedly asserted ground for a new trial upon the undecided ground that was timely filed. If a timely motion for a new trial was not ruled upon by the district court, the district court may rule upon that pending motion on remand following the reinstatement of a jury verdict. United States v. Dixon, 658 F.2d 181, 193 (3d Cir. 1981). The district court may not, however, consider a new Rule 33 claim that was neither pending at the time of remand nor part of an initial and timely Rule 33 claim. United States v. Newman, 456 F.2d 668, 669-70 (3d Cir. 1972); United States v. Tupone, Crim. No. 03-169, 2004 WL 220983, 2004 U.S. Dist. LEXIS 1152, at *10 (E.D. Pa. 2004).

For lack of timeliness, Pelullo's March, 2007, motion will be dismissed to the extent it seeks to amend his Rule 33 motion to add a claim of ineffective assistance of counsel and to the extent it seeks to supplement his initial Rule 33 motion with the Michael Rich letters. The court will address the merits of the unresolved issues raised in the original Rule 33 motion.

    3. Pelullo's 2008 Rule 60(b) Motions: As recounted above, in January, 2008, Pelullo

filed a motion pursuant to Fed. R. Civ. P. 60(b) seeking i) to vacate this court's January 7, 2004, opinion on remand denying his motion to expand the appellate record, ii) vacate his judgment of conviction and sentence, iii) dismiss the indictment and iv) grant bail pending appeal. On or about March 12, 2008, Pelullo filed a supplement to that motion. The thesis Pelullo advances in these motions can be summarized as follows:

> 1. He offered the documents with which he wished to supplement the Court of Appeals record for the sole purpose of showing that the government had withheld documents in his case, not for the truth of the documents.

> 2. This court, when reviewing the documents for the purpose of deciding whether they should be introduced into the record, erred in commenting on the substance of the documents, which included FBI 302 Reports of statements of various persons, including Thomas Giacomaro, which stated falsely that Pelullo had participated in a number of criminal activities other than the Compton Press scheme and was associated with members of organized crime.

> 3. The Court of Appeals, when it reversed this court's new trial order, relied on these false statements as quoted in this court's January 7, 2004, opinion.

> 4. Thomas Giacomaro and his FBI handler, Special Agent Mount, were liars and utterly corrupt, and the statements of Giacomaro and the FBI 302 reports of Special Agent Mount making allegations about Pelullo were false, and designed to win favor with the government by incriminating Pelullo.

> 5. Agent Mount had stolen FBI 302 Reports and turned them over to Giacomaro. This showed that the reason the government had not turned over to Pelullo FBI 302 Reports concerning witnesses in the Compton Press case was that Special Agent Mount had stolen them.

> 6. Because the Court of Appeals opinion reversing the new trial order was based on this court's January 7, 2004, opinion which in turn was based on the lies of Giacomaro and the false 302 Reports of Special Agent Mount, this court's January 7, 2004 opinion should be vacated along with the Court of Appeals's February 25, 2005, opinion based

49

upon it; the conviction should be vacated and the indictment dismissed.

As described above, the government's handling of Giacomaro and Special Agent Mount was not a particularly happy exercise. To test Pelullo's contention that somehow the Compton Press case was one of the subjects of Giacomaro's cooperation with the government, the court acted in accordance with Pelullo's motion that the court examine in camera Giacomaro's Cooperation Binder and the government's U.S.S.G. § 5K1.1 letter on Giacomaro's behalf at the time of his sentencing for the Imperial Air Freight scam. It also examined the documents Pelullo submitted in support of his motion.

In the Cooperation Binder, Giacomaro set forth in great detail the manner in which he had provided information to the government. He attached numerous FBI 302 Reports prepared by Special Agent Mount detailing interviews with Giacomaro. What is apparent is that there was no information that would be material in the Compton Press case and there were no 302 Reports recounting interviews with witnesses in the Compton Press case against Pelullo. Like the documents Pelullo sought to introduce into the record before the Court of Appeals, and which were the subject of the January 7, 2004 opinion, the Cooperation Binder and 302 Reports were unrelated to the Compton Press scheme except for possible Federal Rule of Evidence 404(b) purposes. Neither Giacomaro nor Special Agent Mount testified in the Compton Press case, and their credibility is irrelevant in the instant case.

Similarly, the U.S.S.G. § 5K1.1 letter submitted on Giacomaro's behalf contained nothing of relevance to the Compton Press scheme. It may now be an embarrassment to the government, because Giacomaro was engaging in his own extensive fraud at the time the

government was vouching for his truthfulness, but this has no effect upon the unrelated <u>Pelullo</u> case.

With this by way of background, one can turn to the critical question whether the court has jurisdiction to even consider the 2008 Rule 60(b) motion and supplemental motion. The short answer is that it does not have jurisdiction to hear those motions.

Federal Rule of Civil Procedure 60 provides in part:

> (b) On motion and just terms the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:. . . (6) any other reason that justifies relief . . .

> (c) Timing and Effect of the Motion: (1) Timing. A motion under Rule 60(b) must be made within a reasonable time. . .

Pelullo brings his motions under the Federal Rules of Civil Procedure. A rule 60(b) motion is an inappropriate device for making a challenge to a judgment or order entered in a criminal case. <u>United States v. Mosavi</u>, 138 F.3d 1365, 1366 (11th Cir. 1998). Under certain circumstances, however, the Rules of Civil Procedure, including Rule 60(b), may apply to habeas corpus proceedings. <u>See</u> Fed. R. Civ. P. 81(a)(4). These circumstances are the subject of the court's October 29, 2005 opinion, which, among other things, denied as time barred Pelullo's motion to file an amended § 2255 petition.

In <u>Pridgen v. Shannon</u>, 380 F.3d 721, 727 (3d Cir. 2004), the Court of Appeals, reconciling the rules governing the AEDPA with Rule 60(b), held that to the extent that a Rule 60(b) motion:

> [A]ttacks the manner in which the earlier habeas judgment was procured and not the underlying conviction, the Rule 60(b) motion may be adjudicated on the merits. However, when the Rule 60(b) motion seeks to collaterally attack the

> petitioner's underlying conviction, the motion should be treated as a successive
> habeas petition. We believe this rule is consonant with Congress's goal of
> restricting availability of relief to habeas petitioners.

It is Pelullo's contention that he is attacking the manner in which the January 7, 2004, ruling was procured, specifically, that it was the product of a fraud on the court as a result of the Special Agent Mount-Giacomaro relationship, Giacomaro's continuing life of crime while serving as a cooperating witness, Special Agent Mount's theft of the FBI 302 Reports, and the government's submitting a § 5K1.1 letter to Judge Wolin in support of a departure for Giacomaro without informing Judge Wolin of Giacomaro's on-going criminal activity. Further, Pelullo asserts that the statements in the FBI 302 Reports that were quoted in the Remand Opinion were a tissue of lies concocted by Giacomaro and recited by Special Agent Mount to falsely incriminate Pelullo.

What Pelullo fails to recognize is that however egregious Giacomaro's and Special Agent Mount's conduct may have been, and however blameworthy the government's conduct of the trucking industry investigation may have been, it had no effect upon the Compton Press prosecution or the disposition of the motion resulting in the Remand Opinion. There was no defect in the process leading to the Remand Opinion. Regardless of the truth or falsity of the documents that were the subject of the remand motion and regardless of the manner in which the government handled Giacomaro and Special Agent Mount, the court would have denied Pelullo's motion to supplement the record with the additional documents.

In his 2008 Rule 60(b) motions, Pelullo offers evidence of asserted defects in the government's dealings with Giacomaro and Special Agent Mount, not for the purpose of challenging defects in the habeas review process but rather, by way of collateral attack to

challenge his conviction and sentence. He asserts that this court's January 7, 2004, opinion refusing to expand the appellate record unfairly influenced the Court of Appeals when it reviewed this court's <u>Brady</u> ruling on Pelullo's motion for a new trial pursuant to Rule 33. For relief he seeks to have this court vacate its January 7, 2004, opinion and its May 12, 2005, order reinstating his judgment of conviction.

Pelullo's <u>Brady</u> claim was not raised in his initial § 2255 petition. He now, in his 2008 Rule 60(b) motions, builds upon his original Rule 33 <u>Brady</u> claim to assert that, as exposed by the Giacomaro and Special Agent Mount dealings, evidence was suppressed on a continuing basis as part of an ongoing fraud by the government. In determining whether a purported Rule 60(b) motion is really a successive § 2255 petition "in 60(b)'s clothing," courts have examined whether the motion "directly attack[s] the prisoner's conviction or sentence" or whether it instead "seek[s] a remedy for some defect in the collateral review process." <u>United States v. Winestock</u>, 340 F.3d 200, 207 (4th Cir. 2003). In making this distinction, "new legal arguments or proffers of additional evidence will usually signify that the prisoner is not seeking relief available under Rule 60(b) but instead continuing his collateral attack on his conviction or sentence." <u>Id.</u>

Here, not only the language of Pelullo's 2008 Rule 60(b) motions, but also the mountain of evidence that he proffers in support of his motions, demonstrate that he is attacking his conviction and sentence. Thus, his Rule 60(b) motions are misdesignated and are in reality successive § 2255 petitions. He has failed to obtain the necessary authorization from the Court of Appeals to file a second or successive § 2255 petition, and consequently this court does not have jurisdiction to consider the 2008 Rule 60(b) motions.

The court must either dismiss these motions or transfer them to the Court of Appeals

pursuant to Rule 22-5(h) of the Local Appellate Rules of the Third Circuit and 28 U.S.C. § 1631.

The 2008 Rule 60(b) motions on their face are so patently without merit, seeking as they do to

introduce into the instant case totally irrelevant investigations in other cases, the court will

dismiss the motions rather than transferring them to the Court of Appeals.

      B. <u>Evidence from Related Cases</u>: There remains to be addressed the undecided

contention that Pelullo raised in his original 1999 Rule 33 motion for a new trial. That

contention was that newly discovered evidence obtained from the files of two related civil cases

demonstrated that certain government witnesses testified falsely at his criminal trial. The "newly

discovered" evidence upon which Pelullo relies is:

> 1. An August 1, 1994 declaration submitted by Kenneth Falk, Esq. in a 1993
> lawsuit filed by Fred and Murray Schwartz against Falk, the Wilentz, Goldman
> Spitzer firm, Moshe Milstein, and others. Pelullo contends that the declaration
> establishes that Milstein lied at Pelullo's criminal trial concerning his involvement
> in the disbursement of $2 million in proceeds that Media Partners received from
> the settlement of the National Media litigation.
>
> 2. Fred and Murray Schwartz's answers in the Schwartz v. Falk litigation that
> Murray Schwartz was the sole stockholder of ATTS. Pelullo contends that this
> negates his interest and involvement with ATTS.
>
> 3. Kenneth Falk's 1998 deposition testimony in the 1995 lawsuit in which Moshe
> Milstein sued Falk and the Wilentz, Goldman, Spitzer law firm. Pelullo contends
> that this testimony discloses that David Hellhake gave false trial testimony about
> the extent of his involvement in drafting a September 8, 1989, letter sent by Falk
> to Harry Gerardi and Coolidge Marqueen in response to allegations they made in
> an August 31, 1989, letter.

Before granting a Rule 33 motion based on newly discovered evidence, the trial court

must be satisfied: that i) the evidence is in fact newly discovered, i.e., discovered since the trial;

ii) facts are alleged from which the court may infer diligence on the part of the defendant; iii) the

newly discovered evidence is not merely cumulative or impeaching; iv) the newly discovered

evidence is material to the issues involved; and v) that the evidence is of such a nature that at a new trial it would probably acquit the defendant. United States v. Herman, 614 F.2d 369, 371 (3d Cir. 1980). The burden of proving the need for a new trial rests with the defendant. United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995); United States v. Rocco, 587 F.2d 144, 146 (3d Cir. 1978), cert. denied, 440 U.S. 972 (1979). Failure to establish any of these factors is fatal to a Rule 33 motion. United States v. Adams, 759 F.2d 1099, 1108 (3d Cir. 1985), cert. denied, 474 U.S. 971 (1985).[6]

Pelullo relies on Falk's August 1, 1994, declaration submitted in the 1993 Fred and Murray Schwartz lawsuit against Falk to establish that Milstein lied at Pelullo's criminal trial concerning his involvement in the disbursement of $2 million in proceeds that Media Partners received from the settlement of the National Media litigation. The government argues persuasively that the Falk declaration is totally consistent with his trial testimony concerning the extent of his own decision making capacity with respect to Media Partners and the National

---

[6] In its opinion reversing the court's Brady ruling, the Court of Appeals expressed doubt about the Rule 33 claim based upon documents from the two civil law suits:

> The District Court did not reach the question whether the government suppressed the evidence in the files of the two civil actions against Kenneth Falk and his law firm. . . We believe, however, that our holding, and the principles upon which it is based, have equal validity with respect to the documents from the Kenneth Falk litigations. Accordingly, we see no reason for the District Court to revisit the suppression issue.

399 F.3d at 210 n. 10.

The Court of Appeals treated the civil lawsuit documents as a suppression issue rather than as a newly discovered evidence issue as advanced by Pelullo. The court will address Pelullo's claims applying newly discovered evidence standards, mindful nevertheless of the Court of Appeals's comment.

Media litigation.  The government further argues persuasively that the Falk declaration is in no way inconsistent with evidence establishing the extent of Pelullo's participation in making decisions regarding National Media, such evidence consisting of the trial testimony of Milstein, Hellhake, David Neifeld, Fred Schwartz, Bonnie Lynn and Falk that Pelullo was the person in charge of all facets of the National Media transaction.

However, it is unnecessary to consider whether Falk's declaration is inconsistent with this other evidence.  Pelullo was fully aware of Falk and the civil proceeding in which he was involved.  He called Falk to testify on his behalf at his criminal trial.  During proceedings in connection with the criminal trial, reference was made to a deposition Falk had given at the civil trial.  Because at the time of his civil trial Falk was a defense witness and Pelullo was aware of the Schwartz v. Falk lawsuit, Pelullo did not act with reasonable diligence when he failed to procure a copy of Falk's declaration.  Therefore, the declaration cannot be considered as a basis for a Rule 33 motion based on newly discovered evidence.

In Fred and Murray Schwartz's interrogatory response in the Schwartz v. Falk civil proceeding they stated that Murray Schwartz was the sole stockholder of ATTS.  Pelullo contends that this negates evidence of his interest in ATTS.  It is, however, consistent with Fred Schwartz's testimony in the criminal trial that his father, Murray Schwartz, possessed a 100% stock ownership interest in ATTS.  The government argues persuasively that the trial evidence established that Pelullo's interest and involvement with ATTS was not reflected in the corporate records, and that Murray Schwartz's admitted status as sole stockholder of ATTS does not defeat the government's position, supported by numerous trial witnesses, that Pelullo had a financial interest in, and otherwise benefitted from, his association with ATTS.  However, as in the case of

the Falk declaration, Pelullo was aware of the <u>Schwartz v. Falk</u> litigation at the time of his criminal trial and did not act with reasonable diligence when he failed to acquire Schwartz's interrogatory response in that litigation. These responses cannot be considered as a basis for a Rule 33 motion based on newly discovered evidence.

Pelullo also contends that a deposition taken of Kenneth Falk in 1998 (after Pelullo's 1996 criminal trial) is newly discovered evidence that David Hellhake testified falsely about the extent of his involvement in drafting a September 8, 1989, letter sent by Falk to Harry Gerardi and Coolidge Marqueen in response to allegations they had made in an August 31, 1989, letter. Again the government advances a persuasive argument that Falk's deposition testimony is not inconsistent with Hellhake's recollections, but again, Pelullo's lack of diligence precludes considering the testimony as a basis for a Rule 33 motion based on newly discovered evidence. Pelullo called Falk as a witness at his trial. Nothing prevented Pelullo from questioning Falk either in preparation for trial or at trial concerning the involvement of Pelullo and Hellhake in drafting the September 8 1989, letter to Gerardi and Marqueen.

There is an additional reason to deny Pelullo's Rule 33 motion for a new trial based on evidence derived from the two civil proceedings. Even if the jury had that evidence before it and heard Pelullo's contentions as to its significance, there is no likelihood that the jury would have acquitted Pelullo. The evidence of his guilt on all counts was overwhelming. It is summarized in the court's opinion in <u>United States v. Pelullo</u>, 961 F. Supp. at 744-50. The Appendix to that opinion contains the charts showing the flow of funds out of Compton Press and the Employee Benefit Plans to Pelullo, his companies and family. In the aggregate, the snippets of evidence from the civil trials upon which Pelullo relies could not have overcome the array of evidence of

guilt that the jury had before it.

For these reasons, Pelullo's Rule 33 motion relying on evidence obtained from the two civil trials must be denied.

C. <u>Motions for Release on Bail</u>:  Periodically during these proceedings Pelullo has moved for bail.  Because bail pending disposition of post-conviction habeas corpus review of a conviction is available only when the petitioner has raised substantial claims upon which he has a high probability of success or exceptional circumstances exist which make a grant of bail necessary to make the habeas remedy effective, <u>Landano v. Rufferty</u>, 970 F.2d 1230, 1239 (3d Cir. 1992), <u>cert</u>. <u>denied</u>, 506 U.S. 955 (1992), the court deferred ruling on the bail motion until it was in a position to evaluate the merits of Pelullo's various motions.

As recited above, the court has either dismissed Pelullo's motions for lack of jurisdiction or ruled against him on the merits.  In these circumstances, Pelullo does not have a high probability of success, and there are no exceptional circumstances which make a grant of bail necessary to make the habeas remedy effective.  The motions for bail must, therefore, be denied.

### IV.  <u>Conclusion</u>

For the reasons set forth above Pelullo's motions are disposed of as follows:

1.  Pelullo's March, 2007, motion pursuant to Federal Rule of Criminal Procedure 33 (except as it seeks a ruling on the previously undecided claims contained in his November, 1999, Rule 33 motion), will be dismissed for lack of jurisdiction.

2.  Pelullo's 2008 motion and supplemental motion pursuant to Federal Rule of Civil Procedure 60(b) (having been found to be a successive motion pursuant to 28 U.S.C. § 2255) will be dismissed for lack of jurisdiction without issuance of a certificate of appealability.

3.  To the extent not previously denied, Pelullo's November, 1999, Rule 33 motion will be denied.

4.  Because the government has turned over to the court for in camera inspection the Thomas Giacomaro Cooperation Binder and the government's U.S.S.G. § 5 K.1.1 letter submitted on behalf of Thomas Giacomaro, Pelullo's March, 2008, motion for such a turnover will be dismissed as moot.

5.  Pelullo's March, 2008, motion for the court's certification to the Court of Appeals that it is inclined to grant Pelullo's Federal Rule of Criminal Procedures 33 and Federal Rule of Civil Procedures 60(b) motions and requesting remand of the case so that it can dispose of these motions favorably to Pelullo will be denied.

6.  Pelullo's June, 2008 motion for discovery will be denied.

7.  Pelullo's July, 2008 motion for an order requiring the government to unseal and make available to Pelullo in support of his motions the records in U.S. v. Giacomaro, Crim. No. 03-441, will be denied.

8.  Pelullo's motions to be released on bail will be denied.

The court will file an order implementing this opinion.


October 14, 2008                              *S/ Dickinson R. Debevoise*
                                         DICKINSON R. DEBEVOISE
                                                 U.S.S.D.J.