UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| Plaintiff, : | Crim. No. 94-276(DRD) |
| : | Civ. No. 01-124(DRD) |
| v. : | |
| LEONARD A. PELULLO : | **O P I N I O N** |
| Defendant. : | |

Ralph J. Marra, Jr.
Acting United States Attorney
By:    Leslie F. Schwartz
       Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
       Attorney for United States of America

Leonard A. Pelullo
Fed. #44140-066
Low Security Correctional Institute Allenwood
P.O. Box 1000 - Union A-7
White Deer, PA 17887
       Defendant, *Pro Se*

**Debevoise, Senior District Judge**

On October 14, 2008 the court, among other things, i) dismissed for lack of jurisdiction Defendant, Leonard A. Pelullo's March, 2007, Fed. R. Crim. P. 33 motion (except as it sought a ruling on the previously undecided claims contained in his November, 1999, Rule 33 motion, ii) to the extent not previously denied, denied Pelullo's November, 1999, Rule 33 motion, and iii) dismissed for lack of jurisdiction without issuance of a certificate of appealability Pelullo's 2008

motion and supplemental motion, each brought pursuant to Fed. R. Civ. P. 60(b). (The opinion that the October 14, 2008 order implemented will be referred to as the "2008 Opinion")

By way of background, on January 7, 2004 the court had issued an opinion which, on a remand from the Court of Appeals, denied Pelullo's motion to expand the record to include documents evidencing all manner of criminal activities by Pelullo and others having nothing to do with the Compton Press offence that was the subject of Pelullo's trial, conviction and sentencing in this case. Thereafter the Court of Appeals reversed this court's previous order granting Pelullo a new trial; on remand from the Court of Appeals this court reinstated Pelullo's judgment of conviction and sentence; and the court acted upon Pelullo's unresolved applications.

Among those applications was Pelullo's January 4, 2008 "Motion to Vacate and Expunge From the Record the January 7, 2004 Remand Opinion and To Vacate The Judgment and Conviction in This Case, Dismiss The Indictment with Prejudice, or In the Alternative Order A New Trial Pursuant To The Federal Rule of Civil Procedure 60(b)." On March 12, 2008 Pelullo filed a Supplemental Motion seeking the same relief but adding additional grounds. These motions were denied for lack of jurisdiction in the court's October 14, 2008 order and opinion.

Pelullo filed a notice of appeal from the court's October 14, 2008 order and opinion to the extent that they denied his Rule 33 motions. On or about October 24, 2008 he mailed a Motion for Reconsideration pursuant to Fed. R. Civ. P. 59(e) with respect to the court's denial of his Rule 60(b) motions.

### I. Grounds for Pelullo's Motion

A. Giacomaro's Letter to the Court: In support of his Rule 60(b) motion Pelullo contended that the court's January 7, 2004 opinion was the product of lies by Thomas

Giacomaro. The documents that Pelullo had sought to introduce into the record contained numerous allegations that Pelullo had participated in crimes in conjunction with Giacomaro and that Pelullo had organized crime associations. To show that Giacomaro was a liar, Pelullo provided evidence that while Giacomaro was acting as a government informant he was also engaged in a gigantic fraudulent scheme which caused its victims to lose in excess of $69,000,000. Further, according to Pelullo, Giacomaro was assisted in his corrupt scheme by a rogue FBI Special Agent, Harry Mount, who was Giacomaro's handler and who prepared the FBI 302 reports that Pelullo sought to introduce into the record. It develops that Pelullo did not seek to introduce these documents into the record for their truth, but rather to establish the corrupt nature of Special Agent Mount, who, Pelullo asserts, absconded with FBI 302 reports that recorded statements of witnesses in the Compton Press case, reports that were never turned over to Pelullo and which the government denies existed.

By strange coincidence, in January, 2008, while the court was considering Pelullo's various motions, Giacomaro was transferred from his place of confinement at Fort Dix to Pelullo's unit at FCI Allenwood. The two talked extensively, and Pelullo described in an affidavit what Giacomaro told him about his cooperation with the government and about the new frauds he perpetrated during the ten year period of that cooperation. Giacomaro provided Pelullo with an affidavit and a copy of 54 handwritten pages constituting letters he had written to AUSA Ralph J. Marra, Jr. These letters and affidavit set forth Giacomaro's dealings with Special Agent Mount and various AUSAs, his corrupt activities while serving as an informant, and the occasions when Special Agent Mount and an AUSA enabled him to escape prosecution for criminal offenses. Pelullo filed this material in support of his motions.

For an unaccountable reason Giacomaro communicated directly with the court. He sent the court a copy of his August 12, 2008 letter to the State of New Jersey Parole Board seeking consideration for parole. He recited in summary form the assistance that he had provided the United States government. This tended to corroborate Pelullo's contentions about Giacomaro's and Special Agent Mount's misdeeds. He also stated in the August 12 letter:

> Then I was transferred to Allenwood/Low in January 2008. I was assaulted and threatened by an inmate Leonard Pelullo an Inmate who had his sentence Enhanced because of Testimony I gave to the FBI and U.S. Attorney.

This reference in the opinion is one basis for Pelullo's motion for reconsideration. "There now stands in the record an unrebutted, false allegation that Petitioner assaulted and threatened a federal witness which Petitioner is sure the government will use to his detriment."

The court's October 14, 2008 opinion discredited the allegation of Pelullo's assault and threats, stating "[t]his would appear to be indicative of Giacomaro's present unstable condition, not evidence of any violent tendencies on Pelullo's part." The court considered the letter to be further corroboration of Pelullo's contentions about Giacomaro's cooperation with the government and his simultaneous transgressions. "Nevertheless, because Giacomaro's 54-page account of his cooperation and simultaneous transgressions is corroborated to a great extent by other evidence, the court has accepted it as substantially correct."

The court's conclusion, however, was that "[t]he fact the government appears to have handled Giacomaro ineptly of itself, has nothing to do with the instant case . . . . Assuming that Giacomaro was lying and that Special Agent Mount fabricated FBI 302 reports that accused Pelullo of having engaged in the Pinnacle and other 'bust outs' and of having been associated with organized crime, the instant case would not be affected at all. When the government tried to

4

introduce evidence to that effect at the time of Pelullo's sentencing, the court excluded it; when Pelullo sought to introduce on appeal documents that seemed to support those contentions, albeit for a limited purpose, the court denied his motion to admit the documents as totally irrelevant to the issues in this case."

In his motion for reconsideration Pelullo sets forth in detail his relationship with Giacomaro while the two were together at Allenwood. He describes how he debriefed Giacomaro concerning his cooperation with the government and how he obtained from Giacomaro permission to copy his letters to AUSA Marra. Pelullo then describes how Giacomaro turned on him when he found out that Pelullo could not obtain a lawyer for him. In retaliation Giacomaro attempted to persuade another inmate to provide an affidavit to the effect that he had observed Pelullo threatening and assaulting Giacomaro. When the inmate reported Giacomaro's request, Giacomaro was transferred to another prison. There is no reason to doubt Pelullo's account, which confirms the court's view that Giacomaro's allegation of an assault "would appear to be indicative of Giacomaro's present unstable condition, not evidence of any violent tendencies on Pelullo's part."

B. <u>Errors of Fact as to Agents Mount and Mohr</u>: The October 14, 2008 opinion addressed Pelullo's contention that the government used the investigations in which Giacomaro cooperated, under Special Agent Mount's supervision, to bury FBI 302 reports and documents that would be <u>Brady</u> material in the Compton Press case. The court described the two kinds of offenses that were under investigation at the relevant time. One was the nationwide "bust out" phenomenon, particularly in the trucking industry, and the other was the more limited looting of Compton Press and its Employee Benefit Plans. At the outset there was a relationship between the two

5

kinds of offenses because Pelullo, along with persons associated with him, were thought to be active in both kinds of offenses.

The court reviewed the evidence upon which Pelullo relied to establish that Special Agent Mount worked with the Special Agents pursuing the Compton Press case and that he had prepared and then stolen FBI 302 reports and documents relating to the Compton Press case. (2008 Opinion at 38-44). In particular the court considered Special Agent Mount's December 5, 1994 Memorandum stating that he had received from David Hellhake's attorney, Douglas Roller, two cardboard boxes of documents. Hellhake was an important witness at the Pelullo trial and was also cooperating in the trucking industry case. The court concluded that "[t]here is nothing to suggest that these documents related to the Compton Press case or, if they did, that the documents related to that case were not turned over appropriately to Pelullo's attorneys." (Id. at 41).

Review of the proffered evidence led to the finding that "[a] few Compton Press 302 interview reports taken early in the combined investigation may have become lodged in the trucking industry files and not disclosed to Pelullo's attorneys, but the vast amount of material upon which Pelullo relies in his March, 2008 Supplemental Motion to sustain his charge that Brady material was not turned over to him is relevant only to the trucking industry investigation.

In his motion for reconsideration Pelullo asserts that the court erred on the facts and evidence when it found that Special Agent Mount worked on the trucking industry cases and that Special Agent Richard Mohr worked on the Compton Press case. He cites Special Agent Mohr's affidavit in which he states that his role in the Compton Press case was secondary and that Department of Labor Special Agent Ruffino took notes in a limited number of instances when it

was deemed appropriate; he notes that with 30 actual or potential government witness in the Compton Press case the government failed to produce a single interview report; he further notes Special Agent Mount's memorandum in which he states that "[t]his case has already generated numerous 302's and I believe that many more interviews will be necessary"; Pelullo cites the fact that Special Agent Mount was Hellhake's handler as well as Giacomaro's; and finally, Pelullo cites that certain notes of Special Agent Mount refer to persons who were involved in the Compton Press case, such as Heine and Donna Holman.

A major element of Pelullo's argument that the court misconstrued the evidence concerns the Hellhake documents. The court found, as stated above, that "[t]here is nothing to suggest that these documents related to the Compton Press case or, if they did, that documents related to that case were not turned over appropriately to Pelullo's attorneys." (Id. at 41). Pelullo notes that in his Plea and Proffer Agreement Hellhake agreed to provide information and documents in both the Compton Press and the Pinnacle investigations of Pelullo. Consequently, when his attorney Roller turned over the documents to Special Agent Mount, according to Pelullo, they must have included Compton Press documents as well as the Pinnacle documents. Pelullo refers to a memorandum authored by Special Agent Mount in which he mentions speaking with AUSA Mark Rufolo, who was lead counsel in the Pelullo Compton Press case, about keeping Hellhake "in his current active status until such time as the N.J. trial of LEONARD PELULLO is completed. [Hellhake] will provide important testimony in that case (which is scheduled to begin in mid-September, 1995) and the AUSA felt it was important to ensure that the CW would be immediately available for debriefings, pretrial interviews, and/or proactive measures." (Motion at 12). Pelullo quotes Giacomaro as telling him during their period together at Allenwood, "Len,

7

Mount had all the files on you." (Id.), and that Mount stored the boxes of 302 witness interviews in his office at Wellesley. (Id. at 13).

In support of his motion Pelullo argues that the Giacomaro Cooperation Book and the government's 5 K1.1 letter to Judge Wolin vouching for Giacomaro's usefulness, truthfulness and reliability demonstrate the lack of veracity of the government prosecutors. This, Pelullo contends, establishes that: i) "these same prosecutors and Mount committed fraud on this Court when representing to this Court and the Court of Appeals that there were no FBI 302 witness interviews in this case and that the government was not in possession of the Compton Hellhake documents," and ii) "had this court and the Court of Appeals known of the prosecutors' nefarious conduct with Giacomaro and Mount, the Courts would not have accepted the prosecutors' representations as to the make-up of the prosecution team, i.e., that 'the PWBA agents who monitored the civil litigation were not part of the prosecution team nor did the prosecutors have access to the PWBA files." (Id. at 15).

C. Pelullo's Rule 60(b) Motion: Pelullo argues, as he did in his original motions, that the January and March 2008, motions did not, as the court found, by way of collateral attack challenge his conviction and sentence. Rather, Pelullo contends: "Petitioner has repeatedly stated and detailed that his Rule 60(b) motions challenge the habeas review process. Petitioner never raised one Brady issue in his motions. All of Petitioner's claims center around prosecutorial fraud on this court, the Court of Appeals and Mount's theft of the documents in his control related to this case." (Id. at 16).

For this reason Pelullo insists that the claims were "previously of the sort that have been repeatedly held to be a proper subject for consideration under Rule 60(b). See Winestock, 340 F.

3d at 207 ('[A]n example of a proper 60(b) claim is an allegation that the government agents perpetrated a fraud on the court during the collateral review proceedings.')" (Id. at 18).

D. "New Evidence": In his reply to the government's answer to his motion for reconsideration Pelullo filed a December 31, 2008 letter of Jonathan Kay, Regional Director of the Department of Labor's Employee Benefits Security Administration (formerly the Pension, Welfare and Benefits Administration ("PWBA")).

By way of background, the Court of Appeals, when reversing this court's grant of Pelullo's motion for a new trial, concluded "that the PWBA was not a member of the prosecution team. There is no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources." United States v. Pelullo, 399 F. 3d 197, 218 (3d Cir. 2005). For that reason, the Court of Appeals stated, "we hold that the District Court erred in concluding that the government suppressed the warehouse and PWBA documents." Id. at 219.

By way of further background, this court in its December 13, 2006 opinion (the "2006 Opinion") considered Pelullo's accusation that the AUSA handling the Compton Press case engaged in sustained and deliberately false representations to this court and the Court of Appeals when they asserted that the Department of Labor or the PWBA were not "a part of the prosecution team." Both this court and the Court of Appeals recognized in their opinions that certain PWBA officials, some of whom monitored the civil Compton Press cases, were assisting the criminal prosecution. However, both this court and the Court of Appeals found that there was "no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources . . . Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents." (Id. at 218; 2006 Opinion at

9

26). Further, this court and the Court of Appeals found that "Pelullo's arguments to the contrary notwithstanding, that other agents of the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team. . . [h]ere, the PWBA civil investigators who possessed the documents at issue played no role in the criminal case." (399 F. 3d at 218).

The Kay December 31, 2008 letter to Pelullo reads as follows:

> Leonard A. Pelullo
> Fed #44140-066
> Low Security Correctional Institute Allenwood
> P.O. Box 1000 - Union A-7
> White Deer, PA 17887
>
> Re: Freedom of Information Act Request
>
> Dear Mr. Pelullo:
>
> In the interest of complete and full disclosure, we are providing you with the following information:
>
> There were two criminal cases involving Compton Press which were investigated by our office (at that time, PWBA) in addition to the civil cases:
>
> Compton Press Profit Sharing Plan - case #30-011322(52)
>
> Compton Press Thrift Plan - case #30-011323(52)
>
> The New York Regional Office of PWBA and then EBSA maintained no case files for these cases. All case files were maintained by the U.S. Attorney's Office in Newark, New Jersey, and the DOL/OIG Office of Labor Racketeering, located in Newark, New Jersey at the time that the cases were worked-it has since relocated to Mountainside, New Jersey.
>
> If you have any questions, please contact me at the above address. Thank you for your patience.

Sincerely,

Jonathan Kay
Regional Director

Citing the recent Kay letter, Pelullo contends:

> The letter from the Regional Director of EBSA (formerly the PWBA) to Petitioner not only exposes the government's fraudulent representations to the Courts as to the PWBA's involvement in the civil cases, but also discloses for the first time two additional pieces of information that the government has concealed throughout the instant case.
>
> (1) that the PWBA actually investigated the criminal case; and
>
> (2) that all of the case files created by the PWBA on its investigation(s) on the criminal and civil cases "were maintained by the U.S. Attorney's Office in Newark, New Jersey, and the DOL/OIG Office of Labor Racketeering in Newark, New Jersey at the time the cases were worked.

## II. **Discussion**

A. <u>Standard of Review</u>: "[I]t is well-established in this district that a motion for reconsideration is an extremely limited procedural vehicle." <u>Resorts Int'l v. Greate Bay Hotel & Casino</u>, 830 F. Supp. 826, 831 (D.N.J. 1992). As such, a party seeking reconsideration must satisfy a high burden, and must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." <u>North River Ins. Co. v. CIGNA Reins. Co.</u>, 52 F. 3d 1194, 1218 (3d Cir. 1995).

Since the evidence relied upon in seeking reconsideration must be "newly discovered," a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling. <u>See</u>

11

Local Civil Rule 7.1(i), which governs such motions, and provides that they shall be confined to matter[s] or controlling decisions which the party believes the Judge or Magistrate Judge has "overlooked." The word "overlooked' is the dominant term, meaning that except in cases where there is a need to correct a clear error or manifest injustice, "[o]nly dispostive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." Resorts Int'l, 830 F. Supp. at 831; see also Egloff v. N.J. Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159 (D.N.J. 1988); Pelham v. United States, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

B. Giacomaro's Letter: The first ground for Pelullo's motion for reconsideration is the court's quotation in its opinion of a part of a letter that Thomas Giacomaro sent to the court. Pelullo totally misconstrues the court's purpose in quoting from that letter. The opinion rejected Giacomaro's statement that Pelullo assaulted and threatened him. Rather, the letter was referred to as supportive of Pelullo's contention that Giacomaro had engaged in extensive criminal conduct while he was working with the government as an informant and that Special Agent Harry Mount had misbehaved during and after his handling of Giacomaro.

The crux of the matter, however, is that the government's handling of the Giacomaro case has nothing to do with the instant case. As the court stated in its 2008 Opinion:

> The grounds that are the basis of Pelullo's January, 2008, Motion to Vacate the Remand Opinion do not state a reason to take action in this case. Assuming Giacomaro was lying and that Special Agent Mount fabricated the FBI 302 reports that accused Pelullo of having engaged in the Pinnacle and other "bust outs" and with having been associated with organized crime, the instant case would not be affected at all. When the government tried to introduce evidence to that effect at the time of Pelullo's sentencing, the court excluded it; when Pelullo sought to

12

> introduce on appeal documents that seemed to support those contentions, albeit for a limited purpose, the court denied his motion to admit the documents as totally irrelevant to the issues in this case.

(2008 Opinion at 38, 39).

Quotation from the Giacomaro letter to the court is no reason to reconsider the October 14, 2008, opinion and order.

    C. <u>Errors as to Agent Mount and Mohr</u>: In his motion for reconsideration Pelullo contends that the court erred on the facts and misapplied the evidence when it found that Special Agent Mount worked on the trucking industry cases and that Special Agent Mohr worked on the Compton Press case and when it failed to find that Special Agent Mount possessed and failed to turn over to Pelullo numerous FBI 302s and documents that were relevant to the Compton Press case. Pelullo argues from the evidence that was or should have been a part of his Rule 60(b) motion.

    The court considered Pelullo's arguments and evidence when it ruled on his Rule 60(b) motion. A motion for reconsideration may not be premised on evidence which was available but not presented prior to the earlier ruling. <u>North River Ins. Co. v. CIGNA Reins Co.</u>, 52 F. 3d 1194, 1218 (3d Cir. 1995). A motion for reconsideration is not to be used to reargue issues that the court has already considered and decided. With the exception of contentions based on the Giacomaro letter and the McKay letter, Pelullo's factual contentions are simply a reformulation of the arguments he has already made. An appeal is the vehicle to challenge these findings.

    D. <u>The Status of Pelullo's Rule 60(b) Motion</u>: Pelullo attacks the court's holding that his Rule 60(b) motion was a challenge to his underlying conviction and thus should be treated as a second § 2255 motion. He raises the same arguments that he raised in support of his original

13

motion. A motion for reconsideration is not to be used to reargue issues that the court has already considered and decided, Brambles USA Inc. v. Blocker, 735 F. Supp. 1239, 1340 (D. Del. 1990). Again, Pelullo's vehicle to challenge this holding is by way of appeal.

    E. The Kay Letter[1]: Pelullo argues that the December 31, 2008, letter of Jonathan Kay, Regional Director of the Department of Labor's Employee Benefits Security Administration is new evidence within the meaning of Rule 60(b)(2). Pelullo did not have it, and it was not available to him, when he filed his Rule 60(b) motion or even when he filed his motion for reconsideration. As will be explained below, whether the letter is "new evidence" makes no difference in the disposition of the pending motion. The letter stated that in addition to the civil case there were two criminal cases involving Compton Press that the PWBA was investigating, and that all the case files were maintained by the U.S. Attorney's Office in Newark and the Department of Labor's Office of Labor Racketeering in Newark.

    This letter, Pelullo contends, conclusively establishes that the continuing representations of the U.S. Attorney's office to the Court of Appeals and to this court that the Department of Labor and the PWBA were not a part of the [Pelullo] prosecution team were blatantly false.

    To the contrary - rather than negating the court's understanding of the role of the Department of Labor and the PWBA in the Compton Press prosecution, the Kay letter is totally consistent with, and confirmatory of, that understanding. The court's findings concerning the relationship between the U.S. Attorney's Office and PWBA are set forth in the court's 2006

---

[1] The government submitted a March 6, 2009 letter disputing a number of the contentions that Pelullo made in his reply that accompanied the Kay letter. Finding that these disputed contentions were not relevant to the disposition of the instant motion, the court did not take into account the contentions set forth in the government letter when arriving at this opinion.

14

Opinion.

On May 12, 2005 the court reinstated Pelullo's judgment of conviction and sentence imposed on December 8, 1997. Thereafter Pelullo moved pursuant to Rule 60(b) to vacate the judgment of conviction and dismiss the case with prejudice or direct a new trial. The ground for the motion was that the government's representations to the Court of Appeals that the PWBA was not a part of the prosecution team were knowingly false and that the Court of Appeals's reversal of this court's grant of a new trial was based upon this false information.

In its 2006 Opinion the court held that Pelullo's Rule 62(b) motion was a collateral attack on the underlying conviction and consequently had to be treated as a successive § 2255 petition. Treated as such, the court lacked jurisdiction, because the Court of Appeals had not issued a certificate of appealability.

Despite this lack of jurisdiction over the Rule 60(b) motion, the court addressed the ethical question whether the AUSAs handling the appeal before the Court of Appeals had made deliberately false representations to this court and to the Court of Appeals. Consequently the court reviewed the extensive evidence that Pelullo presented to it and made extensive findings about the extent to which the PWBA participated in the prosecution of Pelullo in the Compton Press case. These findings are set forth at pages 25 to 41 of the 2006 Opinion. These findings are incorporated herein and will only be summarized here.

In 1990 AUSA Robert C. Stewart was Chief of the Strike Force Division of the United States Attorney's Office in Newark. The Strike Force was concerned with the investigation and prosecution of organized crime as distinguished from the usual crimes prosecuted by the United States Attorney's Office. At that time Pelullo was one of the subjects of the Strike Force's

15

investigations involving suspected fraud committed upon a number of corporations in several parts of the United States.

In May, 1989 Pelullo acquired control of Compton Press. In September, 1989 Harry J. Gerardi and Coolidge J. Marqueen, former owners of Compton Press, were terminated as officers and employees of Compton Press and as co-trustees of the two employee benefit plans. Shortly after their termination, Gerardi and Marqueen instituted a civil action in this court against Pelullo and certain of his associates in connection with their administration of the benefit plans. The litigation proceeded during 1989, 1990, 1991 and 1992. During that period the plaintiffs' attorneys in the civil actions conferred with PWBA officials and provided PWBA in New York City with copies of pleadings, certificates, deposition transcripts and other documents. From time to time they pleaded with PWBA to become more involved in the case, but the record disclosed no active role of PWBA in the civil cases. (See 2006 Opinion at 28-31).

The court concluded that "[t]he DOL's monitoring of the civil actions appears to have been only totally passive receipt of information and documents. There is no indication that the prosecution had any sort of control over the PWBA officials who were collecting documents." (2006 Opinion at 30).

According to the Kay December 31, 2008 letter, "[t]here were two criminal cases involving Comton Press which were investigated by our office in addition to the civil cases" - one concerning the Compton Press Profit Sharing Plan and one concerning the Compton Press Thrift Plan. According to the letter "[a]ll case files were maintained by the U.S. Attorney's Office in Newark" and the Department of Labor, Office of Labor Racketeering in Newark.

The 2006 Opinion describes the interaction between PWBA personnel and the Strike

Force during the Strike Force's investigation of Pelullo (2006 Opinion at 31-41). In the fall of 1990, the Compton Press situation came to the attention of the Strike Force, and AUSA Stewart commenced an investigation of it as a part of the larger investigation of Pelullo. This larger investigation encompassed activities in a number of states besides New Jersey, including Pennsylvania, Florida, Illinois, California and Ohio and involved offenses that were outside the purview of the Compton Press inquiry. (2006 Opinion at 31-33).

When the Strike Force decided to bring within its overall investigation the Compton Press offense, as recited at some length in the 2006 Opinion, it drew heavily upon personnel of the PWBA to assist in this investigation. (2006 Opinion at 33-36). The assistance was of such an extent that on occasion FBI memoranda referred to the on-going Strike Force investigation as a "joint investigation between FBI and Department of Labor." (2006 Opinion at 35).

As stated in the 1996 Opinion, "[t]he only documents that there is evidence of the DOL obtaining separately are the documents concerning the civil cases that the DOL received from the attorneys in the civil cases during the 1990-1992 period. All the DOL interviews of witnesses and examination of documents during that period and in 1992 were in the company of FBI agents or assistant U.S. Attorneys." (Id. at 36).

The Court of Appeals recognized this relationship in its 2005 opinion in which it found that the Department of Labor and its PWBA were not a part of the prosecution team. For example, it stated "[d]uring a three-day period in 1991, DOL Special Agent Rosario Ruffino (the principal investigator in the District Of New Jersey case) and two other agents working on the Compton Press matter traveled to Jacksonville and conferred with the FBI agents in charge of the Florida investigation. Florida FBI agents assisted SA Ruffino in identifying six boxes of

17

documents from the retained warehouse documents that were relevant to the New Jersey investigation." 399 F. 3d at 205.

There were two phases of the government's criminal investigation of the Compton Press embezzlement. In the early years, about 1989 to about 1992, it appeared to be a part of the Strike Force's participation in a nationwide investigation of allegations of Pelullo's participation in wide-ranging crash and burn and other fraudulent schemes. Thereafter the project narrowed down solely to an investigation and prosecution of the Compton Press embezzlement.

Two Strike Force attorneys, AUSA Zucker and AUSA Sierra, working under Chief Stewart, handled the Pelullo investigation during its early stages when it was being conducted as a part of the nationwide investigation of Pelullo. By 1995, after it had been decided to concentrate on prosecuting Pelullo solely for the diversion of Compton Press funds, AUSA Rufolo became primarily responsible for the prosecution of Pelullo, and he was assisted by AUSA Schwartz. They, like the Strike Force attorneys before them, were assisted by DOL agents because of their expertise in accounting and pension fund management. Details of this DOL assistance are set forth in the 2006 Opinion at 37-41. The Court of Appeals in arriving at its 2005 opinion was fully aware of the role the DOL agents played in the Pelullo prosecution, stating "there is no question that certain DOL agents were integral members of the prosecution team." 399 F.3d at 215. This court concluded:

> Pelullo's exhibits submitted in support of his motion establish the limited role the DOL and PWBA played in the Pelullo investigation other than assigning agents to accompany FBI agents and AUSAs as they interviewed witnesses and examined documents in Florida and Newark and assigning Ruffino to perform his important task. The labor agencies monitored the civil actions that were active in 1989 and early 1990s, receiving copies of court papers and having occasional conferences with the plaintiffs' attorney. They resisted all attempts of these attorneys to

> persuade them to take an active role in the civil cases, knowing that the investigative and prosecutorial role was being performed by the Strike Force or the United States Attorney's Office.

(2006 Opinion P. 39).

The 2006 Opinion concluded that "[t]he record does not establish that government attorneys made misrepresentations to the Court of Appeals. Consequently, no action is required of this court under the Rules of Professional Conduct." (Id. at 41). The Kay December 31, 2008, letter contains nothing that requires a different conclusion.

Everything contained in the Kay letter is consistent with the facts found in the 2006 Opinion. According to the letter, PWBA classified its investigation as a civil investigation and as two criminal investigations - the criminal investigation concerning the Compton Press Profit Sharing Plan and the criminal investigation concerning the Compton Press Thrift Plan. As is described in the 2006 Opinion, PWBA's civil investigation consisted of receiving copies of pleadings, certifications, deposition transcripts and other documents in the civil actions in this court and conferring with the Plaintiffs' attorneys in those actions.

PWBA's criminal investigation consisted of assigning personnel first to work with the Newark Strike Force as it conducted its wide ranging investigation of Pelullo and later assigning the same or different personnel to work with the AUSAs who were prosecuting Pelullo solely on the Compton Press related charges. Kay's concluding statement is totally consistent with, and, in fact, confirmatory of these accounts:

> The New York Regional Offices of PWBA and then EBSA Maintained no case files for these cases. All case files were maintained by the U.S. Attorney's Office in Newark, New Jersey, and the DOL/OIG. Office of Labor Racketeering located in Newark New Jersey at the time the cases were worked.

19

Thus Pelullo's newly discovered evidence does not provide a ground to grant his motion for reconsideration.

### III. Conclusion

For the foregoing reasons Pelullo's motion for reconsideration is denied. It follows, since conditions have not changed since his last motion to be released on bail was denied, his latest motion to be released on bail should be denied.

                                                  *s/ Dickinson R. Debevoise*
                                                  DICKINSON R. DEBEVOISE
March 9, 2009                                          U.S.S.D.J.