**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br>    v.<br><br>LEONARD A. PELULLO,<br><br>          Defendant. | Crim. No. 94-276(DRD)<br>Civ. No. 01-124(DRD)<br><br>**O P I N I O N** |

Paul J. Fishman
United States Attorney
By:    Leslie F. Schwartz, Assistant United States Attorney
       Norman J. Gross, Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102

      *Attorney for United States of America*

GIBBONS, P.C.
By:    Lawrence S. Lustberg, Esq.
       Thomas R. Valen, Esq.
One Gateway Center
Newark, New Jersey 07102

      *Counsel for Leonard A. Pelullo*
      *On Defendant's May 17, 2010 Motion*

Leonard A. Pelullo
Fed. No. 44140-066
L.S.C.I., Allenwood
P.O. Box 1000
White Deer, PA 17887

      *Defendant Pro Se,*
      *On Defendant's December 10, 2010 Motion*

**DEBEVOISE, Senior District Judge**

Two defense applications are pending before the Court. First, Defendant Leonard Pelullo moves for relief pursuant to Federal Rule of Civil Procedure 60(b) and (d) on the ground that the government misrepresented material facts to the Court of Appeals for the Third Circuit and to this Court. Second, Pelullo moves for relief pursuant to Rule 60(b) on the ground that the Supreme Court decision in <u>United States v. Santos</u>, 553 U.S. 507 (2008) established that his conviction on the indictment's money laundering counts was invalid, requiring that the judgment of conviction on all counts be set aside and a new trial ordered on the theft counts.

## I.     Background

On December 9, 1994 a grand jury sitting in Newark, New Jersey returned a 54 count indictment against defendants Leonard Pelullo and Raul Corona.[1]

Count 1 charged a two-part conspiracy. First, defendants and others were accused of conspiracy to embezzle approximately $4,176,000 belonging to the Compton Press Employees' Profit Sharing Retirement Plan (the "Retirement Plan") and belonging to the Compton Press Employees' Thrift Plan (the "Thrift Plan") contrary to 18 U.S.C. § 664. (The two plans will be referred to collectively as the "Employees Benefit Plans"). Second, defendants and others were accused of conspiring to commit money laundering offenses, namely, to conduct financial transactions that involved the proceeds of unlawful activity (the thefts from the Employees Benefit Plans) with the intent to promote the unlawful activity and knowing that the financial

---

[1]     Prior to trial the charges against Corona were dismissed for the reason that the government used information immunized during proceedings in the Middle District of Florida to obtain the indictment against him in the District of New Jersey. <u>United States v. Pelullo</u>, 917 F. Supp. 1065 (D.N.J.).

transactions were designed to conceal the nature and ownership of the proceeds of the unlawful activity contrary to 18 U.S.C. § 1956(a)(1).

Counts 2 through 12 each charged that the defendants embezzled an amount of money or assets of one or the other or both of the two Employees Benefit Plans. Counts 13-54 each charged that the defendants engaged in a specific transaction which constituted an act of money laundering.

The Indictment charged that Pelullo conspired to commit and committed three separate, multi-transaction embezzlements. First, he transferred a total of $1.15 million from various brokerage accounts maintained by the Employees Benefit Plans to Granada Investments, Inc. ($750,000), and to Paribas - an investment banking firm ($450,000)—to further his interest in a takeover of DWG Corp., as well as to pay personal expenses.

Second, he transferred $1,326 million from the Employees Benefit Plans accounts at various brokerage houses to pension accounts at a Florida bank. From there the funds were transferred to the trust account of Adorno, Zeder, a Miami law firm. Thereafter, Pelullo orchestrated numerous transfers out of the Plans' funds from the trust account, a significant portion of which was used to reimburse Pelullo and others for their investment in Away-to-Travel-South, Inc. ("ATTS"), a travel agency,[2] and the remainder of which was used to further the business interests and pay personal expenses of Pelullo and members of his family.

The third embezzlement arose from Pelullo's termination of an annuity contract owned

_____

[2]     ATTS had been formed to purchase from the bankruptcy court the assets of Ambassador Travel, a heavily indebted travel agency with offices located in department stores, which had filed a Chapter 11 petition.

by the Employees Benefit Plans and issued by the UNUM insurance company, resulting in a $330,000 liquidation charge. At the directions of Pelullo's subordinates, UNUM transferred the remaining proceeds of the annuity, $1.4 million, to a corporate account controlled by Pelullo. From there, Pelullo caused the transfer of those proceeds to the Adorno, Zeder trust account, and their ultimate expenditure on Pelullo's business and personal expenses. Among the business ventures that Pelullo sought to fund with Employees Benefit Plans funds included a deal involving Nursery Acquisition Corp., and the acquisition of National Media, an infomercial company which had $10 million in cash.

On November 8, 1996 a jury convicted Pelullo of all forty-four counts in the Indictment. The Court denied a series of post-verdict motions, see 961 F. Supp. 736 (D.N.J. 1997) (in which the trial evidence is discussed extensively), 971 F. Supp. 159 (D.N.J. 1997) and 5 F. Supp. 2d 285 (D.N.J. 1998). On December 8, 1997, the Court imposed a sentence of 210 months for each of the 41 money laundering counts, six months for the conspiracy and each of the embezzlement counts, all to be served concurrently with each other and with the sentence imposed on Pelullo for racketeering and wire fraud convictions in the Eastern District of Pennsylvania.

The Court of Appeals affirmed the Court's judgment on June 15, 1999, and rehearing *en banc* was denied on August 23, 1999. The Supreme Court denied Pelullo's petition for a writ of certiorari on January 10, 2000.

During the two and one-half years after the Court of Appeals affirmed Pelullo's conviction on June 15, 1999, United States v. Pelullo, 185 F. 3d 863 (3d Cir. 1999 (Table), (rehearing denied en banc August 23, 1999)), Pelullo filed a series of motions and a petition for relief pursuant to 28 U.S.C. § 2255.

In November, 1999 Pelullo filed a tri-partite motion for a new trial pursuant to Fed. R. Crim. P. 33. Each part developed one aspect of Pelullo's contention that newly discovered evidence disclosed that the government had suppressed and failed to disclose favorable evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and had elicited perjured testimony and argued from false evidence to the jury at his trial. The evidence that allegedly had not been disclosed came from a 2,400 square foot warehouse Pelullo maintained in Miami Florida, and from the Department of Labor's ("DOL") Pension and Welfare Benefits Administration ("PWBA").

The third part of the 1999 motion for a new trial relied primarily upon depositions and documents that Pelullo obtained from the DOL pursuant to an order of the court and documents obtained from the DOL pursuant to a Freedom of Information Act (FOIA) request. The depositions were of David Hellhake taken in a Florida bankruptcy matter, In re Ocean Properties of Delaware Inc., S. D. Fla. Case No. 90-11919 BRC-SM and of David Hellhake's father, George P. Hellhake, taken in the same matter. In addition Pelullo relied upon the newly discovered letter dated August 30, 1989 to Douglas Miller of Shearson Lehman authorizing the transfer of the Employees Benefit Plans' account at A.G. Edwards. The letter was signed by Coolidge Marqueen, one of Compton Press's former owners, as well as by Raul Corona (a former defendant) and David Hellhake. Further, Pelullo relied upon the newly produced report of Gus R. Lesnevich, an expert forensic document examiner who had examined seven of the original Granada Investment Inc. loan documents and concluded that the signatures of Andrew N. Heine on each of these documents were genuine.

These documents, according to Pelullo, contradicted the government's contentions and

the testimony of its witnesses i) concerning the relationship of David and George Hellhake to

GH Enterprises, the role of GH Enterprises in the DWG transaction and George Hellhake's role

in the ATTS transaction, ii) that Gerardi and Marqueen had not been aware of the transfer of

Employees Benefit Plans' funds to acquire the DWG stock and iii) that Heine had not signed

loan instruments in connection with the DWG stock acquisition.

In April, 2000, prior to argument on Pelullo's new trial motion, the court suggested that

the government turn over to Pelullo the documents in the PWBA file, which the government

agreed to do. In January 2001, Pelullo filed a petition for relief pursuant to 28 U.S.C. § 2255

asserting 1) the Court failed to provide the jury with specific unanimity instructions, 2) the Court

misapplied the sentencing guidelines in that it sentenced Pelullo pursuant to U.S.S.G. § 2S1.1,

which is applicable to money laundering, rather than the embezzlement, guidelines, 3) the Court

improperly amended Pelullo's judgment of conviction to include forfeiture provisions, and 4) the

government failed to present sufficient evidence to support the conviction for money

laundering.[3]

In its May 17, 2002 opinion the Court granted Pelullo's motion for a new trial based upon

Brady violations. The Court denied Pelullo's petition for relief under § 2255 on the first and

fourth grounds for relief, granting a certificate of appealability on the first ground. It did not

address the second and third § 2255 grounds.

The court found no evidence that the government knowingly used false evidence, but

held that the disclosures subsequent to trial of documents primarily from a Florida warehouse but

---

[3]     As the Court ruled in a December 14, 2006 Opinion this was a first § 2255 motion that
rendered a subsequent Rule 60(b) motion a second or successive § 2255 petition.

also from the DOL's own files evidenced such a serious violation of the government's <u>Brady</u>

obligations that Pelullo's motion for a new trial had to be granted on that ground alone. <u>United</u>

<u>States v. Pelullo</u>, Civ. No. 01-124, Crim. No. 94-276, slip op. at 12-23 (D.N.J. May 17, 2002).

The government appealed the order granting the new trial. It argued that the warehouse

documents were Pelullo's, that he was familiar with them and that he had full opportunity to

review them. As to the DOL documents, the government urged that the PWBA was a civil arm

of the DOL monitoring a separate civil law suit and thus was not part of the prosecution team

responsible to search for and turn over to Pelullo material that might be considered <u>Brady</u>

material.

In support of its contention that the PWBA was not part of the prosecution team the

government in its Third Step Brief in the Court of Appeals (Pelullo Exh. 1) stated "the PWBA

Officials who possessed the documents at issue were not members of the prosecution team in this

case." In a Memorandum submitted in a subsequent proceeding (Pelullo Exh. 16), the

government summarized its position before the Court of Appeals: "Rather, the government

contended that the agents and employees of the DOL and PWBA who were part of the

prosecution team were not involved in collecting civil lawsuit documents."

The Court of Appeals reversed this court's grant of Pelullo's motion for a new trial and

remanded so that the court could address the motions that it had found unnecessary to decide in

light of the fact that it anticipated a new trial, <u>United States v. Pelullo</u>, 399 F. 3d 197 (3d Cir.

2005).

With respect to the warehouse documents, the Court of Appeals held:

In sum, the following factors militate against a finding of suppression of the

warehouse documents: (1) the massive amount of documents, which belonged to Pelullo; (2) the government's lack of knowledge as to the exculpatory nature of the material contained in the warehouse documents; (3) the defense knowledge of, and access to, the subject documents. The government's representations, the only factor weighing in favor of suppression do not, under the circumstances, negate Pelullo's duty to exercise reasonable diligence.

We hold that the District Court clearly erred in its findings of fact and that there was no suppression of the warehouse documents.

Id. at 216.

Turning to the PWBA documents, the Court of Appeals held: "Because we reject the District Court's conclusion that the PWBA should be considered part of the 'prosecution team' we conclude the government did not suppress the PWBA documents." Id.

The Court presented the factual question as follows:

Here, there is no question that certain DOL agents were integral members of the prosecution team. Pelullo argues that this compels the conclusion that the PWBA (as part of the DOL) was part of the prosecution team as well, thus extending the government's Brady obligations to information possessed by the PWBA. The government argues that the prosecution team should not be defined to include the entire DOL, a massive federal agency. The question presented then, is whether the PWBA officials who possessed the documents at issue were members of the "prosecution team" in this case.

Id.

The following quotations from the Court of Appeals's opinion demonstrate that it accepted the government's characterization of the PWBA's role:

While the United States Attorney's Office in New Jersey and agents from the Labor Racketeering Office of the DOL (which is responsible for enforcing violations of federal criminal law) were investigating Pelullo's actions with respect to the benefit plans, officials of the PWBA, a civil arm of the DOL, were monitoring a separate lawsuit, Gerardi, et al. v. Pelullo, et al., United States District of New Jersey Civ. No. 89-4069. That case, like this one, involved the conversion of benefit plan assets. The PWBA collected documents which had been exchanged in discovery between Pelullo and other litigants in that civil case.

399 F. 3d at 209

The District Court also found that the government suppressed the PWBA documents, on the ground that the government's <u>Brady</u> obligations extended to the content of those files because "this material was in the files of the same agency, the DOL, that prepared the present case for trial." Because we reject the District Court's conclusion that the PWBA should be considered part of the "prosecution team," we conclude the government did not suppress the PWBA documents.

<u>Id.</u> at 216

Applying the general principles set forth in these cases - that the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case - we conclude that the PWBA was not a member of the prosecution team. There is no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources. *Cf. United States v. Antone,* 603 F. 2d 566, 569-70 (5th Cir. 1979) (holding that information possessed by state investigator should be imputed to federal prosecutor because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants'"). Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents. And Pelullo's arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team. Indeed, in *Locascio,* information was not attributable to the prosecution team, even though it was known to investigators drawn from the same agency as members of the prosecution team. Likewise here, the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.

<u>Id.</u> at 216

Finally, the Court of Appeals noted that:

even if the prosecutor is charged with knowledge, either actual or constructive of the PWBA documents, Pelullo's *Brady* claim would still fail if he could have obtained the information through the exercise of reasonable diligence. While the public nature of these documents, generated as they were during the course of two civil actions, suggests that Pelullo had sufficient access, to the documents to defeat his *Brady* claim, we need not reach that issue in light of our holding here. (Emphasis added).

Id. at 219 fn. 24.

The Court of Appeals also affirmed this Court's denial of collateral relief, holding that Pelullo's challenge to his jury instructions was procedurally barred. The Court of Appeals directed this Court to 1) reinstate Pelullo's judgment of conviction and sentence, 2) resolve the remaining § 2255 issues, and 3) give serious consideration to vacating its order releasing Pelullo on bail. The Supreme Court denied Pelullo's petition for certiorari on or about January 26, 2006.

In compliance with the mandate, on May 12, 2005 this Court entered an order reinstating the judgment of conviction. The Court also ordered that Pelullo's bail be revoked. On May 24, 2005 Pelullo filed an appeal with the Court of Appeals from the order reinstating his judgment of conviction and sentence, asserting, among other things, that this Court in connection with the sentence should have applied the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

On November 1, 2005 the Court denied Pelullo's § 2255 claim that he was incorrectly sentenced pursuant to the money laundering guidelines rather than the embezzlement guidelines. The Court, however, granted Pelullo's § 2255 claim that the judgment of conviction had been improperly amended to include a forfeiture provision. The Court also rejected Pelullo's claim that he should be resentenced under Booker, finding that for retroactivity purposes, the judgment became final on January 10, 2006 when the Supreme Court denied certiorari from Pelullo's direct appeal. Further, this Court denied Pelullo's motion to amend his § 2255 petition to add a claim of ineffective assistance of counsel, finding that this claim was totally unrelated to any of his four § 2255 claims. The Court denied a certificate of appealability as to all claims.

Pelullo filed separate appeals from the Court's reinstatement of the judgment of sentence,

and from the Court's denial of his § 2255 claims and of its denial of his motion to amend that petition.

The government filed a cross-appeal regarding the Court's decision that the judgment of conviction was improperly amended to include forfeiture.[4]

On or about May 12, 2006, defendant Pelullo filed a Motion for Relief Pursuant to Federal Rule of Civil Procedure 60(b) in which he sought to vacate the Judgment of conviction reinstated by this Court on May 12, 2005. In particular, Pelullo contended that documents he received after May 12, 2005, pursuant to FOIA requests, demonstrated that the PWBA was an integral part of the "prosecution team." According to Pelullo, this cast doubt upon the basis for the Court of Appeals's March 8, 2005 decision that the four allegedly material PWBA documents he received post-trial were not "suppressed" under Brady. On July 28, 2006, Pelullo filed a Motion for Release on Bail pending Appeal and Resolution of his Rule 60(b) application.

In an order dated December 14, 2006, this Court held that the Rule 60(b) motion should be treated as a second and successive petition under 28 U.S.C. § 2255,[5] and as a result the Court lacked jurisdiction because Pelullo had neither requested nor received approval from the Court of Appeals to file such a petition. See 28 U.S.C. § 2255(h). In making its ruling, this Court noted

---

[4]     On or about January 5, 2009, the Third Circuit affirmed this Court's May 18, 2005 Order reinstating the judgment of sentence and further remanded for entry of an order correcting the judgment of sentence to include forfeiture in the amount of $3,562.897. United States v. Pelullo, 305 F. App'x 823, 827-28 (3d Cir.), cert. denied Pelullo v. United States, 130 S. Ct. 64 (Oct. 5, 2009).

[5]     Pelullo had filed his first petition for Section 2255 relief on or about January 9, 2001. At the July 21, 2011 hearing on the application for relief under Rule 60(b) and (d) the government argued that the December 14, 2006 Opinion is dispositive of the jurisdictional issues in the pending application.

that "the role of the DOL and PWBA agents was exactly what the Court of Appeals understood it to be: "there is no question that certain DOL agents were integral members of the prosecution team," "<u>see</u> 12/14/06 Opinion at 39, 2006 WL 3694590, at * 22, and "that the record does not establish that the government attorneys made misrepresentations to the Court of Appeals," <u>see</u> 12/14/06 opinion, at 41, 2006 WL 3694590, at *22.[6]

This Court transferred the Rule 60(b) motion to the Court of Appeals to be treated as an application for leave to submit a second or successive petition. This Court also denied Pelullo's motion for bail. Pelullo thereafter filed a notice of appeal from this Court's December 14, 2006 order.

By letter dated August 2, 2007, Pelullo elected not to proceed with the transferred proceeding in the Court of Appeals. Accordingly, the Court of Appeals dismissed the transferred application for leave to submit a second or successive petition on June 1, 2007. On October 15, 2007, the Court of Appeals dismissed Pelullo's appeal of this court's December 14, 2006 order transferring his Rule 60(b) motion to the Court of Appeals for lack of jurisdiction. In particular, the Court of Appeals held that orders transferring motions found to be second or successive section 2255 motions to a Court of Appeals are not appealable. The Court of Appeals, however, dismissed Pelullo's appeal without prejudice to the defendant filing a new section 2244 application with the appellate court. Finally, the Court of Appeals affirmed this Court's denial of

---

[6]     The Court found that the government's statement in a letter to defense counsel that PWBA employee Carmine Pascale was not involved in the monitoring of the civil lawsuits was a "mistake" as it appeared that he had been involved in such monitoring in 1990 and 1991, <u>see</u> 12/14/06 Opinion, at 39-40; 2006 WL 3694590, at *22. As this Court stated, "Pascale was doing what several DOL and PWBA personnel were doing-monitoring the civil actions. There is no evidence that they were doing that under the guidance or supervision of the Strike Force or the

bail.

On or about March 29, 2007, Pelullo filed a motion asking this Court to rule upon claims asserted in his 1999 Rule 33 motion which the Court did not rule upon in 2002, for leave to supplement his motions with a claim of ineffective assistance of counsel, and for leave to supplement his Rule 33 motion with two allegedly newly discovered letters between Michael Rich, Esq., and government witness Fred Schwartz.

On or about January 4, 2008, Pelullo filed a motion pursuant to Fed. R. Civ. P. 60(b), in which he sought 1) to vacate this Court's January 7, 2004 opinion on remand denying his motion to expand the appellate record, 2) to vacate his judgment of conviction and sentence, 3) dismissal of the indictment, and 4) bail pending disposition of his motions.

On or about October 14, 2008, this Court held that the undecided contentions raised in Pelullo's 1999 Rule 33 motion were without merit. In particular, this Court held that Pelullo did not act with reasonable diligence in discovering before trial the alleged "newly discovered evidence" in the files of two related civil cases. 10/14/08 Opinion at 54-55. In addition, this Court held that "even if the jury had the evidence before it and heard Pelullo's contentions as to its significance, there is no likelihood that the jury would have acquitted Pelullo," as "the evidence of his guilt on all counts was overwhelming." See 10/14/08 Opinion at 57. This Court further held that it was without jurisdiction to entertain Pelullo's attempt to amend his Rule 33 motion to add a claim of ineffective assistance of counsel and to supplement his Rule 33 motion with letters generated by Michael Rich, Esq. in an entirely different civil lawsuit than the lawsuits that were the subject of the 1999 Rule 33 motion. See 10/14/08 Opinion at 48.

_____

United States Attorney's Office." See 2006 WL 3694590, at *22.

Finally, this Court held in its 10/14/08 Opinion that Pelullo's 2008 Rule 60(b) motion seeking to strike the Court's January 7, 2004 Opinion denying his motion to expand the appellate record was in reality a second and successive Section 2255 petition which required authorization from the Court of Appeals in that it attacked his underlying conviction and sentence. See 10/14/08 Opinion at 53.

On or about October 24, 2008, Pelullo filed a Motion for Reconsideration with respect to this Court's denial of his Rule 60(b) motion. Among other things, Pelullo argued that a December 31, 2008 letter that he received from Jonathan Kay, Regional Director of the Department of Labor's Employee Benefits Security Administration (formerly the PWBA), in response to a FOIA request for documents, established that the U.S. Attorney's Office had continued to make misrepresentations regarding the involvement of the PWBA.

In a 3/10/09 Opinion denying reconsideration, this Court held that Director Kay's December 31, 2008 letter was entirely consistent with the Court's 2006 Opinion that the government attorneys made no misrepresentations regarding the PWBA. In the letter, Director Kay had stated that the PWBA had investigated two criminal cases involving Compton Press and that the files for these criminal cases were maintained at the U.S. Attorney's Office in Newark and the Dept. of Labor's Office of Labor Racketeering in Newark. See 3/10/09 Opinion, 2009 WL689680, at *8 (D.N.J. 2009). In particular, in denying Pelullo's motion for reconsideration, the Court stated:

> Everything contained in the Kay letter is consistent with the facts found in the 2006 Opinion. According to the letter, PWBA classified its investigation as a civil investigation and as two criminal investigations - the criminal investigation. Concerning the Compton Press Profit Sharing Plan and the criminal investigation concerning the Compton Press Thrift Plan. As described in the 2006 Opinion,

14

> PWBA's civil investigation consisted of receiving copies of pleadings, certifications, deposition transcripts and other documents in the civil actions in this court and conferring with the Plaintiff's attorneys in those actions.
>
> PWBA's criminal investigation consisted of assigning personnel first to work with the Newark Strike Force as it conducted its wide ranging investigation of Pelullo and later assigning the same or different personnel to work with the AUSAs who were prosecuting Pelullo solely on the Compton Press related charges.

3/10/09 Opinion, 2009 WL 689680, at *11 (D.N.J. 2009).

A July 2, 2009 Order of the Court of Appeals denying a Pelullo application to file a second or successive motion under 28 U.S.C. § 2255 included language that gives rise to his most recent motion filed December 30, 2010 on which Pelullo originally appeared pro se:

> [Pelullo] cites <u>United States v. Santos</u>, 128 S. Ct. 2020 (2008), a case in which the Supreme Court interpreted the meaning of a term in a federal statue. Nothing in this order precludes Pelullo from filing a habeas petition pursuant to 28 U.S.C. § 2241 to present his claim, <u>see, e.g.</u>, In re Dorsainvil, 119 F. 3d 245, 251 (3d Cir. 1997), but we do not express any opinion on the District Court's jurisdiction over, or the merit in, any such petition.

On or about November 19, 2009, the Court of Appeals issued an opinion summarily affirming this Court's 1) denial on the merits of the claims left open in Pelullo's initial Rule 33 motion; 2) denial of Pelullo's Rule 33 motion to add an ineffective assistance of counsel claim and to supplement his original new trial motion with the Michael Rich, Esq. letters; and 3) denial of Pelullo's rule 60(b) motion alleging fraud on the federal court regarding the PWBA's involvement in the Compton Press case. See <u>Pelullo v. U.S.</u>, 352 Fed. App'x. 620 (3d Cir. 2009). In summarily affirming the denial of Pelullo's Rule 60(b) claim of alleged fraud upon the federal courts, the Court of Appeals stated in pertinent part: "The district court did not abuse its discretion in concluding that Pelullo did not produce any evidence pertaining to the Compton

Press case that warranted reopening the proceedings." 352 Fed. App'x. at 623, n.5. Finally, the Court of Appeals declined to issue a certificate of appealability as to this Court's dismissal of Pelullo's Rule 60(b) motion, seeking to vacate this Court's January 7, 2004 Opinion denying the motion to expand the appellate record, as Pelullo's claim involved neither newly discovered evidence nor a new rule of constitutional law made retroactive to cases on collateral review, and further would not have affected the outcome of his trial. 352 Fed. App'x. at 625.

On or about May 17, 2010 Pelullo filed yet another pro se motion pursuant to Fed. R. Civil Procedure Rule 60(b) contending that documents he recently acquired pursuant to FOIA requests from the Department of Labor, Office of Inspector General established that the government "knowingly misrepresented the PWBA's actual role on the prosecution team and its access to the exculpatory documents in the possession of the PWBA agents who monitored the civil litigation." Pelullo filed a Motion for Release pending the disposition of his Rule 60(b) Motion. The Court found that the issues Pelullo raised were sufficiently serious to request that Lawrence S. Lustberg, Esq. and Thomas R. Valen represent him in these proceedings. A bail hearing was held on the bail motion on or about June 21, 2010. The government opposed the motion for release on both jurisdictional and substantive grounds.

On or about June 25, 2010, this Court filed an opinion and order regarding Pelullo's bail application.

The opinion summarized the lengthy history of the Pelullo proceedings and particularized the reason that the Court of Appeals advanced in its 2005 opinion for its finding that the PWBA documents were not Brady material because the PWBA was not a part of the "prosecution team."

Further, the Court referred to its prior rulings holding that "the role of the DOL and

16

PWBA agents was exactly what the Court of Appeals understood it to be: 'there is no question that certain DOL agents were integral members of the prosecution team.'" see 12/14/06 Opinion at 39, 2006 WL 3694590, at *22, and "that the record does not establish that the government attorneys made misrepresentations to the Court of Appeals," see 12/14/06 Opinion, at 41, 2006 WL 3694590, at *22. The Opinion referred to its March 10, 2009 Opinion in which it held that the December 31, 2008 letter of Regional Director Jonathan Kay was entirely consistent with the Court's opinion that the government attorneys made no misrepresentations regarding the PWBA.

The May 17, 2010 Rule 60(b) motion was supported by documents that Pelullo had recently received pursuant to his FOIA requests. These documents supported a strong argument that, however one defines "prosecution team," the PWBA did more than contribute a limited number of its personnel to work with the prosecution and otherwise limit its activities to monitoring the civil case against Pelullo. For example, a November 15, 1990 letter to Chief Stewart of the Strike Force, DOL's Special Agent in Charge wrote "OLR, FBI and PWBA (DOL) have opened an investigation of a potential embezzlement (18 U.S.C. 664) of 3,000,000 from the benefit plans of Compton Press which was sold in 1987 to Equity Finance Group. Leonard Pelullo, a Scarfo LCN associate." A further example, a November 13, 1996 press release of the DOL on the occasion of the jury verdict finding Pelullo guilty on all 54 counts of the Indictment, included the statement that "[t]he investigation leading to the conviction was conducted by the U.S. Labor Department's OIG and PWBA and the Federal Bureau of Investigation."

The Opinion described the numerous documents from which it could be argued that the DOL and PWBA were not only members of the prosecution team but were important members.

After the Opinion was issued Pelullo asked that the government turn over certain documents that the government had withheld as privileged. The Court examined the documents in camera and then asked that they be turned over to Pelullo. Interestingly they tend to support the government's position that at least initially the DOL's role was to monitor the civil action and simply provide technical assistance to the prosecution.

The Court rejected the government's contention that under <u>Pridgen v. Shannon</u> 380 F. 3d 720 (3d Cir. 2004), this motion is a second § 2255 petition and that absent a certification of the Court of Appeals this Court lacks jurisdiction, stating: "However, when one considers the totality of the allegations and the likely relief that would result from validation of the allegations, this is not a direct attack on the judgment of conviction; it is an attack on the manner in which the earlier habeas judgment was procured."

The Court found three arguable grounds for jurisdiction: "The first is Rule 60(b)(6)'s 'any other reason that justifies relief.' The second is the grant of power to a court in Rule 60(d)(1) 'to entertain an independent action to relieve a party from a judgment, order or proceeding.' The third is the general equity power of the court to address grievous abuses of judicial process." In any event the Court concluded it had jurisdiction to proceed with the bail motion.

The Opinion concluded, noting the many uncertainties that remained in the factual development of Pelullo's claims, about which the Court had reached no findings. There were uncertainties about the remedies that might result if Pelullo established that the government misrepresented the PWBA's role in the investigation of the case: "at this point in the proceeding the likelihood that this will result in the vacation of his conviction or a new trial is

problematical." The Court found that "[i]n the present circumstances bail is not appropriate."[7]

In his brief in reply to the government's answering brief on Pelullo's <u>Santos</u> motion, Pelullo not only addressed the <u>Santos</u> issues, but also submitted additional Department of Labor ("DOL") documents that Pelullo contends support his contention that the government knew that the PWBA was a part of the prosecution team. On March 22, 2011 the DOL turned over to Pelullo two additional boxes of documents in response to Pelullo's original FOIA request. Pelullo contends that a number of these documents are relevant to his Rule 60(b) and (d) motion.

One time DOL Agent Rosario (Sal) Ruffino was an acknowledged member of the prosecution team during the pre-indictment investigation of Pelullo and thereafter. Among the newly submitted documents is a February 22, 1991 handwritten note from Ruffino to Assistant United States Attorney Arthur Zucker, who at that time was handling the criminal case against Pelullo. It reads:

> Art,
>
> These are PWBA documents which you may wish to look at (particularly the Miami Herald article). See Carmine Pascale if you have any questions.
>
> Sal

Pelullo contends that this note is further evidence that the PWBA was part of the prosecution team, as Pascale was a PWBA agent and Ruffino was working as a full time member

---

[7]     At the July 21, 2011 hearing Pelullo's counsel justifiably relied heavily on this opinion both with respect to jurisdiction and the fact of misrepresentation. Although the government's characterization of the PWBA's role in the prosecution was not accurate, and the Court of Appeals accepted that characterization, the finding of possible jurisdiction was premature and there was no finding that the alleged misrepresentation was either intentional or the result of willful blindness.

of the prosecution team.

The government responds that the only document referred to in the note is a copy of a publically available 4/28/90 article in The Miami Herald that refers to Pelullo's indictment by a federal grand jury in Ohio for crimes that had nothing to do with embezzlement of pension monies from Compton Press. Affidavits of Arthur Zucker and Ruffino state that neither has any recollection of this note which was written three years before the indictment and five years before Pelullo's criminal trial.

Pelullo refers to a handwritten note of Michael Briglia (who filled PWBA Agent Pascale's role in December 1991) in which he describes developments in the Compton Press civil litigation. The role immediately follows a note in the files from DOL-OIG (the DOL criminal investigative arm). Pelullo deduces from this that the PWBA forwarded these documents to Ruffino.

Apart from observations that the note is not addressed to anyone and the documents could not have been supplied to the DOL, OIG contemporaneously with the note, the government points out that the documentation was publically available and could not be characterized as evidence. According to the affidavits of AUSA Arthur Zucker and Ruffino, the documents relied upon by the prosecution team included the financial documents obtained through grand jury subpoena and the documents contained in the six boxes obtained from the Florida warehouse. By letter dated March 2, 1995 Pelullo was advised that he could make arrangements to copy all of the documents in the possession of the U.S. Attorney's Office, including documents obtained pursuant to grand jury subpoena.

The newly produced DOL-OIG documents include a number of documents that appear to

correspond to entries in an index of documents from the PWBA files previously provided to the Court. Pelullo speculates that the presence of documents in both the PWBA indices and in the files of entities on the prosecution team undercuts the government's claim that it did not receive documents from the PWBA. He notes that 53 documents in the custody of the government trial lawyers and Agent Ruffino were also in the possession of PWBA, suggesting that the government obtained the documents from the PWBA rather than other sources.

The government has submitted affidavits of AUSA Arthur Zucker and Michael Rich demonstrating that the U.S. Attorney's Office was not dependent upon the PWBA to obtain documents relating to the civil case against Pelullo, and it is not remarkable that the PWBA file concerning the civil action and the U.S. Attorney's files should contain many of the same documents. The AUSAs met with the civil action attorneys and obtained documents directly from them. Attorney Rich recalls meeting with AUSA Rufolo and AUSA Schwartz and providing them with documents.

Special Agent Ruffino further describes his and the PWBA's relationship with the U.S. Attorney's Offic in his affidavit accompanying the most recent government brief:

> 1. I am a former Special Agent of the United States Department of Labor. Office of Labor Racketeering ("OLG"). I was involved in the investigation of Leonard Pelullo for embezzlement of approximately $4 million from the Compton Press Pension and Thrift Funds. Although I retired from OLG in May 1995, I continued to assist in the prosecution of Leonard Pelullo from the fall of 1995 through the trial in November 1996 in my capacity as an employee of the Waterfront Commission.
>
> 2. Carmine Pascale was an employee of the Department of Labor, Pension and Welfare Benefits Administration ("PWBA"). It is my recollection that he referred this matter to OLG for possible criminal prosecution based upon a complaint to his office.

3.　I recall that I worked with Robert Goldberg of the Pension and Welfare Benefits Administration ("PWBA") and Special Agent Dick Mohr of the Federal Bureau of Investigation with regards to the prosecution of the criminal case against Leonard Pelullo.　I do not recognize the name of PWBA employee Michael Briglia.　It is my recollection that once a grand jury investigation was initiated that there was a wall between any criminal and civil investigations.

4.　I believe that I relied upon the following sources for documents gathered during the investigation: 1) grand jury subpoenas and 2) six boxes retrieved from a warehouse in Florida which had been seized pursuant to a search warrant by another district.

5.　I have no recollection of sending a note to AUSA Arthur Zucker in 1991 stating that the PWBA had documents that he may wish to look at.　In fact, I do not recall getting any documents from the PWBA.

6.　I recall interviewing Janice Larson but I have no specific recollection concerning an interview with her and her attorney in March 1995.

Included among the documents in Pelullo's May 2011 DOL-OIG production was the deposition of George Hellhake from the Ocean Properties Bankruptcy proceeding.　Pelullo contends that this demonstrates that the government suppressed <u>Brady</u> material from the DOL OIG files as well as the PWBA files.　It is difficult to discern how this bankruptcy deposition of a non-witness in the Pelullo trial constitutes <u>Giglio</u> or <u>Brady</u> material.　It is something of which Pelullo must have had knowledge.　It was marked as an exhibit on the Andrew Heine deposition in the Compton Press litigation, which, according to the government, was provided to Pelullo as part of the <u>Jencks</u> material during the case.

Finally, Pelullo contends that Agent Ruffino was untruthful in an affidavit the government filed in which he stated that the only notes that he took during the trial preparation process related to the interview of Jacob Der Hagopian.　The newly produced DOL-OIG documents include handwritten notes he made during an interview of Janice Larson, a witness in

the case.  The government suggests that the notes were taken during a proffer session and not during trial preparation.  Pelullo had been furnished with Ms. Larson's proffer agreement and grand jury testimony.  The government contends that there was no <u>Brady</u> material in the overlooked Larson notes.

In short, the documents that Pelullo recently filed add nothing to his earlier submissions in support of his Rule 60(b) and (d) motion.

## II.     <u>Jurisdiction</u>

A.     <u>May 17, 2010 Motion</u>:

In this motion Pelullo moved for relief pursuant to Fed. R. Civ. P. 60(b) and (d) on the ground that the government misrepresented to the Court of Appeals that the PWBA was not a part of the prosecution team and therefore the government could not be held responsible for a failure to turn over to Pelullo documents that the PWBA possessed that could otherwise be classified as <u>Brady</u> material.

Fed. R. Civ. P. 60(b) provides in pertinent part as follows:

"(b) <u>Grounds for Relief from a Final Judgment, Order or Proceeding</u>.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment order or proceedings for the following reasons:

…

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

…

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(d) provides in pertinent part:

> (d) Other Powers to Grant Relief. This rule does not limit a court's power to:
>
> > (1) entertain an independent action to relieve a party from a judgment, order, or proceeding.
> >
> > …
> >
> > (3) set aside a judgment for fraud on the Court.

The government points out, and Pelullo concedes, that the motion pursuant to Rule 60(b)(3) for fraud is time barred. Fed. R. Civ. P. 60(c)(1) provides that a motion pursuant to Rule 60(b)(3) must be made within one year after the entry of the judgment or order or the date of the proceeding. The date of the Court of Appeals decision that relied on the alleged misrepresentation was May 17, 2002, and the date of the last district court order entered in this case prior to the instant motion for relief was this Court's March 10, 2009 Order denying Pelullo's motion for reconsideration. Either date places Pelullo's motion outside the one year time limit.

Motions filed pursuant to Rule 60(b)(6) must be filed "within a reasonable time." However, the grounds for relief under Rule 60(b)(6) are restricted to reasons <u>other than</u> those enumerated in the previous five subsections (which include fraud). <u>Arrieta v. Battaglia</u>, 461 F. 3d 861, 864 (7th Cir. 2006) ("if the asserted ground for relief falls within one of the enumerated grounds for relief subject to the one year time limit of Rule 60(b), relief under the residual provision of Rule 60(b)(6) is not available"); <u>Cotto v. United States</u>, 993 F. 3d 274, 278 (1st Cir. 1993). Thus 60(b)(6) is not available to Pelullo.

Despite his strenuous argument to the contrary, Pelullo lacks jurisdiction under Rule

60(b) for a more fundamental reason. His motion is a second or successive motion under 28 U.S.C. § 2255, and cannot proceed in this Court without prior permission from the Court of Appeals.

As recited above, Pelullo filed his initial motion for relief under 28 U.S.C. § 2255 on January 9, 2001. He styles his present motion as a Rule 60(b) motion. That Rule provides for relief from a final judgment or order in a civil, not criminal case. A habeas proceeding pursuant to § 2255 is a civil proceeding. However, the Court of Appeals has held that when a purported Rule 60(b) motion seeks to collaterally attack the petitioner's underlying conviction rather than "the manner in which the earlier habeas judgment was procured," the matter should be treated as a successive § 2255 petition subject to the limitations on such petitions. Pridgen v. Shannon, 380 F. 3d 721, 727 (3d Cir. 2004), see also United States v. Winestock, 340 F. 3d 200, 207 (4th Cir. 2003).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, Tit. I, 110 Stat. 1214 limits a defendant's ability to file more than one collateral challenge. The defendant has one year within which to file his first request for relief under § 2255 from the latest of four specified events, which in this case is the date the judgment of conviction became final. 28 U.S.C. § 2255. Before a defendant may seek a second or successive application for such relief from a district court, he must move before the pertinent court of appeals for an order authorizing the district court to consider the motion.

In Pridgen the Court of Appeals held that when a Rule 60(b) motion attacks the petitioner's underlying conviction, it must be deemed a § 2255 petition requiring Court of Appeals certification when it is a successive such petition. It is not deemed a § 2255 petition

25

when it attacks "the manner in which the earlier habeas judgment was procured." <u>Id.</u> at 727.

Here, by its terms, Pelullo's motion is an attack on the judgment of conviction. It is entitled "Motion to Vacate the Judgement of Conviction and Dismiss the Indictment with Prejudice." For relief it asks "that this Honorable Court vacate the judgment of conviction, dismiss the indictment with prejudice, or in the alternative, grant a new trial and release Petitioner forthwith." (Memo in Support of Motion at p. 51).

Pelullo argues that he was proceeding pro se when he drafted his initial Memorandum, and that the reality of the situation demonstrates that his claim based on misrepresentations to the Courts about the role of the PWBA is an attack on the manner in which the earlier habeas judgment was obtained.

This argument cannot be sustained. Pelullo is not attacking the manner in which the earlier habeas judgment was obtained. He seeks vacation of his conviction on grounds not raised in the prior § 2255 petition. As recited above, on November 4, 1999 Pelullo filed a motion under Fed. R. Crim. P. 33 for a new trial on <u>Brady</u> grounds. On January 9, 2001 he filed a § 2255 petition raising four claims, none of which alleged failure of the government to make disclosures. On May 17, 2002 this Court granted the Rule 33 motion and ordered a new trial. It denied two of the § 2255 claims, issuing a certificate of appealability as to one of them. It did not address two of the claims. Among other developments, the government appealed this Court's grant of Pelullo's Rule 33 motion and grant of a new trial. It was during the prosecution of that appeal that the government is asserted to have made the misrepresentations about the role of the PWBA.

Pelullo is not claiming that these asserted misrepresentations prevented him from fairly presenting any of the claims that he raised in his initial § 2255 motion. His claim in the instant

motion is that misrepresentations were made during the resolution of his Rule 33 motion. This confirms that within the meaning of <u>Pridgen</u> Pelullo's Rule 60(b) motion is an attack on his judgment of conviction and subject to the limitations of the AEDPA. Because Pelullo has not obtained authorization of the Court of Appeals, this Court lacks jurisdiction to hear Pelullo's motion to the extent it relies upon Rule 60(b).

Pelullo relies not only upon Rule 60(b) to establish jurisdiction, he also argues that this Court has jurisdiction both under its general equitable power to address a judgment obtained by fraud and has specific authorization to entertain an independent action to relieve a party from a judgment, order, or proceeding (Rule 60(d)(1) and to set aside a judgment for fraud on the court (Rule 60(d)(3)).

Pelullo relies upon <u>Hazel-Atlas Glass Co. v. Hartford-Empire Co.</u>, 322 U.S. 238 (1944) (referred to approvingly in <u>United States v. Beggerley</u>, 524 U.S. 38 (1998)) to support his contention that the Court has jurisdiction to consider his application pursuant to the Court's inherent equitable powers. In <u>Hazel-Atlas</u> the plaintiff in a patent infringement action against Hazel-Atlas obtained a judgment of infringement in 1932 and on appeal relied in part upon an article purportedly written by a disinterested expert but actually written by one of the plaintiff's attorneys. After obtaining its judgment the plaintiff went to great efforts to prevent the purported author from disclosing the true facts about the authorship of the article. However, Hazel-Atlas was ultimately able to develop irrefutable evidence of the fraud and commenced an action in the Court of Appeals. The Court refused relief on the grounds that (i) the fraud was not newly discovered, (ii) the spurious publication, though quoted in the 1932 opinion, was not the primary basis of the 1932 decision and (iii) that in any event it lacked the power to set aside the decree of

the district court because of the expiration of the term during which the 1932 decision had been rendered.

The Supreme Court reversed, stating:

> Federal courts, both trial and appellate, long ago established the general rule that they would not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered. This salutary general rule springs from the belief that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered. This has not meant, however, that a judgment finally entered has ever been regarded as completely immune from impeachment after the term. From the beginning there has existed along side the term rule a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry. This equity rule, which was firmly established in English practice long before the foundation of our Republic, the courts have developed and fashioned to fulfill a universally recognized need for correcting injustices, which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule.

Id. at 244 (citations omitted). The Court concluded that "[e]very element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments." Id., at 245. It added, "[e]quitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired." Id. at 248.

Notwithstanding Hazel-Atlas, Pelullo cannot rely upon an inherent equity power of the court to support jurisdiction over this application. The cases upon which he relies, including Hazel-Atlas, are all civil cases. United States v. Beggerly supra; Demjanjuk v. Petrovsky, 10 F. 3d 338 (6th Cir. 1993). In this Circuit it has been held that federal courts do not have an inherent power to vacate their criminal judgments and must rely on statutory or Rule authority to do so:

. . . However, both <u>Hazel-Atlas</u> and <u>Chambers</u> are civil cases. In the criminal context, the Supreme Court has held that district courts lack "inherent supervisory power" to enter an untimely judgment of acquittal sua sponte when doing so is in clear contradiction of Federal Rule of Criminal Procedure 29(c). <u>Carlisle v. United States</u>, 517 U.S. 416, 425-28 (1996). The Court explained, "[w]hatever the scope of this 'inherent power,' however, it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." <u>Id.</u> at 426.

<u>United States v. Washington</u>, 549 F. 3d 905, 912 (3d Cir. 2008); <u>see</u> <u>also</u> <u>id.</u> at 914:

Given the absence of authority suggesting a longstanding inherent power of a district court to vacate a criminal sentence based on fraud, other than [<u>United States v. Bishop</u>, [774 F. 2d 771 (7th Cir. 1985)] and its limited progeny, we find that there is no "'long unquestioned' power of federal district courts" to vacate a judgment procured by fraud in the criminal context.

<u>see</u> <u>also</u> <u>id.</u> at 917:

While we are dubious that federal courts ever had the inherent power to vacate criminal sentences that were procured by fraud, "[w]hatever the scope of this "inherent power," . . . it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." <u>Carlisle</u>, 517 U.S. at 426. Accordingly, we hold that to the extent there might have at one point been inherent power in the court, such power was abrogated by Congress pursuant to [18 U.S.C.] § 3582(c) and Federal Rule of Criminal Procedure 35(a).

Pelullo attempts to distinguish <u>Washington</u>, noting that in <u>Washington</u> it was the government, not the defendant, seeking to vacate the judgment and that the judgment to be vacated was a sentence (and not a decision on an appeal from a Rule 33 order). While these distinctions exist, <u>Washington</u> stands for the general proposition that in criminal cases district courts do not have an inherent power going beyond that given by statute or Rule to vacate a judgment of conviction as Pelullo seeks to do here. It is necessary to examine whether the remaining Rule upon which Pelullo relies provides this Court with jurisdiction to hear his application.

Rule 60(d) provides:

> (d) Other Powers to Grant Relief.  This rule does not limit a court's power to:
>
> > (1) entertain an independent action to relieve a party from a judgment, order, or proceeding,
>
> > …
>
> > (3) set aside a judgment for fraud on the court.

The evidence upon which Pelullo relies to establish his claim of fraud on the court is set forth extensively in the Court's June 25, 2010 opinion addressing Pelullo's bail application.  At that time the Court relied primarily upon Pelullo's extensive papers, and the government had not yet had an opportunity to address fully either the jurisdiction question or the merits of his misrepresentation claim.  Notwithstanding this one-sided presentation, the Court denied bail.  In addition, Pelullo has submitted additional DOL documents along with his May 10, 2011 reply brief concerning his <u>Santos</u> motion.

The new documents upon which Pelullo relies are largely of DOL origin, describing the roles of the PWBA, OIG and OLR, often in cooperation with the FBI.  They portray the major role that the DOL played in the entirety of the proceedings against Pelullo - almost an exclusive role in the civil proceedings and an important cooperative role in the criminal proceedings.

During the many years when Pelullo faced civil and criminal actions both the DOL and the United States Attorney's Office personnel changed.  For example, in the United States Attorney's Office initially Robert C. Stewart assumed supervision of the Pelullo investigation and prosecution, followed by a series of Assistant United States Attorneys ("AUSAs"): AUSA Arthur P. Zucker (1990 -     ), AUSA Jose P. Sierra (1992 - 1995), AUSA Mark W. Rufolo

(1995 -     ), and AUSA Leslie Schwartz (        -to date).  The prior opinions in this case describe the complexity of its investigation, prosecution and trial.

In its documents the DOL and its sub-agencies emphasized their important role in the various phases of the proceedings against Pelullo.  It is not unusual for each agency participating in an important prosecution to emphasize the significance of its own role, leaving it to its cooperating agencies to inform the public of the credit to which they are due.  For example, the DOL issued a November 13, 1996 press release (Pelullo Exh. 10) upon the occasion of the jury verdict finding Pelullo guilty on all 54 counts of the indictment that stated, "[t]he investigation leading to the conviction was conducted by the U.S. Labor Department's OIG and PWBA, and the Federal Bureau of Investigation."  Surely the United States Attorney's Office's press people gave appropriate credit to that Office.  These statements are not useful in determining who was part of the prosecution team for <u>Brady</u> purposes.

The manner in which the DOL described its role in the Pelullo proceedings does not answer the question whether the PWBA was part of the "prosecution team" within the meaning of that term as employed in the Court of Appeals's February 25, 2005 opinion.  The Court of Appeals was informed that the PWBA was deeply involved in the civil proceedings against Pelullo.  Its opinion also recited that the PWBA contributed personnel to assist the United States Attorney's Office investigation, prosecution and trial of Pelullo.

The meaning of "prosecution team" can be debated, and, depending upon that meaning, it can be persuasively argued the government's description of the DOL's role in the Pelullo investigation, prosecution and trial was not accurate.  But there is no evidence that any government attorney acted with the intent to deceive either the Court of Appeals or this Court

31

concerning that role.

Assuming that in the extraordinarily complex circumstances of this case there were inaccurate descriptions of the extent of the PWBA's exact role in the Pelullo proceedings, this would not rise to the kind of conduct that would permit use of Civil Rule 60(d)(1) and (3) for relief for fraud on the court. "Fraud on the court" is limited to fraud which "seriously affects the integrity of the normal process of adjudication [and] should embrace only that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." King v. First Am. Investigations, Inc., 287 F. 3d 91, 95 (2d Cir. 2002) (internal quotation marks omitted). The challenged conduct "'must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'" State Street Bank and Trust Co. v. Inversiones Evazuriz Limitada. 374 F. 3d 158, 176 (2d Cir. 2004).

A judgment may be set aside only upon a showing of (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) that in fact deceives the court. Herring v. United States, 424 F. 3d 384, 390 (3d Cir. 2005). Pelullo urges the Court to follow the Sixth Circuit's requirement that a movant's burden when pursuing an independent action is to show, instead of intentional fraud, "reckless disregard" for, or "willful blindness" of the truth. Johnson v. Bell, 605 F. 3d 333, 339 (6th Cir. 2010); Demjanjuk v. Petrovsky, 10 F. 3d 338 (6th Cir. 1993). Although the Court of Appeals has not adopted a test for fraud on the court, its language in Herring suggests that it will reject the Sixth Circuit rule and follow the "intentional fraud" rule adopted by the other circuits that have addressed the question:

Actions for fraud upon the court are so rare that this Court has not previously had

the occasion to articulate a legal definition of the concept. The concept of fraud upon the court challenges the very principle upon which our judicial system is based, the finality of a judgment. The presumption against the reopening of a case that has gone through the appellate process all the way to the United States Supreme Court and reached final judgment must be not just a high hurdle to climb but a steep cliff face to scale.

424 F. 3d at 386

Thus fraud on the court must involve truly egregious conduct, such as bribing a judge, tampering with a jury, hiring an attorney for the purpose of influencing a judge. See Stewart v. O'Neill, No. 00 Civ. 8560, 2002 WL 1917 888, *2 (S.D.N.Y. Aug. 16, 2002).

Even if one drew from Pelullo's documents all the inferences he seeks be drawn, nothing of this dire nature took place in this case. This does not provide a basis for relief pursuant to Fed. R. Civ. P. 60(d). Even were the Sixth Circuit standard applied, Pelullo has not established either reckless disregard or willful blindness upon the part of government attorneys.

Pelullo has advanced a number of other contentions, such as estoppel, materiality of documents and numerous contentions previously dealt with. In view of the fact that the Court lacks jurisdiction over this application these contentions will not be addressed. The Court will transfer the Rule 60(b) and (d) motion to the Court of Appeals to be treated as an application for leave to submit a second or successive petition.

**B.      December 30 2010 (<u>Santos</u>) Motion**

Pelullo also styles his <u>Santos</u> motion as an application for relief under Rule 60(b)(6). He asks the Court to apply the holding of <u>Santos</u>—that the "proceeds of some form of unlawful activity" used by the money laundering statute[8] means criminal profits rather than criminal

---

[8]      18 U.S.C. § 1956. The statute has since been modified to reverse the <u>Santos</u> decision.

receipts—to "vacate the money laundering counts of conviction and grant a new trial on the non-money laundering counts…." (Dec. 2010 Br. 15). Pelullo argues that his payment of business expenses cannot constitute money laundering under Santos and that his other convictions under 18 U.S.C. § 664 for embezzlement were so closely intertwined with the money laundering charges as to require that they be retried. (Dec. 2010 Br. 3-4).

As stated above, Rule 60(b) is a civil mechanism that applies only to private actions and cannot normally be used to vacate a criminal conviction. However Pelullo claims that the Court has authority to apply Rule 60(b) to this purpose under the holding of Gonzalez v. Crosby, 545 U.S. 524 (2005). He quotes language from the Gonzalez decision stating that Rule 60(b)(6) "permits reopening when the movant shows any reason justifying relief from the operation of the Judgment" and that "[a] change in the interpretation of a substantive statute may have consequences for cases that have already reached final judgment, particularly in the criminal context." Id. at n. 9.

Despite these select quotes, the balance of the Gonzalez decision makes clear that Pelullo's motion is impermissible under Rule 60(b). In Gonzalez, the Supreme Court reviewed a Rule 60(b) motion filed by a prisoner in state custody. The motion challenged the procedures followed in the disposition of the prisoner's previously filed habeas petition. The prisoner's first habeas petition had been rejected as untimely under the statute of limitations contained in AEDPA.[9] After the petition had been dismissed, the Supreme Court decided the Artuz v.

_____

[9]    28 U.S.C. § 2244(d)(2).

<u>Bennett</u>[10] case, which clarified a tolling rule concerning the AEDPA statute of limitations.[11]
Armed with this new ruling, the prisoner filed a motion under Rule 60(b) seeking to reopen the
dismissed habeas petition.

The state in <u>Gonzalez</u> argued that the Rule 60(b) motion should be barred as a "second or
successive" habeas corpus application under 28 U.S.C.A. § 2244(b).[12] The Court of Appeals for
the Eleventh Circuit agreed and dismissed the petition for failure to demonstrate either (1) a new
rule of constitutional law of retroactive application, (2) newly discovered facts, or (3) fraud on
the court in the previous petition. <u>Gonzalez</u>, 531 U.S. at 528. In opposition, the petitioner argued
that the Rule 60(b) motion was a challenge to a procedural ruling in a prior habeas case and not a
new application.

On review, the Supreme Court described the steps that a court must follow in determining
whether a Rule 60(b) motion constitutes a "second or successive application," writing:

---

[10]    531 U.S. 4 (2000).

[11]    The <u>Gonzalez</u> petitioner had filed his habeas petition two months after the statute of
limitation had expired. But in dismissing the petition, the lower court did not toll the statute of
limitations during the pendency of prior applications for relief brought by the petitioner in state
court, finding that they were "not properly filed." <u>Artuz</u> clarified the rule concerning when a
state petition is "properly filed" for the purposes of staying the AEDPA statute of limitations (28
U.S.C. § 2244(d)(2)) and made clear that the statute of limitations should have been stayed for
the <u>Gonzalez</u> petitioner.

[12]    Because the prisoner in <u>Gonzalez</u> was in state custody, the Court evaluated the "second
or successive" rule that appears in 28 U.S.C. § 2244 and applies to habeas petitions brought
under 28 U.S.C. § 2254. As Pelullo is federal custody, his application is vulnerable under the
comparable terms of 28 U.S.C. § 2255. While the <u>Gonzalez</u> court warned that the provisions are
"not identical" and expressly "limit[ed] [its] consideration to § 2254 cases", the analysis of
<u>Gonzalez</u> would appear to apply with equal force here given the remarkable similarity in the
applicable language between § 2254 and § 2255.

Under § 2244(b), the first step of analysis is to determine whether a "claim presented in a second or successive habeas corpus application" was also "presented in a prior application." If so, the claim must be dismissed; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions.[13] In either event, it is clear that for purposes of § 2244(b) an "application" for habeas relief is a filing that contains one or more "claims." That definition is consistent with the use of the term "application" in the other habeas statutes in chapter 153 of title 28. See, *e.g., Woodford v. Garceau,* 538 U.S. 202, 207, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (for purposes of § 2254(d), an application for habeas corpus relief is a filing that seeks "an adjudication on the *merits* of the petitioner's claims"). These statutes, and our own decisions, make clear that a "claim" as used in § 2244(b) is an asserted federal basis for relief from a state court's judgment of conviction.

Id. at 530.

The court then presented some examples of Rule 60(b) motions that would constitute "claims"

subject to the procedural bar of § 2244, noting that:

[A] motion might contend that a subsequent change in substantive law is a "reason justifying relief," from the previous denial of a claim. Virtually every Court of Appeals to consider the question has held that such a pleading, although labeled a Rule 60(b) motion, is in substance a successive habeas petition and should be treated accordingly.

We think those holdings are correct. A habeas petitioner's filing that seeks vindication of such a claim is, if not in substance a "habeas corpus application," at least similar enough that failing to subject it to the same requirements would be "inconsistent with" the statute.

Id. at 531 (internal citations omitted).

Turning to the Gonzalez petitioner's claim, the court found that the Rule 60(b) motion was not

an attack on his underlying conviction or a merits determination made concerning a previous

habeas petition. Rather petitioner alleged a "defect in the integrity of the federal habeas

---

[13]     From context, it is clear that the Gonzalez court is referring to the "new facts" and "new rule of constitutional law" exceptions found in § 2244(b)(2).
    .

proceedings." Id. at 532. The court held that a motion under Rule 60(b) is not precluded under § 2244 where the motion "merely asserts that a previous ruling which ***precluded a merits determination*** was in error-for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." Id. at n. 4 (emphasis added). In contrast, a challenge to a prior merits determination or a new claim on the merits would be precluded. Id. at 532. However, the Gonzalez court, while holding that the petitioner's motion was not barred under § 2244, ultimately rejected the motion for another reason, that he had failed to show that the minor change in procedural law represented "extraordinary circumstances" as required by Rule 60(b)(6). Id. at 536. The court did note that "[a] change in the interpretation of a *substantive* statute may have consequences for cases that have already reached final judgment, particularly in the criminal context" Id. at n. 9.

Here, Pelullo's Rule 60(b) Santos motion is an unambiguous attack on the validity of his underlying conviction based on an intervening change in the interpretation of a federal substantive statute. Unlike the Gonzalez petitioner, Pelullo does not seek to revive his prior § 2255 petition from dismissal on technical or procedural grounds. To the contrary, Pellulo's § 2255 petition was resolved on the merits over ten years ago. Pelullo's action is a collateral attack on his conviction that cannot be countenanced under Rule 60(b). United States. v. Akers, 519 F. Supp. 2d 94, 95-96 (D.D.C. 2007) ("Generally, a motion pursuant to Rule 60(b) seeks a remedy for some defect in the collateral review process. By contrast, an attack on a prisoner's conviction or sentence is tantamount to a § 2255 motion.").

Since Pelullo has already filed a § 2255 motion, any "second or successive" motion like this one "must be certified as provided in section 2244 by a panel of the appropriate court of

appeals to contain…newly discovered evidence…or…a new rule of constitutional law….” 28 U.S.C. § 2255. Pelullo has not obtained such a certification for the instant motion and is not likely to be successful in doing so. Indeed, on July 2, 2009, the Court of Appeals issued an order stating that Pelullo's <u>Santos</u> challenge did not implicate either undiscovered evidence or a new rule of constitutional law. This Court is bound by that decision. If adjudicated under § 2255, Pelullo's motion must fail.

Aware of this procedural vulnerability, Pelullo argues in the alternative that his motion be construed as an application for habeas corpus relief under 28 U.S.C. § 2241. Since Pelullo is a *pro se* litigant[14], his filings must be “liberally construed.” <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007). To avoid “unnecessary dismissal” we may “ignore the legal label that a *pro se* litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category.” <u>Castro v. United States</u>, 540 U.S. 375, 381 (2003). And there is authority suggesting that a merits attack on a conviction based on an intervening change in law may be properly brought under § 2241 even if a petitioner has already exhausted his or her remedies under § 2255. <u>See</u> <u>e.g.</u>, <u>In re Dorsainvil</u>, 119 F. 3d 245, 251 (3d Cir. 1997).

However § 2241 is not a broad alternative waiting to be invoked once a prisoner has exhausted his or her § 2255 rights.[15] A petitioner may bring a § 2241 claim, “only in unusual situations, such as those in which a prisoner has had no prior opportunity to challenge his

---

[14]     While Pellulo is currently represented by counsel, the instant motion was filed while he was *pro se*.

[15]     <u>See</u> <u>Dorsainvil</u>, 119 F.3d at 251 (“We do not suggest that § 2255 would be “inadequate or ineffective” so as to enable a second petitioner to invoke § 2241 merely because that petitioner is unable to meet the stringent gatekeeping requirements of the amended § 2255. Such a holding

conviction for a crime later deemed to be non-criminal by an intervening change in law." Brown v. United States, No. 10-2895, 2011 WL 240693, *1 (3d Cir. Jan 27, 2011) (table); see also Okereke v. United States, 307 F.3d 117, 121 (3d Cir. 2002) (exception requires an "intervening change in law … that potentially made the crime for which that petitioner was convicted non-criminal").

In this case, Petitioner makes a variety of arguments in favor of habeas relief, many of which are effectively irrelevant. As an initial matter, Pellulo argues that the transactions charged as money laundering did not promote the underlying § 664 charges. (Dec. 30 Br. 23-26). While this argument is wrapped in a Santos motion, it has little to do with the decision in that case and is, in essence, a challenge to the sufficiency of the evidence used to support the initial jury verdict. As such, Pellulo has already exercised his repeated opportunities to make this very argument, at trial, in his appeal, and in his first § 2255 motion. A raw challenge to the sufficiency of a jury verdict, based on no new evidence or change to the legal environment cannot be properly entertained under § 2241, particularly when that challenge has already been made and rejected.

More substantially, Pellulo and his counsel argue that the Santos decision has effectively made his conduct "non-criminal" by modifying the meaning of the word "proceeds" as used in the money laundering statute to mean "profits" rather than "net receipts." Pellulo argues that because the money he stole from the pension funds was used to pay for various business transactions and expenses there were no profits. For example, Pellulo argues that "the proceeds of the Plan loans to Granada were used to pay investment bank fees to Paribas, reimbursement to

would effectively eviscerate Congress's intent in amending § 2255.").

Fairview Financial for the fees paid to Trafalger Investment Bank and the buyout of MBA's interest in the Granada L.P… [t]hus there were no profits." (Dec. 30 Br. 36). In contrast, the government contends that the crime of embezzlement was complete when Pelullo removed money from the pension funds and that all money removed constituted ill-gotten "profits" of that crime, no matter how it is ultimately spent.

Pellulo's position fundamentally misconstrues <u>Santos</u> and is at odds with subsequent authority applying the decision. The profits of crime are the total money or property unlawfully obtained, minus any expenses incurred in the criminal activity itself. <u>U.S. v. Yusuf</u>, 536 F.3d 178, 190 (3d Cir. 2008) ("Other than some small expenses incurred in perpetuating the mail fraud-i.e., the postage stamp affixed to their monthly tax return or any other preparation fees relating to the return-the unpaid taxes retained by defendants amounted to profits."). Once this money or property is converted from its lawful owner, the manner in which it is spent has no bearing on whether it constitutes profits. <u>Abuhouran v. Grondolsky</u>, 643 F.Supp.2d 654, 669 (D.N.J. 2009) ("when the [Defendants] through their manifold fraudulent acts, secured each loan, the specified unlawful activity, bank fraud, was completed. Whatever was done with the proceeds of each loan was the start of a new activity, a separate crime if done with the requisite intent."). [16] As such, profits of crime, once obtained, remain profits whether spent on business expenses, utility bills, sports cars, or merely stuffed under a mattress. If profits are invested in a

_____

[16]     See <u>also</u> <u>Soreide v. Zickefoose</u>,  No. 10-2452, 2010 WL 4878744, 11 (D.N.J. Nov. 23, 2010) ("a litigant aiming to bring his/her claims under Santos must allege facts showing that his/her money laundering charges (and conviction) was based only on the transactions executed by the litigant for the purposes integral to his/her execution of the underlying illegal activity, e.g., on the payments of the costs necessitated by running that particular underlying illegal "business.").

fashion that conceals or promotes the underlying offense, the separate crime of money laundering has been committed. Id. But a subsequent act of money laundering does not mean that the initial crime yielded no profits. Money laundering conceals the profits of crime; it does not actually eliminate them.

In the May 2011 Brief, Pellulo argues that the government's position is inconsistent with statements made at trial and in subsequent proceedings concerning when the "embezzlement scheme" was completed or what the objects of the scheme were. (May 2011 Br. 13). Pellulo contends that the government is in a double bind. Either the transactions were "integral" and "necessary" components of the money laundering, making them "mere proceeds" that cannot give rise to liability post Santos, or they were "independent" and "not integral," and therefore could not have "promoted" the underlying crime as required under the statute. (May 2011 Br. 14-15).

But this argument does great violence to the statute. First, if all acts of promotion involved only receipts and not proceeds, then the promotion arm of the money laundering statute would be effectively nullified. No authority submitted to the Court suggests that Santos should be read in this fashion. Second, numerous courts have held that a defendant may "promote" unlawful activity via transactions which permit him to realize the benefits of that activity or conduct that activity in the future.[17] These transactions are not "expenses" and do not reduce the

---

[17]    See, e.g., U.S. v. Paramo, 998 F.2d 1212, 1218 (3d Cir. 1993) ("a defendant can engage in financial transactions that promote not only ongoing or future unlawful activity, but also prior unlawful activity… Accordingly, the jury rationally could have concluded that cashing the checks promoted each antecedent fraud…."); United States v. Williamson, 339 F.3d 1295, 1302 (11th Cir. 2003) ("Thus, the depositing and cashing of checks that represented the proceeds of

profits of the original criminal act. Third, the jury verdict convicting Pellulo of money laundering did not specify whether each transaction "promoted" the underlying embezzlement or "concealed" the proceeds. It would be inappropriate for this Court to reexamine the sufficiency of the evidence supporting the jury verdict on a limited procedural vehicle such as § 2241.

Finally, even if Pellulo's arguments were persuasive, it would be improper for this Court to order relief. Merely casting Pellulo's motion as a § 2241 petition does not imbue this Court with jurisdiction to hear it. Unlike § 2255, which vests jurisdiction with the trial district, applications for habeas corpus relief under § 2241 must be brought in the district of confinement. 28 U.S.C. § 2241(a); Rumsfeld v. Padilla, 542 U.S. 426, 443 (2004) ("The plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); Meyers v. R. Martinez, No. 10-3298, 2010 WL 4846051, 1 (3d Cir. Nov. 30, 2010) ("for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement"). Pellulo is presently confined in White Deer, Pennsylvania, located in the Middle District of Pennsylvania. Any habeas petition brought under § 2241 must be heard there.

Pellulo argues that this requirement is not one of subject matter jurisdiction, but merely one of "personal jurisdiction" or "venue." (May 2011 Br. 11). Pelluo further argues that the government may "waive objections to jurisdiction in § 2241 petitions." Id. But these arguments

---

the mail fraud promoted not only the Appellants' prior unlawful activity, but also their ongoing and future unlawful activity. Such evidence is sufficient to sustain a conviction for promotional money laundering.") cert. denied, 540 U.S. 1184 (2004); United States. v. Silvestri, 409 F.3d 1311, 1335 (11th Cir. 2005) ("The subsequent deposit of the checks, as proceeds of the specified

are unavailing. First, the language of both <u>Padilla</u> and <u>Meyers</u> explicitly state that the district of confinement requirement is one of jurisdiction rather than venue. Second, even if the district of confinement requirement is non-jurisdictional, it is still a requirement of the statute, and we may not simply ignore it for the petitioner's convenience.  Last, even if the government may waive the requirement under some circumstances, it has not done so here. Indeed, the government has filed a brief challenging the jurisdictional validity of petitioner's motion.

Since this Court lacks authority to evaluate Pelullo's <u>Santos</u> motion, the Court will not address his contentions on the merits. Petitioner's <u>Santos</u> motion will be denied.

### III.   <u>Conclusion</u>

Petitioner's application for relief under 60(b) and (d) concerning alleged misrepresentations made to the Court of Appeals will be treated as an application for leave to file a subsequent § 2255 petition and TRANSFERRED to the Court of Appeals. Petitioner's application for relief under <u>Santos</u> will be treated as a § 2241 petition and DENIED.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  July 22, 2011

---

unlawful activity of mail fraud, satisfied the requirements of the money-laundering counts.").